# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE

| | | |
|---|---|---|
| **SHAWN TAYLOR, and** | ) | |
| **BRYAN MORRIS,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Jury Demand** |
| | ) | |
| **KIM KELLEY,** | ) | |
| **PHILLIP JOSEPH DRAKE,** | ) | |
| **DIGITAL DEFENDERS UNITED** | ) | |
| **INCORPORATED,** | ) | |
| **GROW ONLINE, LLC,** | ) | |
| **UNITING AMERICA, INC.,** | ) | |
| **PHIL WILLIAMS,** | ) | |
| **LEVI ISMAIL,** | ) | |
| **SCRIPPS MEDIA, INC.,** | ) | |
| **NEWS-PRESS & GAZETTE** | ) | |
| **COMPANY,** | ) | |
| **STEVE ABRAMOWICZ** | ) | |
| **HEARTLAND JOURNAL, LLC** | ) | |
| **CRISTINA TEMPLET, in her individual** | ) | |
| **capacity,** | ) | |
| **DAVID GREGORY, in his individual** | ) | |
| **capacity,** | | |
| **and** | | |
| **DOES 1-25** | | |
| **Defendants.** | | |

---

# COMPLAINT

---

Table of Contents

**INTRODUCTION** ........................................................................................................... **4**

**PARTIES** ........................................................................................................................ **5**

**JURISDICTION AND VENUE** ........................................................................................ **8**

**ALLEGATIONS OF FACT** ............................................................................................ **12**

    Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership. ..........................12

    Plaintiffs Begin Working for the New Administration in Millersville. ...............................................18

Assistant Chief Shawn Taylor's Creation of a Joint Task Force to Combat Corruption. .................20

The Millersville Undercover Pedophile Sting. .................................................................................29

Defendant Kim Kelley's Disruptions, False Alarms, and False Claim That Suspect "Got Away." - Paragraphs 92 to 96. .........................................................................................................................36

Suspect Henry Dean Jordan Solicits the Decoy Profile Operated by Capt. Dorris. ..........................38

Kim Kelley Demands $35,000 from Craig Sawyer to Illegally "Purchase Trafficked Children." .........40

Kim Kelley Remains in Nashville After the Pedophile Sting Ends. .....................................................41

From Source to Scapegoat: Reporter Phil Williams Betrays a Source and Begins Smear Campaign Against Shawn Taylor and Other Millersville Officials. ....................................................................42
    Defamatory Article Published on May 20, 2024 .........................................................................45
    Phil Williams and NewsChannel 5's "Hate Comes to Main Street" Smear Campaign Against Shawn Taylor ....45

Defendants Cristina Templet, David Gregory, Phil Williams, and Scripps Media, Inc. Conspire to Violate Shawn Taylor's First Amendment Rights. .............................................................................53
    Defamatory Article Published on May 22, 2024 .........................................................................56
    Phil Williams and NewsChannel 5 Amplify False Claims .............................................................56

The TBI Operation Plan Shows Investigation Was Requested on May 22, 2024. ...........................59

Millersville's Request for a Prosecutor Pro Tem and Investigative Grand Jury is Declined. .............60
    Defamatory Articles Published on May 28, 2024.......................................................................62
    Defamatory Allegations That Shawn Taylor Denied Covenant School Shooting Took Place And Claimed School Shooting Was "Staged" ....................................................................................62

Capt. Todd Dorris Testifies at The Preliminary Hearing on May 28, 2024. ...................................71

Defendant Kim Kelley and Phil Drake's Intentional Sabotage of the Millersville Pedophile Sting in Furtherance of Their Racketeering Influenced Corrupt Organization. .............................................77

Phil Drake and Kim Kelley's "Child-Purchasing" and "Survivor Center" Fraud Scheme. ..................79

Defendant Phil Drake Admits Involvement In Interstate and Transnational Racketeering Scheme, Willfully Violating Rights of Americans, and Engaging in Acts of Terrorism. ..................................81

Defendants Phil Drake and Kim Kelley's "Survivor Center" Is An Instrument of Fraud Racketeering. ..........................................................................................................................................86

Phil Drake Publicly Claims To Have Created the "Q Anon" Conspiracy As Part of His Work as Contractor for CIA, FBI, and OIG. ...................................................................................................99
    False Attribution of Motive and Fabrication of Timeline to Smear Shawn Taylor as Retaliatory and Delusional ....101
    Commissioner David Gregory's Defamatory Statements - June 3, 2024 Work Session .................105
    Defamatory Article Published on June 6, 2024.........................................................................110
    Phil Williams Attacks His Victim for Speaking Out and Doubles Down on Lies ...........................110
    Defamatory Article Published on June 7, 2024.........................................................................115
    False Reporting, Character Smearing, and Ridicule of Whistleblower Protections .......................115
    Defamatory Article Published on June 21, 2024........................................................................117
    Phil Williams Repeats Fabrications, Attributes False Claims, and Attempts to Erode Public Trust in Law Enforcement ....117
    July 15 2024 Article ................................................................................................................121
    "Secret recordings from inside child-predator sting shows police ignoring laws." .........................121

July 22, 2024 – "Did Millersville detective commit perjury about child-predator investigation? Here's the evidence." .................................................................................................................................... 124

July 23 2024 – "TBI opens investigation of Millersville child-predator sting amid questions of possible perjury." .................................................................................................................................... 134

July 29 2024 – "TBI expands investigation … looking into misuse of government data." ............................... 134

August 5 2024 – "The stories that Millersville conspiracy cop tells about himself, his employment history, his threats." .................................................................................................................................... 135

August 12 2024 – "TBI limits Millersville's access to sensitive law-enforcement data, chief says in podcast interview." .................................................................................................................................... 136

August 26, 2024 – "QANON COMES TO MAIN STREET: Millersville cops team up with so-called pedophile hunter who blames 'satanic cult masquerading as Jews'" ............................................................ 137

**August 2024 - Steve Abramowicz And The Heartland Journal Join Defendants Kim Kelley And Phil Drake's Racketeering Enterprise ................................................................................................ 139**

**Det. Candler Attempts to Obtain a Judicial Subpoena for Public Records. .................................... 147**

September 4, 2024 – "TBI agents raid Millersville Police Department, home of town's 'conspiracy cop'" .... 158

September 5, 2024 – "QAnon-affiliated figures rally to defense of Millersville 'conspiracy cop' Shawn Taylor after TBI raids" .................................................................................................................... 159

September 16, 2024 – "When QAnon Comes to Main Street: Investigating the Millersville Police Department and its 'conspiracy cop'" ............................................................................................................ 160

September 19, 2024 – "Conspiracy theorists threaten retaliation against judge, district attorney, TBI agents" .................................................................................................................................... 162

October 7, 2024 – "Election denier says his group gained access to U.S. banking data" ............................... 163

October 22, 2024 – "Two key GOP lawmakers threaten 'political fallout' if TBI continues investigation of Millersville police" .................................................................................................................... 164

December 9, 2024 – "Conspiracy cop Shawn Taylor resigns from Millersville Police Department amid criminal probe" .................................................................................................................................... 165

January 31, 2025 – "Millersville police chief resigns, blaming 'untenable' situation. His department still faces TBI probe." .................................................................................................................... 167

**CAUSES OF ACTION ................................................................................................................ 168**

**COUNT III – VIOLATIONS OF RACKETEERING INFLUENCED CORRUPT ORGANIZATION ACT (18 U.S.C. §§ 1961–1968) ............................................................................................................ 173**

**COUNT II – CONSPIRACY IN VIOLATION OF RICO ACT (18 U.S.C. § 1962(d)) ........................ 178**

**COUNT V: DEFAMATION – TENNESSEE LAW ........................................................................ 179**

**COUNT VI: FALSE LIGHT – TENNESSEE LAW ........................................................................ 181**

**COUNT VII: DEFAMATION BY IMPLICATION OR INNUENDO – TENNESSEE LAW .................... 183**

**COUNT VIII: CONSPIRACY – TENNESSEE LAW ...................................................................... 184**

**PRAYER FOR RELIEF ............................................................................................................... 186**

Plaintiffs Shawn Taylor and Bryan Morris, for their cause of action against the Defendants Kim Kelley, Digital Defenders United, Incorporated, Grow Online, LLC, Phillip Joseph Drake, Uniting America, Inc., and Does 1-25, state and allege as follows:

## INTRODUCTION

1. Plaintiffs Shawn Taylor and Bryan Morris—both veteran law-enforcement officers who served as the Assistant Chief and Chief of Police in the Millersville Police Department— bring this action to vindicate their rights and reputations after Defendants orchestrated a coordinated, interstate smear campaign. Under the guise of assisting the Millersville Police Department with investigating "child-trafficking" operations, Defendants Kim Kelley, Phillip Joseph Drake, and their affiliated for-profit entities (Digital Defenders United, Inc., Grow Online, LLC, and Uniting America, Inc.) propagated falsehoods and manipulated public perception to enrich themselves, obstruct legitimate policing, and destroy Plaintiffs' careers.

2. Through repeated acts of wire fraud (18 U.S.C. §§ 1961, 1952), money-laundering, travel in aid of racketeering, and related predicate offenses, Defendants operated their ventures as an illegal enterprise. They solicited donations and drove traffic to monetized platforms by disseminating fabricated allegations—knowing those claims would trigger baseless criminal inquiries, undermine law-enforcement operations, and enrich their enterprises.

3. Defendant Commissioners Cristina Templet and David Gregory, together with Scripps Media, Inc., Phil Williams, and Levi Ismail, targeted Shawn Taylor for exercising his First Amendment Rights as a private citizen on matters of public concern and sought to punish Taylor's protected speech and chill future criticism of municipal officials.

4. The Defendants their organizations published and repeated defamatory statements and omissions that falsely accused Taylor and Morris of professional incompetence and criminal conduct. Those publications irreparably harmed both Plaintiffs' reputations, livelihoods, and emotional well-being.

**PARTIES**

5. Plaintiff Shawn Taylor is the former Assistant Chief of Police of Millersville, Tennessee situated between Robertson County and Sumner County, Tennessee. He is a police officer certified by the Tennessee Peace Officer Standards and Training ("POST"). At the time of the acts and omissions alleged of herein, he was a citizen and resident of Robertson County, Tennessee.

6. Plaintiff Bryan Morris is a citizen and resident of Sumner County, Tennessee. He is a POST-certified police officer and at the time of the allegations herein was the Chief of Police for the City of Millersville, Tennessee.

7. The Defendant Kim Kelley aka "Kimberly Promise Kelley," is a citizen and resident of Austin, Texas. Kelley is a director of Digital Defenders United Incorporated, and a co-Founder and Spokesperson for Defendant Uniting America Inc. She may be served at 2203 Red Fox Road, Austin, Texas 78734.

8. Defendant Phillip Joseph Drake is a citizen and resident of Hidalgo County Texas where he is currently on house arrest for multiple felonies. Drake ran an unsuccessful campaign as Democrat and became an independent candidate for President of the United States in 2024. In November of 2024, Defendant Drake was arrested by U.S. Marshalls for multiple charges of fraud and cattle theft between $35,000 and $150,000 for each charge.

9. The Defendant Digital Defenders United Incorporated is a not-for-profit organized under the laws of the State of Alabama with its principal place of business located at 17350 State Highway 249, Suite 220, Houston Texas, 77064-1132. Defendant Digital Defenders United, Incorporated may be served through its President Chad Jackson in Dothan, Alabama. Defendant Digital Defenders United, Incorporated is owned and controlled by Defendant Kim Kelley and it is a coconspirator and instrumentality of the racketeering and illegal activities identified herein.

10. Defendant Uniting America, Inc. a/k/a "Uniting Americas Inc." is a purported non-profit co-founded by Defendant Kim Kelley that is owned and operated by Phillip Drake with its principal place of business located at 125 Huskey Court, Spartanburg, South Carolina. Although it was granted nonprofit status on November 15, 2023, there have been no 990s filed with the IRS, and its website https://unitingamericainc.org was deactivated on December 5, 2024. Uniting America, Inc. is, in fact, a front for money laundering, human trafficking, and funding for the additional acts of racketeering identified herein. It may be served through its founder, Phillip Joseph Drake.

11. Defendant Grow Online, LLC is a limited liability company with its principal place of business located at 1806 Sandy Lake Drive, Friendswood, Texas 7754. Defendant Grow Online, LLC is owned in whole or in part by Defendant Kim Kelley and it is a coconspirator and instrumentality of the racketeering and illicit activities identified herein. Defendant Grow Online is engaged in the illicit business activities of Defendants Phil Drake, and Uniting America, Inc.. Defendant Grow Online, LLC has received over $200,000 in illicit funds from Defendants Phil Drake and Uniting America, Inc, in furtherance of the unlawful racketeering scheme alleged herein.

12. Defendant Cristina Templet a/k/a Cristina Rosado was a Commissioner for the City of Millersville at all times relevant herein. She is a citizen and resident of Sumner County, Tennessee. She is sued in her individual capacity.

13. Defendant David Gregory is a Commissioner for the City of Millersville. Upon information and belief, he is a citizen and resident of Goodlettsville, Davidson County, Tennessee. He is sued in his individual capacity.

*The Media Defendants*

14. Defendant Scripps Media, Inc., doing business as NewsChannel 5, is a Delaware company duly authorized to do business in Tennessee. Scripps Media, Inc. owns and operates NewsChannel 5 (WTVF) in Nashville, Tennessee, located at 474 James Robertson Parkway, Nashville, Tennessee 37219. WTVF is a CBS affiliate. Scripps Media, Inc. may be served through its registered agent, Corporation Service Company located at 2908 Poston Ave, Nashville, TN 37203.

15. Defendant Phil Williams is a reporter for NewsChannel 5 and an employee of Scripps Media, Inc. He is a citizen and resident of Williamson County, Tennessee. Defendant Williams used his Channel 5 branded social media and his own "PhilNvestigates" social media profiles to promote, post, and republish the defamatory articles alleged herein, which is done with the knowledge, approval, and at the direction of Defendant Scripps Media, Inc.

16. Defendant Levi Ismail is a reporter for NewsChannel 5 and an employee of Scripps Media, Inc. He is a citizen and resident of Davidson County, Tennessee. In addition to posting and publishing from his NewsChannel 5 credentials, he also posts on social media using various handles such as "NashvilleNews" and "@LeviIsmailTV" among others, where he

posted and reposted each and every one of the false and defamatory articles identified herein.

17. Collectively, Defendants Scripps Media, Inc., Phil Williams, and Levi Ismail may be referred to herein as "The Channel 5 Media Defendants."

18. Defendant News-Press & Gazette Company owns and operates "KEYT-TV" and keyt.com. It posted and republished various articles from The Channel 5 Media Defendants and is therefore liable for same. "Keyt.com" is the official website for News 3-12, a television station serving various areas in California and is a purported CNN Affiliate owned by News-Press & Gazette Company, based on St. Joseph, Missouri. KEYT-TV also claims to be an "ABC affiliate." It's principal office is 825 Edmond Street, Saint Joseph, Missouri, 64501.

19. Defendant Steve Abramowicz is a citizen and resident of Williamson County, Tennessee. He is the owner of Defendant Heartland Journal LLC.

20. Defendant Heartland Journal LLC a Tennessee limited liability company with its principal office at 1025 Westhaven Blvd, Ste 205, Franklin, TN 37064. It's registered agent is Waterford Tax Group, PLLC 105 Westpark Drive, Ste 109, Brentwood, TN 37027.

21. Does 1-25 are the John and Jane Doe Defendants and co-conspirators of the principal defendants named herein who are therefore liable for the acts, omissions, and predicate acts of the principal named Defendants. Discovery will be necessary to identify Doe Defendants 1-25.

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction because the Plaintiffs' claims are brought pursuant to 18 U.S.C. § 1961 et seq., and federal questions are therefore presented under

28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1667.

23. This Court has jurisdiction over this action pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), codified at 18 U.S.C. §§ 1961–1968. RICO is a federal law designed to combat organized crime by allowing prosecution and civil penalties for acts performed as part of an ongoing criminal organization.

24. This Court also has jurisdiction over the Plaintiffs' claims under 42. U.S.C. § 1983. Federal questions are therefore presented under 28 U.S.C. § 1331.

25. As alleged herein, this Court has RICO jurisdiction over the Defendants because they have engaged in a pattern of racketeering activity, which includes committing at least two "predicate offenses" within a ten-year period. Defendants have engaged in a series of unlawful acts that constitute predicate offenses under RICO, both in Millersville, Sumner County, Tennessee, in May 2024, and elsewhere in the United States over the preceding ten years. These predicate acts include, but are not limited to:

    a. Human Trafficking and Involuntary Servitude: Violations of 18 U.S.C. §§ 1584, 1589, 1590, and 1591, involving the purchase, sale, and exploitation of individuals through force and coercion.

    b. Financial Crimes and Extortion: Violations of 18 U.S.C. §§ 1951, 1952, 1960, and 1343, encompassing extortion, money laundering, and wire fraud aimed at financing and perpetuating the Defendants' illicit activities.

    c. Sexual Exploitation of Children: Violations of 18 U.S.C. §§ 2251–2260 and 2421–2424, involving the procurement and transportation of minors who have been trafficked for unlawful sexual purposes.

d. Economic Espionage and Theft of Trade Secrets: Violation of 18 U.S.C. § 1832, involving the unauthorized recording and dissemination of sensitive information to harm law enforcement efforts and gain illicit advantages.

e. Interference with Law Enforcement Operations: Violations of 18 U.S.C. §§ 1324, 1327, and other related statutes, involving the obstruction of legitimate law enforcement investigations and the manipulation of legal processes to facilitate criminal enterprises.

f. Murder-for-Hire and International Terrorism: Violations of 18 U.S.C. § 1958, which prohibits murder-for-hire schemes, and 18 U.S.C. §§ 2331(1) and 1959, which address international terrorism and violent crimes in aid of racketeering activity. Specifically, based on Phil Drake's admissions, the Defendants engaged in separating children from their parents at the U.S.–Mexico Border, participating in the murder of those parents, and smuggling satchels of money back into the United States to bribe officials. These actions constitute a clear "murder-for-hire" scheme and "international terrorism," directly violating the aforementioned statutes.

g. Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises: Violations of 18 U.S.C. § 1952, which prohibits the use of interstate or foreign commerce facilities to further racketeering activities. The Defendants traveled across state lines and utilized interstate mail and commerce facilities with the intent to distribute the proceeds of unlawful activities, commit crimes of violence to further these activities, and facilitate the promotion and management of their criminal enterprises.

26. The Defendants' coordinated and continuous illegal activities demonstrate the Defendants' involvement in an organized scheme to exploit and undermine both individuals and law enforcement efforts. By committing these predicate acts, the Defendants have subjected themselves to RICO jurisdiction in this Court to redress the extensive harm caused by the Defendants' criminal conduct.

27. Venue is in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district. Venue is also proper in this district under 18 U.S.C. § 1965(a), as Defendants Kim Kelley, Phil Drake, individuals and as representatives of their Affiliated Organizations, Grow Online, LLC, Digital Defenders United, Inc., and Uniting Americas, Inc. Incorporated, travelled to the Middle District of Tennessee, in furtherance of schemes made unlawful and as part of Racketeering-Influenced Corrupt Organizations.

28. Venue is also proper in the Middle District of Tennessee as Defendants Phil Williams and Scripps Media, Inc. reside, are headquartered, and/or conduct business in the Middle District and the acts and omissions alleged herein also occurred in the Middle District.

29. In support of the allegations regarding the defamatory publications alleged herein, Plaintiffs rely on the separate Appendix filed contemporaneously herewith which includes the following files in YYMMDD format:

### INDEX OF ARTICLES CITED IN COMPLAINT

1. 240520 Article -'Al Gore, you're a piece of sh_t!' Meet Millersville's conspiracy cop.pdf
2. 240522 Commissioners demand meeting to look at hiring of Millersville's conspiracy cop.pdf
3. 240523 Article - KEYT.COM - City commissioners demand special meeting to investigate hiring of conspiracy cop | News Channel 3-12.pdf
4. 240524 Don't investigate my client, conspiracy cop's attorney tells Millersville.pdf
5. 240528 It's Indecent - Friend of Covenant Victim on Conspiracy Cop....pdf
6. 240528 Millersville's conspiracy cop pushed bogus theories about Covenant shooting.pdf
7. 240603 Conspiracy Cop Take Aim At Critics...pdf

8. 240604 Millersville commissioners stand with assistant police chief.pdf
9. 240605 Millersville city attorney admits he generated reports used by conspiracy cop.pdf
10. 240606 Shawn Taylor thinks I am the real problem'.pdf
11. 240607 Millersville special meeting postponed, conspiracy cop now a 'whisteblower'.pdf
12. 240616 Phil Williams- Nashville Banner.pdf
13. 240618 Conspiracy cop's conspiracy-minded attorney.pdf
14. 240621 Police chief downplays conspiracy cop's Covenant shooting claims.pdf
15. 240715 Secret recordings from inside child predator sting shows police ignoring laws.pdf
16. 240722 Did detective commit perjury about child-predator investigation_.pdf
17. 240723 TBI investigates Millersville child-predator sting.pdf
18. 240729 TBI expands investigation of Millersville Police Department.pdf
19. 240805 The stories That Millersville Conspiracy Cop Tells....pdf
20. 240812 TBI limits Millersville's access to sensitive law enforcement data, chief says.pdf
21. 240827 Craig Sawyer responds to NC5 investigation with false accusations, bluster.pdf
22. 240904 TBI agents raid Millersville Police Department, home of 'conspiracy cop'.pdf
23. 240905  Cops team up with pedophile hunter who fears 'satanic cult masquerading as Jews'.pdf
24. 240905 QAnon-affiliated allies rally to the defense of Millersville conspiracy cop.pdf
25. 240916 Investigating the Millersville Police Department and its 'conspiracy cop'.pdf
26. 240919 Conspiracy theorists threaten retaliation against judge, district attorney, TBI.pdf
27. 241007 Election denier says his group gained access to U.S. banking data.pdf
28. 241022 GOP lawmakers threaten 'political fallout' for TBI's Millersville investigation.pdf
29. 241024 GOP letter threatening TBI was 'wrong way to go,' House speaker says.pdf
30. 241209 Shawn Taylor resigns from Millersville Police Department amid criminal probe.pdf
31. 241218 Hints of drama, yet hope for future as new commission takes rein in Millersville.pdf
32. 250114 Millersville detectives take aim at whistleblower in federal lawsuit.pdf
33. 250131 Millersville police chief resigns, blaming 'untenable' situation.pdf

## ALLEGATIONS OF FACT

*Background of Issues in Millersville, Tennessee and 2024 Changes in Leadership.*

30. Millersville, Tennessee, a known waypoint for illicit trafficking due to its location near the Kentucky border and major highways, has long struggled with governance issues. Following its incorporation in 1981, the City endured decades of incompetence, corruption, and financial mismanagement. Leadership failures led to missed opportunities for state and federal grant funding, and a staggering volume of lawsuits filed against the City in 2022–2023 ultimately caused Millersville to lose its municipal insurance coverage with Public Entity Partners, Tennessee's primary public risk insurer.

31. In January 2024, Commissioner Alisa Huling's special election victory over former Mayor Tim Lassiter broke a longstanding deadlock on the Millersville Board of Commissioners. This realignment—favoring Mayor Tommy Long and Vice Mayor Milton Dorris—triggered a pattern of retaliatory obstruction by Commissioners Cristina Templet and David Gregory, who began an aggressive campaign to sabotage municipal progress and personally attack Plaintiffs Shawn Taylor and Bryan Morris.

32. On January 23, 2024, the Board voted 3–2 to terminate City Manager Scott Avery, an at-will employee with a controversial history, including a prior firing and misconduct during his tenure. Days before his removal, Avery deleted approximately 30,000 city emails and texts, forwarded sensitive communications to his personal account, and was seen on CCTV removing boxes of documents from City Hall.

33. Mayor Long and Vice Mayor Dorris also began exposing and dismantling corrupt practices—chief among them a scheme involving the issuance of fraudulent police commission cards to "reserve officers" linked to Solaren Risk Management, a private security company. Commissioner Templet had close personal ties to those involved, while Commissioner Gregory was later found in possession of one of the illegal cards issued in his name.

34. Mayor Long had first ran for commissioner in 2020 to fill a two year, unexpired term. He ran again in November of 2022 for a four year term, receiving 46% of the votes and becoming the City's next Mayor. In December of 2022, he heard a rumor that Cristina Templet did not live in the City of Millersville when she ran for City Commissioner, which is illegal. T.C.A. § 2-2-122 states that a person's residence is the "place in which the person's habitation is fixed, and to which, whenever the person is absent, the person has a

definite intention to return[.]" The property claimed as a Millersville residence by Templet was 7711 Ruby Lane in Millersville. Templet had used this address to illegally register to vote in 2018, and she had also used the address on her "Candidate Nominating Petition" filed on August 14, 2020. In fact, there was no habitation on the Templet's Millersville property at all until February-March of 2021. Thus, it was clear that Templet had illegally registered to vote under T.C.A. § 2-19-107, and made false entries on official registration and election documents under T.C.A. § 2-19-109, both of which are Class D felonies.

35. On November 16, 2021, Cristina Templet voted to approve a land purchase agreement with the City of Millersville selling a property to StaPro Investments, LLC, a company owned by Templet's husband in which she had an undisclosed, personal financial interest, in violation of Section 2-187 and 2-189 of the Millersville Code of ordinances, T.C.A. § 6-54-107, T.C.A. § 12-4-101, and the official misconduct statute, T.C.A. § 39-16-402. Templet did not even submit a "Personal Interest Disclosure Form" disclosing her interests in the dozen or so shell companies she and her husband owned until September 21, 2023.

36. The Templets then took action to conceal their involvement in various projects in the City, including Winston Templet using fictitious names like "Jones Property Town Homes" or having former City Manager Scott Avery list only the tax and parcel numbers in City meeting agendas instead of listing the address and the owner/developer information.

37. After Mayor Long removed Winston Templet from the Planning Commission due to a conflict of interest with him voting to approve projects where he and his wife held an undisclosed, material interest, the Templets retaliated by forming another shell company they named "FU Tommy Long, LLC," spray-painting the name on a dumpster and moving it around town until they eventually parked it next to Mayor Long's home.

a. See https://www.wsmv.com/2023/09/06/husband-political-rival-millersville-mayor-tommy-long-registers-company-with-state-named-fu-tommy-long-llc/ (Sept. 6, 2023).

b. Winston Templet discussing the vendetta on one of his many YouTube Videos:



38. Before January 2024, the City faced longstanding problems, including an alleged quid pro quo scheme with Solaren Risk Management—a security firm owned by Jack Byrd III. Uncertified officers received Police Commission Cards, allowing them to direct traffic and work lucrative downtown Nashville security gigs, despite lacking the required Tennessee POST certification. Media outlets ran multiple stories alleging unlicensed guards and impersonation of police officers.

   a. https://www.tennessean.com/story/news/2017/08/10/nashville-metro-council-candidate-runs-office-while-fighting-extortion-charges-giles-county/548537001/ (Aug. 10, 2017);
   b. https://www.wsmv.com/2023/05/04/security-company-insiders-imposter-police-officers-all-worked-same-business/ (May 3, 2023);
   c. https://www.newschannel5.com/news/newschannel-5-investigates/security-company-vows-to-make-changes-following-allegations-of-hiring-unlicensed-guards (May 26, 2023);
   d. https://www.wsmv.com/2024/07/02/state-issues-62-violations-against-company-accused-allowing-imposter-cops-nashville-streets/ (July 2, 2024);
   e. https://tennesseeconservativenews.com/davidson-county-sheriffs-office-investigating-fake-cops-in-nashville/ (Sept. 23, 2024);

f. https://www.newschannel5.com/news/newschannel-5-investigates/sheriff-suspends-four-deputies-for-wearing-misleading-police-patch-while-working-off-duty-private-security (Oct. 11, 2024);

39. Former Chief Dustin Carr was often in the news, with allegations of an illegal quid pro quo for the sale or barter of police commission cards for up to $5,000 a piece. At least one eyewitness claimed in an online podcast to have seen that Carr had a drawer that was filled with bundles of cash that vastly exceeded his police chief salary. Carr abruptly resigned on December 12, 2022 shortly before photos he had taken of himself brandishing his penis at City Hall while in his police uniform emerged online.

a. https://www.wsmv.com/2023/07/07/recorded-phone-call-former-police-chief-raises-questions-quid-pro-quo-commission-card/ (July 7, 2023);
b. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-police-chief-named-in-bullying-lawsuit-resigns (Dec. 12, 2022).
c. https://mainstreetmediatn.com/articles/news-robertsoncountyconnection/millersville-police-chief-abruptly-resigns-before-emergence-of-indecent-photograph-2/ (Dec. 27, 2022).

40. Throughout 2023, the City of Millersville faced ongoing issues. Former Assistant Police Chief Glenn Alred—lacking a current P.O.S.T. certification—served full-time when he could only lawfully be employed as a "part-time reserve officer," violating P.O.S.T. rules and subjecting the City to potential criminal sanctions. He and Interim Police Chief Melvin Brown resigned in July 2023, sparking additional media coverage of their actions:

a. https://www.newschannel5.com/news/newschannel-5-investigates/millersville-cop-under-investigation-amid-questions-about-his-state-certification (Mar 9, 2023);
b. https://www.wsmv.com/2023/09/26/internal-investigation-former-assistant-chief-violated-deadly-force-restriction-policy/ (Sept. 25, 2023).
c. https://www.newschannel5.com/news/newschannel-5-investigates/state-investigators-confirm-timesheet-issues-for-now-former-millersville-assistant-police-chief (Aug. 18, 2023).

41. In November 2023, then–City Manager Scott Avery hired Robert "Uno" Richman from Texas as Millersville's new police chief, despite Richman's lack of a college degree and a controversial record as Associate Commissioner for Child Protective Investigations in Texas, which included allegations (reported by the Texas Tribune) of mishandling sex trafficking and abuse reports at a foster care facility resulting in the Governor of Texas demanding that Richman step down from office.

    a. https://www.texastribune.org/2022/08/12/texas-child-abuse-agency-rich-richman/ (Aug. 12, 2022).

42. Around January 26, 2024, Interim City Manager Tina Tobin terminated Richman after he presented a roster listing former City Manager Scott Avery as a "reserve officer." Records online also revealed that Richman faced harassment and criminal trespass charges in Texas for conduct presumed to have occurred before he had relocated to Tennessee:



| OTHER EVENTS AND HEARINGS | | |
|---|---|---|
| 03/13/2024 | Magistration Documents | |
| 03/13/2024 | Complaint & Information (Open Case) | |
| 03/13/2024 | Order for Summons (Judicial Officer: Brown, Elaine ) | |
| 03/13/2024 | Summons | |
| | Richman, Robert J | Returned Unserved 03/20/2024 |
| | | Returned                  03/20/2024 |
| 03/20/2024 | Summons Return | |
| 04/24/2024 | Arraignment (9:00 AM) (Judicial Officer Johnson, Chris) | |
| | NO ARREST / NO WARRANT | |
| | Result: Failure To Appear | |
| 05/22/2024 | Order for Summons (Judicial Officer: Brown, Elaine ) | |
| 05/22/2024 | Summons | |
| | Richman, Robert J | Returned Unserved 05/28/2024 |
| | | Returned                  05/28/2024 |
| 05/28/2024 | Summons Return | |
| 07/03/2024 | Arraignment (9:00 AM) (Judicial Officer Johnson, Chris) | |
| | NO ARREST / NO WARRANT | |

43. Before the January–February 2024 personnel changes in Millersville, the City had only one detective with under a year of experience, and he had been "*Giglio*-impaired"[1] by the Robertson County DA for lying about involvement in a traffic stop of a meth trafficker, Savannah Hill. A *Giglio*-impaired officer is when prosecutors refuse to call a witness due to documented untruthfulness, often leading to case dismissals. Former Assistant Chief Glen Alred—friend and associate of ex–Chief Dustin Carr—was also *Giglio*-impaired by the same DA for lying about his role in that same traffic stop.

***Plaintiffs Begin Working for the New Administration in Millersville.***

44. In February 2024, Interim City Manager Tina Tobin appointed Plaintiff Bryan Morris as Millersville's Chief of Police. Chief Morris quickly discovered that the prior administration had inflated its full-time officer roster and populated the Department with numerous

---

[1] See *Giglio v. U.S.,* 405 U.S. 150 (1972), a case in which the prosecution failed to disclose a promise of immunity to a state's witness. In Tennessee law enforcement circles, a "*Giglio*-impairment" refers to a prosecutor's duty to provide exculpatory evidence that impeaches the testimony and credibility of the police officer, and is part of the *Brady v. Maryland,* 373 U.S. 83 (1963) line of cases. If the exculpatory evidence is that the officer had lied to prosecutors, for example, it could result in a refusal to prosecute the officer's cases. In that regard, a *Giglio*-impairment amounts to a "scarlet letter" for law enforcement officers.

uncertified officers, placing Millersville out of compliance with the Tennessee Peace Officer Standards and Training ("P.O.S.T.") Commission. He recruited fully certified, experienced officers, abolished the City's controversial reserve/auxiliary program—which had been diverting Millersville's police resources to private security details in Downtown Nashville—and refocused the Department's manpower on protecting Millersville residents.

45. At the time he was hired, Chief Bryan Morris was a seasoned law-enforcement officer with more than fifteen years of progressive command experience. He spent nearly a decade as Chief of Police for the City of Ridgetop, then led the Nashville State College Police Department, where he professionalized campus safety operations and forged inter-agency partnerships. In Millersville he was entrusted with dual leadership roles—serving simultaneously as Chief of Police and City Manager—where he steered city-wide initiatives, balanced multimillion-dollar budgets, and launched community-oriented policing strategies that drove down crime and strengthened public trust. Morris complements his field leadership with rigorous credentials, including a B.S. in Criminal Justice and the coveted FBI-LEEDA "Trilogy" of Supervisory, Command, and Executive Leadership awards, along with specialized counter-terrorism and incident-response certifications. An adept strategist, proven problem-solver, and respected mentor, Chief Morris brings a record of transforming organizations, safeguarding citizens, and elevating every team he leads.

46. Chief Morris hired Assistant Chief Shawn Taylor, a highly decorated, 23-year law-enforcement veteran whose career ranges from front-line patrol to elite tactical and investigative commands. Beginning his service in 1997, he became a go-to expert in

interstate drug interdiction, K-9 operations, complex narcotics and corruption investigations, and SWAT tactics—amassing hundreds of hours of advanced training in fields as diverse as cyber-crime, clandestine-lab enforcement, and human trafficking interdiction. Taylor's tactical acumen is matched by strategic vision: he founded FTG Solutions, LLC, an intelligence-analysis and training consultancy that supports agencies and private clients alike. Armed with a degree in Business & Organizational Management and professional memberships that include ROCIC, the National Narcotics Detector Dog Association, and the Tennessee Meth Task Force, he blends executive-level management skill with hands-on operational leadership. Renowned for his relentless investigative drive, data-driven decision-making, and ability to mentor the next generation of officers, Assistant Chief Taylor consistently elevates the performance and integrity of every team he leads.

47. Before the 2024 leadership change, a local trailer park had become infamous as "the body park," with one-to-two apparent overdose deaths virtually every week. Prior administrations ignored—or proved unable to curb—the crisis. Under Chief Morris's leadership, overdose fatalities in Millersville virtually ceased within weeks.

48. Leveraging his technical expertise, Assistant Chief Taylor spearheaded the modernization of the Millersville Police Department. He secured access to advanced intelligence platforms and law-enforcement databases, providing actionable information to Detectives Michael Candler and Captain Todd Dorris, who handled casework on the ground. Taylor's contributions accelerated the Department's investigative tempo and entrenched a culture of data-driven policing within the MPD.

***Assistant Chief Shawn Taylor's Creation of a Joint Task Force to Combat Corruption.***

49. On February 28, 2024, Assistant Chief of Police Shawn Taylor emailed federal FinCEN representatives requesting assistance in obtaining access for the Millersville Police Department. FinCEN provided contact information for Tennessee representatives of the TBI. Assistant Chief Taylor subsequently emailed Brooklyn Nash and Aja Brechtel of the Tennessee Bureau of Investigation (TBI), stating that he had been brought in to Millersville to correct various issues, including uncovering financial issues within the city that required access to FinCEN data to develop. Taylor proposed a phone call to discuss his request and "put together a game plan." The call was scheduled for the following day.

50. On or around February 29, 2024, the TBI spoke with Taylor and provided him with re-dissemination guidelines and guidelines on the use of Suspicious Activity Reports (SARs) by law enforcement. These documents highlighted that SARs information could be used as a part of <u>any</u> criminal investigation, and should be treated as a "confidential informant" that the officer could use to locate other credible information. The documents stated that re-dissemination of SARs documents should typically only be to other officials, federal, state or local, but that the primary rule was that the primary rule is that the subject of FinCEN data should never be informed that a Suspicious Activity Report was filed against them by a financial institution.

51. Assistant Chief Taylor had identified numerous inconsistencies in the City of Millersville's files and paperwork, including missing documents and files pertaining to employee background checks and employment records.

52. On March 2, 2024, Assistant Chief Taylor requested a report of all background checks for queries made by Millersville between January 1, 2022, and January 26, 2024 from the Sumner County Emergency Communications Center (ECC). This request included

information about pre-employment and employment-related queries, including the names and dates of requested background checks, as well as records of whether criminal findings were returned as part of these queries. The reports Taylor received further substantiated evidence that the City of Millersville had been conducting improper background checks of various individuals.

53. On March 6, 2024, Chief Bryan Morris and Assistant Chief Shawn Taylor met with officials and attorneys from the Tennessee Department of Commerce and Insurance (TDCI), the Tennessee P.O.S.T. Commission, and representatives of other state agencies to address several issues, including Millersville's prior practice of printing illegal police commission cards for uncertified officers, the lack of training records for almost all of the auxiliary/reserve officers from Millersville who had been working for Solaren Risk Management, and missing municipal files, including personnel files for former MPD officers.

54. On March 7, 2024, Assistant Chief Taylor followed up with TDCI and Regulatory Board officials via email, expressing gratitude for their assistance and offering to provide them with intelligence reports on some of the topics and individuals discussed during their meeting.

55. On March 7, 2024, Taylor requested additional criminal case numbers from the ECC, through the Computer-Aided Dispatch (CAD) system. Although TBI documents would later claim that Taylor had not filed incident reports or citizen complaints in CAD when requesting criminal case numbers, nothing about the practice is unlawful. First, entering information into CAD is at each officer's discretion, and no law requires it to obtain a criminal case number. Criminal case numbers are also not required for a criminal

investigation. The CAD system is used to track the status of units, record incident details, and to generally ensure that resources are dispatched quickly and accurately. Second, the MPD intentionally avoided placing details in CAD since that system can be accessed by officials and the public—potentially alerting suspects that they are under investigation. In Millersville, preserving operational security ("OPSEC") demanded that no such information be published in CAD.

56. On March 8, 2024, Asst. Chief Taylor emailed TBI Agent Katie Chestnut, identifying himself and stating that he and Chief Morris had recently been hired and that he had been tasked to fix the issues that had plagued the Millersville Police Department, including his discovery of numerous issues and security breaches uncovered while auditing the records and systems utilized by former members of the Millersville Police Department. Asst. Chief Taylor requested to schedule a time to speak with Agent Chestnut to speak about the issues that he and the MPD had identified. Agent Chestnut is the Support Supervisor for Criminal Justice Information Services (CJIS) and Tennessee Information Exchange System (TIES) for the TBI. CJIS is a division within the FBI responsible for managing and disseminating critical criminal justice information to federal, state, local, and international law enforcement agencies to ensure they have accurate and timely information necessary for effective policing, investigations, and maintaining public safety. CJIS allows for data management of from the National Crime Information Center (NCIC), and other databases and serves as the backbone of information sharing in the criminal justice community. TIES is a secure, statewide network designed to facilitate seamless information sharing among law enforcement agencies within Tennessee and with federal entities. TIES tailors the CJIS databases to sharing at the statewide level, providing

Tennessee law enforcement agencies with a platform for collaboration and efficient access to essential information.

57. On March 11, 2024, Assistant Commissioner Alex Martin of the Tennessee Division of Regulatory Boards emailed Asst. Chief Taylor, thanking him for the time that he and Chief Morris had taken out of their schedules to meet and brief Commissioner Martin and Chief Legal Counsel Jesse Gentry.  Martin thanked Taylor for his willingness to share documents and other information that would aid them in their pursuit of a resolution of their cases, and stated that he and Gentry would be happy to come to Millersville to review any additional material.  Commissioner Martin informed Taylor that he was looking forward to staying in touch.

58. On March 11, 2024, Assistant Chief Shawn Taylor of the City of Millersville Police Department emailed the Tennessee Integrated Criminal Justice Portal (ICJP) Administrator to report a potential misuse and security breach involving the Criminal Justice Portal (CJP) by former employees of the City of Millersville.  Assistant Chief Taylor stated that he had received a report from a local District Attorney outlining an event where the Criminal Justice Portal was allegedly misused. Acting on this report, Assistant Chief Taylor requested the City of Millersville's Administrator of the Criminal Justice Portal to perform an offline search of individuals named in the District Attorney's letter, as well as other individuals of concern. The findings returned by the City's Administrator conflicted with the information provided by the District Attorney. Assistant Chief Taylor sought further assistance and clarification from the ICJP Administrator and requested a phone conversation to discuss the matter, offering availability on Friday of that week.

59. On March 12, 2024, Asst. Chief Taylor contacted the ICJP administrator regarding alleged misuse of the portal by former Millersville employees. The administrator included his manager, Christine Estes, and Business Analyst Gina Brawley, and they scheduled a TEAMS call to discuss Taylor's concerns. Taylor informed the ICJP administrator that he wanted to investigate the matter to a conclusion and take action, if necessary.

60. On March 14, 2024, the ICJP administrator informed Taylor that the Millersville Police Department currently lacked proper authorization to access the Criminal Justice Portal due to previous issues with Millersville employing uncertified officers. During subsequent correspondence, the ICJP clarified procedures and provided relevant user agreements so that MPD could be .

61. On March 15, 2024, Assistant Chief Taylor met with various officials with the Tennessee Administrative Office of the Courts (AOC) to discuss his findings regarding portal misuse. He proposed forming a Task Force to address public corruption and shared investigative findings with the AOC.

62. On March 15, 2024, Taylor emailed Christine Estes at the AOC, stating:

Mrs. Estes,

I hope you are well. I am following up on the meeting we had by TEAMS on 03/15/2024. As stated in the meeting, We have opened a criminal investigation into several former Millersville employees, regarding possible misuse of Criminal Justice Portal as well as several other possible criminal acts. We are diligently auditing files, records, evidence and will begin conducting interviews in the near future. Your assistance in auditing and providing me the findings on the reports I have requested will be extremely helpful in identifying issues. I will provide you ALL the findings as we identify them.

Warm regards,
Shawn Taylor
Assistant Chief of Police

63. Between March 15 and March 19, 2024, Asst. Chief Taylor continued to coordinate with the AOC regarding their TNCRIM Audit Request, inquiring as to whether there were possible criminal infractions for unlawful access of the ICJ Portal by uncertified officers employed by the prior administration.

64. On March 20, 2024, TBI Intelligence Analyst Brooklyn Nash emailed Asst. Chief Taylor, to follow up and see if he had submitted a FinCen request, a response indicating that the TBI was eager to assist Taylor during the investigation. Taylor responded the following day, stating that he had not yet submitted the first FinCen request, but that he was working on one but making sure that it was on point when he sent it. He then indicated that he should have his first request submitted by Friday.

65. On March 26, 2024, Assistant Chief Taylor emailed the AOC with an update on the investigation previously discussed in a TEAMS meeting. He believed he had enough probable cause to seek a search warrant for one suspect and intended to continue investigating all involved until he was ready to request warrants for all. Taylor also noted that he was in contact with the Tennessee Department of Commerce and Insurance, which was conducting its own parallel investigation. He proposed forming a multi-agency task force—including the AOC—to combine gathered evidence and welcomed any input the AOC could offer.

66. On April 2, 2024, Charisse Bonwell from the AOC replied to Taylor's request for her agency to join his Task Force, confirming their willingness to assist. **She copied TBI's Joshua Schwartz and several other state officials on her response to Taylor, stating, "We will assist you in any way that we can. Please let me know what you need in that endeavor."**

67. At no point during the creation of this Task Force did any state or federal official indicate that Taylor's actions were even remotely improper. Instead, emails demonstrate that they praised his competence, diligence, and adherence to protocol. Official records show Taylor was conducting investigations with assigned case numbers, uncovering extensive criminal activity in Millersville with ties extending across the United States.

68. On April 2, 2024, Millersville's former Chief of Police, Dustin Carr, was apprehended during a what appeared to be a theft sting operation in Goodlettsville. Authorities discovered over $100,000 in stolen goods in Carr's possession, while driving a Solaren Risk Management vehicle, and the report indicates that he was alleged to have been selling the stolen goods on Facebook. This incident originated in 2023 and documented in CAD as Case No. 23-35167. The report also references Case No. 24-12894, and states that Carr represented himself "as an officer." Despite the severity of these allegations, Carr was neither charged nor prosecuted for theft or impersonation. This lack of action and selective enforcement of the laws further raises doubts and concerns about the credibility and motives behind the allegations of "official misconduct" against Shawn Taylor for investigating criminal activity, as well as the allegations of "perjury" based on statements from the Defendants in the case at bar.

69. On April 3, 2024, Chief Bryan Morris forwarded Taylor an email from the Blue Lightning Operation Center (BLOC), an ICE division focused on combatting human trafficking and commercial sexual exploitation. It included a sample BLOC access request letter from federal HSI/ICE officials for other MPD officers to use, as Taylor already had BLOC access since 2009 and served as an official HIDTA (High Intensity Drug Trafficking Area) Agent.

70. On April 4, 2024, Taylor updated the TDCI on his ongoing investigation into a former Millersville PD officer who had illegal used the Criminal Justice Portal to conduct background checks on individuals for personal reasons unrelated to anything concerning the City of Millersville. Taylor requested copies of the relevant files, and continued working with TDCI on these issues.

71. On April 4, 2024, Gen. Ray Whitley closed his investigation of Commissioner Cristina Templet, claiming that there was no evidence of criminal activity "that would warrant prosecution."

72. On April 5, 2024, sent additional information to TDCI about more individuals of interest to the joint investigation.

73. On April 23, 2024, Asst. Chief Taylor announced "Operation Clean Sweep," the initiative targeting corruption and misconduct. That evening, former Mayor Tim Lassiter was arrested on charges of criminal simulation for his involvement in document fraud completed in furtherance the unapproved build-out of the sleeping quarters for Millersville's Fire Hall, which was ironically not build according to Fire Code and which therefore could never be used for its intended purpose, costing taxpayers over $100,000 in wasted funds. The charges of tampering with governmental records and criminal simulation where based on allegations that Lassiter had issued himself building permits he was not authorized to grant. Despite commissioners warning him not to do so, the renovation project for the fire department was completed anyway. Lassiter was also possibly involved in building out the city's almost unusable evidence room in a similar manner.

74. On April 24, 2024, Channel 5 News quoted Gen. Ray Whitley's frustration about not being consulted before the MPD arrested former mayor Lassiter on two counts of document fraud. Whitley claimed that he found the situation "very strange," and indicated that he was unsure of whether his office would prosecute the case, despite not having reviewed any of the evidence. Commissioner Cristina Templet, speaking outside the jail with Lassiter's family, called the arrest a personal vendetta by mayor Tommy Long. Templet said she believed Lassiter was an "amazing human being" who was somehow wrongly treated by the city. The story noted how Lassiter had stepped down as mayor in 2022, following a lawsuit by two former Millersville Police officers who claimed they were bullied out of their jobs and faced racial discrimination.

75. Between May 3-7, 2024, the TBI emailed Asst. Chief Taylor multiple positive results of SARs reports and Cash Transaction Reports (CTRs) of various individuals and corporations who were being investigated. These positive FinCEN results indicated that the flagged transactions were deemed suspicious by independent federal authorities, signaling potential money laundering and other financial crimes that warranted further scrutiny.

*The Millersville Undercover Pedophile Sting.*

76. From May 17-19, 2024, the City of Millersville Police Department conducted an undercover child solicitation sting with the assistance and guidance of Veterans for Child Rescue ("V4CR"), a non-profit organization comprised of military professionals, military veterans, former and current law enforcement officers, and child abuse and trafficking survivors that, in addition to raising awareness about child trafficking, provides advice and live assistance to law enforcement agencies conducting pedophile stings across the United

States. V4CR provided live training to Millersville officers in how to prepare for and run an undercover pedophile sting, which differs from the more common types of undercover stings, such as narcotics and prostitution stings.

77. On May 16, 2024, in advance of the sting, all V4CR volunteers and the Millersville Police Officers participating in the Operation met at Assistant Chief Taylor's house, where the following was briefed and explained:

   a. The requirements of Tennessee law for prosecuting the unlawful solicitation of a law enforcement officer posing as a minor;

   b. The district attorney's preference that the MPD officers do the actual texting or messaging with the suspects during the part of any conversation that involved the actual solicitation or solicitations from the suspects;

   c. For evidence custody reasons, no personal cell phones could be used for any part of the Operation or any solicitation;

   d. The V4CR volunteers were not to handle any solicitation because it could not be prosecuted unless the solicitation of the sex act itself was with an officer posing as a minor;

   e. V4CR volunteers who were monitoring one of the Ops Phones were to bring could only filter through profiles that had reached out to the decoy profile, and they were only permitted to "chat" with subjects for the limited purpose of gauging whether they were still interested in chatting after the decoy profile indicated that their real age was under 13;

   f. There was to be no recording or photographing of the Operation or participants with any cell phones, most notably because Det. Michael Candler was the City's

undercover narcotics officer and his likeness and name were not associated with the Millersville Police Department or any photographs published by them in my public;

78. The primary law applicable to the sting is T.C.A. § 39-13-528, which sets forth the elements of the offense of solicitation of a minor:

(a) It is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age, or **solicits a law enforcement officer posing as a minor, and whom the person making the solicitation reasonably believes to be less than eighteen (18) years of age**, to engage in conduct that, if completed, would constitute a violation by the soliciting adult of one (1) or more of the following offenses:
(1) Rape of a child, pursuant to § 39-13-522;
(2) Aggravated rape, pursuant to § 39-13-502;
(3) Rape, pursuant to § 39-13-503;
(4) Aggravated sexual battery, pursuant to § 39-13-504;
(5) Sexual battery by an authority figure, pursuant to § 39-13-527;
(6) Sexual battery, pursuant to § 39-13-505;
(7) Statutory rape, pursuant to § 39-13-506;
(8) Especially aggravated sexual exploitation of a minor, pursuant to § 39-17-1005;
(9) Sexual activity involving a minor, pursuant to § 39-13-529;
(10) Trafficking for commercial sex acts, pursuant to § 39-13-309;
(11) Patronizing prostitution, pursuant to § 39-13-514;
(12) Promoting prostitution, pursuant to § 39-13-515; or
(13) Aggravated sexual exploitation of a minor, pursuant to § 39-17-1004.
(emphasis added).

79. Thus, the statute prohibits soliciting a law enforcement officer posing as a minor if the suspect making the solicitation reasonably believes the person was less than eighteen years of age.

80. Before the sting began, Robertson County Assistant District Attorney Jason White informed Capt. Dorris that he wanted the police officers to perform the text messaging with suspects *during the solicitation*. Adult conversations with a minor, alone, are not illegal; however, soliciting sexual activity from a minor or an undercover officer posing as one is.

Under T.C.A. § 39-13-522, "rape of a child" involves unlawful sexual penetration when the victim is between 8 and 12 years old—so any solicitation of sexual activity with someone in that age range or an officer posing as one constitutes unlawful solicitation of a minor.

81. No Tennessee case specifically requires an officer to be the one "typing" text messages during a sting operation. Nevertheless, the Millersville Police Department followed the Robertson County DA's guidance and relayed that information to all V4CR volunteers that MPD Detectives were required to handle all solicitation-related texting.

82. Capt. Dorris and Asst. Chief Taylor both instructed V4CR volunteers that only detectives could handle solicitation texts. V4CR Volunteer Tim Brown reiterated these instructions during the three-day event. Volunteers could initially "chat" with subjects to see how they reacted once the decoy profiles revealed they were 12 years of age. If conversations turned "raunchy" or veered into solicitation, volunteers were instructed to bring the phone to detectives to review and handle the solicitation.

83. Other instructions and rules were given to V4CR volunteers, including the rule that nobody was allowed to take any Ops Phone from the kitchen area of the VRBO, which is where Capt. Dorris and Det. Candler were seated next to V4CR's Tim Brown. It was abundantly clear to every volunteer that all of the solicitations had to be handled by Millersville detectives and needed to take place on phones purchased by the Millersville Police Department.

84. Prior to the Operation, Gen. White informed the MPD that it was OK for the V4CR volunteers to assist setting up the phones used in the Operation, and had stated that the MPD officers needed to wait until V4CR got into Millersville to set up the decoy profiles.

Although Kim Kelley would later complain during a podcast interview that "nothing had been set up" when she arrived in Millersville as part of her attack on the Millersville PD, this was because Gen. White wanted the profiles to be set up in Millersville when the V4CR volunteers were present, and not prior to their arrival.

85. All volunteers, including Defendant Kim Kelley, were briefed on Tennessee's solicitation law and told that only Millersville detectives could handle actual solicitations, and this rule was repeated multiple times over that weekend. In the event that a suspect spontaneously solicited a volunteer while they were "chatting," the phone was to be handed to a detective so they could attempt a second or third provable solicitation, which was common. All volunteers were aware that any solicitations not handled by a law enforcement officer would not be presented for prosecution.

86. Kim Kelley knew after meeting Det. Candler that he was an undercover narcotics detective who was not to be photographed and who had taken measures to ensure that he would not be featured or "tagged" in any picture or video. He wore plain clothes and a hat concealing his face during the Op.

87. On Thursday, May 16, 2024, the Millersville Police Department purchased six (6) generic Android smart phones from Walmart to be used in the Operation, referred to as the "Ops Phones." Det. Candler unboxed each phone that evening to complete the initial activation of each phone by connecting the cell phone to the carrier's network. As he unboxed each phone, he numbered each phone and box with a black permanent marker, writing the phone number on the box, and placing each box in a separate evidence bag that followed each phone. That evening, he charged the phones at the Police Department.

88. A VRBO in Millersville was rented from May 17 to May 20, 2024, and used as the "Chatter house" for detectives and volunteers. Before the operation, Det. Dorris consulted DA Jason White, who confirmed volunteers could help set up phones but reiterated that only detectives could handle the solicitation. Volunteers ("chatters") screened messages to weed out innocuous chats and "work up" toward a solicitation, but once a conversation was reaching the point of solicitation, volunteers were required to hand the phones over to detectives to ensure the solicitation could be prosecuted.

89. On the Morning of Friday, May 17, 2024, with the assistance of V4CR volunteer Tim Brown, Capt. Dorris and Det. Candler set up the social media accounts and decoy profiles on the phones used during the Operation. Each decoy profile had a data sheet that accompanied the Ops Phone, setting forth the fictitious names and other "personal" information used for the decoy accounts.

90. As part of the live training provided by V4CR during the Operation, Tim Brown assisted the detectives with organizing and setting up each decoy profile, while explaining how he generates the names, which AI programs he uses for modifying pictures, and his methodology for setting up profiles on the App they would be using during the sting, which was called MocoSpace.

91. Detectives Dorris and Candler, with Tim Brown's help, created the MocoSpace profile on Ops Phone #3 that attracted an individual with the username, "honeylover1034," later identified as Henry Dean Jordan of Nashville.

92. Det. Dorris selected the AI-altered decoy photo from a batch of several options provided by V4CR volunteers. Tim Brown had generated the photos from AI using real photos that Kim Kelley and Aspen Sawyer had taken inside the VRBO. These interior photos served

as the base or starting point for the AI program to alter and make them appear to be 12 year old girls. None of the volunteers ever suggested that Dorris use the specific image that he selected for Ops Phone #3.  Similar AI-altered photos of Kim Kelley and Aspen Sawyer were sent to Det. Candler for him to select.

93. Once the decoy profile photos were uploaded to the MocoSpace profiles on the morning of Friday May 17, 2024, the profiles started receiving dozens of immediate views and communications from men, and some women.  Videos taken that morning show Det. Candler and Capt. Dorris both texting and messaging various subjects and suspects.

94. Detectives Dorris and Candler were stationed primarily in the kitchen of the Chatter House—its central hub—handling texts and messages on their Ops Phones. Tim Brown sat beside them to monitor the volunteers, who began filtering chats or "chatting" with subjects to anticipate which were likely to become suspects, with the expectation that phones would be handed off to one of the detectives if the conversation was turning toward a solicitation.

95. During the Operation, Tim Brown had to repeat the rules several times to Kim Kelley, who seemed to be having difficulty following the rules.  Neither Brown nor any other MPD officer was aware at the time that Kim Kelley was intentionally violating the rules to fabricate evidence of "illegality" occurring during the Op to blackmail V4CR and sabotage the MPD and impugn its leadership.   Nobody was to take the Ops Phones outside of the room.  Nobody was to be texting on personal phones while the Operation was taking place. Chatters could sift through conversations with subjects to see which of them were still interested in communicating after the decoy profile revealed they were actually underage. Defendant Kelley, however, intentionally violated these rules as part of her and Phil Drake's plan to sabotage the MPD sting, leak the information to the Channel 5 Media

Defendants, and exploit the subsequent coverage to promote themselves and their businesses.

***Defendant Kim Kelley's Disruptions, False Alarms, and False Claim That Suspect "Got Away." - Paragraphs 92 to 96.***

96. Assistant Chief Taylor and Chief Morris were both part of the "takedown team," stationed at a location separate from the Chatter House. Around 5:00 p.m. on Friday, May 17, 2024, Taylor was in an unmarked vehicle near the interstate conducting surveillance, searching for the suspects that Kim Kelley claimed were coming.

97. While Taylor and others were conducting surveillance in unmarked vehicles, Kim Kelley periodically shouted to Detective Candler, "I got one coming in!" and insisted the "suspects" were "15 minutes away." Each time, Detective Candler relayed this information to the takedown team via radio, forcing the rest of the team to prepare for interception and scan for the suspects. When Detective Candler asked Kelley if there had been a solicitation, Kelley said no. It did not make sense for individuals to be arriving if there had been no solicitation, and Kelley was aware that solicitations had to be handled by the Detectives. Concerned by these discrepancies, Candler went over to see what Kelley was doing on her phone but he did not observe any conversations with individuals claiming to be en route to the Chatter House. At some point during the operation, Kim Kelley's bizarre behavior caused Det. Candler to question Kim Kelley's motives, and he told Tim Brown that he believed Kim Kelley was secretly recording them.

98. Kelley's continued misinformation not only created a chaotic atmosphere at the Chatter House but also led Assistant Chief Taylor to temporarily call off the operation that evening. Although the MPD did not realize at that time that Kim Kelley had conspired with

Defendant Phil Drake to sabotage the undercover sting, her duplicity became apparent when she told news outlets about detectives letting a suspect "get away," even though none of those "suspects" actually existed. Stated differently, she "cried wolf" and falsely reported that suspects were approaching, so that she and Phil Drake could later mock the MPD by claiming these imaginary suspects "got away."

99. Drake later made the implausible claim on Episode 240 of The Heartland Journal Podcast that MPD officers could not locate the arrested suspect, Henry Dean Jordan, but that he was able to "ping" the suspect's cell phone and located him "within 3 seconds." These dubious assertions underscore Kelley and Drake's consistent dishonesty and fraudulent claims in promoting themselves to advance their racketeering organizations at the expense of others, including Plaintiffs. Their reckless and unfounded claims highlight their deliberate efforts to mislead the public and obstruct legitimate law enforcement operations.

100. In subsequent media interviews, Defendant Kim falsely claimed to the Channel 5 Media Defendants (and Defendant Phil Drake claimed on The Heartland Journal Podcast) that a suspect escaped because an MPD vehicle lacked a siren on the vehicle. Both Kelley and Drake used this pretext to make the MPD and its leadership – Shawn Taylor and Bryan Morris – appear incompetent. Drake and Kelley had rehearsed the same story, as both of them mocked the purported lack of a siren and stated that officers should have hung their heads out the window and "made siren sounds with their mouths." While the Defendants' statements were intended to impugn the reputations of the Plaintiffs and their department, they nonetheless revealed Drake and Kelley's profound ignorance of even basic police procedure—blue lights are used to stop vehicles, while sirens merely alert surrounding motorists that an emergency vehicle is approaching.

***Suspect Henry Dean Jordan Solicits the Decoy Profile Operated by Capt. Dorris.***

101.　　　A few hours later, suspect Henry Dean Jordan (profile "honeylover1034") contacted the

decoy profile on Ops Phone #3, and officers noted that other MocoSpace users were

claiming to have knowledge that Jordan was a child predator, which comments are visible

in one of the photographs taken by the detectives:



102.　　　Kim Kelley claims she "identified" Jordan's profile.　In fact, Tim Brown and

Michael Candler saw the profile and comments, and this was the reason why Candler

snapped the above picture and then handed the phone to Capt. Dorris.　It was reasonable

to believe that Jordan was likely to solicit the decoy profile and Capt. Dorris retained

possession of that phone, Ops Phone #3.　Thereafter, Tim Brown observed Dorris typing

messages to Jordan in both the MocoSpace App, and the subsequent text messages with Jordan where the solicitations occurred.

103.    Capt. Dorris and Det. Candler continued working with Ops Phone #3 and other Ops Phones, periodically placing the phone down on the table.  Shortly after the solicitations were obtained from Jordan, Defendant Kim Kelley grabbed Ops Phone #3 and attempted to walk to another room with it.  Det. Candler yelled for Kelley to come back and set the phone down.  Shortly thereafter, Kim Kelley made a second attempt to take Ops Phone #3 away from the detectives to another location.  In retrospect, Kelley's actions were obvious attempts to photograph the Jordan solicitation on her personal phone to fabricate her claim that she had handled the solicitations instead of Capt. Dorris.

104.    During Capt. Dorris's communications, Henry Dean Jordan was informed that the individual he believed he was speaking to was a child about to turn thirteen (13) years old. Despite this, Mr. Jordan made explicit statements regarding his intentions to engage in various unlawful sexual acts, and coordinated plans to travel by bicycle to a designated meeting location in Millersville at the Bethel Road Shell Station near I-65 North Exit 104.

105.    After Jordan failed to arrive at the Shell Station at the agreed upon time that evening, MPD officers located and detained Mr. Jordan pedaling his bicycle up the shoulder of I-65 North near mile marker 103. Jordan was taken to the Millersville Police Department, and Capt. Dorris left the Chatter House to handle the paperwork.

106.    Although Jordan was never questioned by MPD detectives, he told Capt. Dorris, "I never touched that girl" while he was being processed at the Millersville Police Department.  Capt. Dorris then prepared documentation regarding the incident, and Jordan

was subsequently transferred to the Robertson County Jail and taken before a judicial commissioner around 2:25 am on May 18, 2024, where his arrest warrant was signed.

107.    That same evening, Henry Dean Jordan voluntarily spoke to a documentary film crew that accompanied the V4CR volunteers, where Jordan voluntarily confessed to the crime of soliciting a minor.  Contrary to the false statements later made by Kim Kelley that this was improper or would "jeopardize" the prosecution, it is well-established under Tennessee law that statements voluntarily made by a suspect to a third-party that is not a law enforcement officer are generally admissible against the defendant at trial.  See, e.g., *State v. Sanders,* 452 S.W.3d 300 (Tenn. 2014); *State v. March,* 395 S.W.3d 738 (Tenn. Crim. App. 2011).

108.    At the end of each day, all of the Ops Phones were gathered and secured.  After the evidence from Ops Phone #3 was downloaded, the phone was brought back to the Chatter House.  Upon information and belief, Ops Phone #3 was returned to the Chatter House on Sunday, May 19, 2024.  It is possible that Kim Kelley had access to Ops Phone #3 at this point, as the decoy profile on this phone could still be used to work up other suspects.  Although Kim Kelley later claimed to the Channel 5 Media Defendants that she handled the solicitation with Jordan and that Capt. Dorris's testimony was not accurate, none of the videos or recordings that have been posted online by the Channel 5 Media Defendants actual show her texting Henry Dean Jordan.  None of the videos have time stamps or dates, and all of the videos are edited, isolated clips that cut off conversations mid-way to intentionally create the false inference that Kelley handled the solicitation and that Capt. Dorris and Det. Candler did not.   .

***Kim Kelley Demands $35,000 from Craig Sawyer to Illegally "Purchase Trafficked Children."***

109.    On the evening of Saturday, May 18, 2024, Kim Kelley openly demanded that Craig Sawyer, CEO of V4CR, provide her with $35,000 to purchase trafficked children as a means of "rescuing" them from traffickers.   Det. Candler overheard Kelley's demand for payment, but was unaware at the time that Kim Kelley and Phil Drake were actively soliciting payments to purchase trafficked children from child traffickers as part of their illegal business model to "combat" child trafficking.    At some point prior to the Millersville Operation, Kim Kelley and Phil Drake developed the opinion that intercepting pedophiles as part of a child solicitation/child exploitation sting was somehow not an effective way to prevent pedophiles from victimizing children, or that intercepting pedophiles on the "demand side" of child trafficking was not as effective as direct action against child traffickers on the "supply side" of an illegal child trafficking ring.   Regardless of whatever distinction Kelley and Drake had conjured in their minds, Sawyer refused to pay the $35,000 and Kim Kelley became upset.  She stormed outside the rental house, once again taking an Ops Phone with her that required Det. Candler and another V4CR Volunteer to go outside and retrieve the phone from her.

*Kim Kelley Remains in Nashville After the Pedophile Sting Ends.*

110.    Kim Kelley had the means and motive to fabricate evidence, and on the evening of May 19, 2024, she was given the opportunity to do so.  V4CR had rented a VRBO for the Millersville Operation from Friday May 17, 2024 to Monday, May 20, 2024.  When the pedophile sting ended on the evening of May 19, 2024, Kim Kelley stayed by herself overnight at the VRBO.  Thus, she had an entire evening to herself inside the VRBO to record videos of herself and fabricate evidence that made it appear she was openly chatting with suspects on one of the Millersville Op Phones during the sting.

111.    Asst. Chief Taylor returned on Monday, May 20, 2024 to retrieve some radios that had been left inside the rental.  When he arrived, there were two vehicles on the property, the sedan that Kim Kelley was driving and a four-door truck.  When Taylor entered the house, he announced his presence and saw Kim Kelley hurry to her bedroom and shut the door.  Upon information and belief, Defendant Kelly was hiding Defendant Drake in her bedroom at the VRBO.

112.    After the Millersville Operation had concluded, Kim Kelley stated that she was staying in Nashville for a few extra days.  Upon information and belief, during this time she met with additional co-conspirators in the days that followed to further prepare and orchestrate the smear campaign used to damage the Plaintiffs.

*From Source to Scapegoat: Reporter Phil Williams Betrays a Source and Begins Smear Campaign Against Shawn Taylor and Other Millersville Officials.*

113.    In the Spring and Summer of 2024, Defendants Scripps Media, NewsChannel 5 and Phil Williams launched a multi-part continuation of stories of and concerning Plaintiff Taylor and Plaintiff Morris in their on-line series entitled *"Hate Comes to Main Street,"* a series of articles about hate groups, Neo-Nazis, Ku Klux Members, even though neither Chief Taylor nor Chief Morris ever had any affiliation whatsoever with any hate group. This association with Neo-Nazis by these media Defendants was intentional and made knowingly or with reckless disregard for the truth.

114.    Williams represented to viewers that he had *personally uncovered* the story through his own "investigation," when, in fact, he knew the opposite to be true. In the last week of

January of 2023, Plaintiff Shawn Taylor met with Phil Williams and NewsChannel 5 reporter Levi Ismail at Franklin, Tennessee coffee shop. Taylor brought each reporter a bound notebook and a USB drive containing documentary evidence of corruption, including political-campaign finance corruption, then occurring in Middle Tennessee. Taylor recorded the meeting. After reviewing the materials, Williams admitted that the evidence Taylor presented to him "*looks like Dixie Mafia.*" Williams therefore possessed direct, first-hand knowledge that Taylor (and, by extension, Morris) were whistle-blowers exposing corruption—*not* participants in it.

115.     Levi Ismail sent the following text to Shawn Taylor about the meeting as follows:



116.     After their January 2023 meeting, Shawn Taylor periodically provided additional information to Levi Ismail and NewsChannel 5 as a source of information and for assistance with various intelligence and investigatory tasks.

117.     Once Shawn Taylor became Assistant Chief of Police in Millersville, however, Defendant Phil Williams betrayed Taylor's trust, turning him from a source to a scapegoat. He exploited every scrap of confidential information that Taylor had provided to him in

January of 2023, and used Taylor's appointment as Assistant Chief of Police to manufacture a crisis where none existed, thereby exploiting a source for his own partisan purposes. In so doing, Williams and the Channel 5 Media Defendants forfeited any claim of reporting on a legitimate controversy. Their conduct was a calculated smear campaign aimed squarely at undermining Shawn Taylor and Bryan Morris in order to influence an upcoming local election.

118.      The "*Hate Comes to Mainstreet*" series purported to reveal an "investigative discovery" that hate-based extremists had infiltrated Millersville's police department and City Hall. Throughout the broadcasts Williams repeatedly identified, associated, and unmistakably implied that Plaintiffs Chief Bryan Morris and Assistant Chief Shawn Taylor were "extremists" who had "brought hate to Millersville" and corrupted city resources for their own gain. Each of those statements and implications was false, defamatory per se, and published to a statewide audience and republished by Scripps media to nationwide audiences.

119.      Phil Williams and NewsChannel 5 also used numerous pictures and other references throughout their website to associate Taylor and Morris with Neo-Nazis, the KKK, and other hate groups, such as the following image:



**Hate Comes to Main Street**

**WTVF-TV, NewsChannel 5 Nashville & Phil Williams**

NewsChannel 5's Chief Investigative Reporter Phil Williams unmasked the hate, political extremism and unhinged conspiracy theories infecting political life in Tennessee, and then became a target himself.

**Defamatory Article Published on May 20, 2024**

**Phil Williams and NewsChannel 5's "Hate Comes to Main Street" Smear Campaign Against Shawn Taylor**

120.　　On May 20, 2024, Defendants Phil Williams and NewsChannel 5 published an article titled "'Al Gore, you're a piece of sht!' Meet Millersville's conspiracy cop"*, filed herewith in the appendix of news articles, as part of their politically motivated series, "Hate

Comes to Main Street." The article targets Plaintiff Shawn Taylor and falsely associates him with dangerous conspiracy movements, hate groups, and mental instability, with the deliberate aim of discrediting him as a law enforcement officer and destroying his personal and professional reputation.

121.     Williams packaged the piece as an exposé revealing that Assistant Chief Shawn Taylor was a delusional "Q-Anon" adherent who "had no evidence whatsoever" for his claims and who abused confidential law-enforcement databases to pursue eccentric political vendettas. The article's unmistakable gist—and the headlines, videos, graphics, and narration that amplified it—was that Taylor is mentally unstable, professionally unfit, dishonest, and a danger to the public. By extension, the article impugned Chief Bryan Morris, who had hired Taylor and completed a full P.O.S.T.-compliant background investigation.

122.     Williams repeatedly branded Taylor "Millersville's conspiracy cop," asserting that Taylor peddles "bizarre" fantasies and "imagines sinister plots … with no evidence whatsoever." This epithet is defamatory and falsely portrays Taylor as mentally disordered, irrational, and unqualified to carry a badge. In truth, Taylor passed the Tennessee P.O.S.T.-mandated psychological examination—a fact that was in Taylor's personnel file and therefore known (or recklessly ignored) by Defendants before publication.  Plaintiffs aver that Williams and NewsChannel 5 possessed a copy of Taylor's personnel file.

123.     The import of the article is unmistakably defamatory. It impugns the character, mental fitness, and professional competency of Assistant Police Chief Shawn Taylor by falsely labeling him a "conspiracy theorist" and deceptively implying that he is aligned with violent extremists, such as the QAnon movement, white supremacists, and hate

groups, despite Defendants knowing full well that Taylor has never been affiliated with, nor expressed support for, any such groups.

124.   The article falsely claims about Taylor that "court records showed the conspiracy theorist has bounced from town to town," when in fact there are only two lawsuits involving Taylor in the Middle District at the time of the defamatory article.

125.   The article insists more than a dozen times that Taylor "has no evidence" and that his assertions are "completely bogus." Williams knew, however, that the podcasts he mined for sound bites included slide decks, source documents, and other corroborating materials that Taylor displayed on-screen. By stripping those visual exhibits from the story, refusing to link the underlying podcasts, and cherry-picking isolated quotations, Williams manufactured the false impression that Taylor's statements were groundless.

126.   Williams stitched together remarks from dozens of unrelated podcasts—recorded 18 months to two years before Taylor was hired in Millersville—to suggest that Taylor claimed "one vast plot":

> "Taylor claims that he's uncovered a vast criminal conspiracy that involves former President George Bush, Bill and Hillary Clinton, former Vice President Al Gore, billionaire George Soros, Bill Gates and Warren Buffett, along with U.S. Senator Marsha Blackburn, former Senator Bob Corker, former governor Ray Blanton, Ned Mcwherter, and Bill Haslam, potentially involving current governor Bill Lee, not to mention State Senator Jack Johnson, his wife Judge Deanna Johnson, Tennessee banker Jim Ayers, former TBI director Larry Wallace, current state safety Commissioner Jeff Long, and at least three Tennessee district attorneys. On top of that, there's the FBI, the CIA, the TBI, and the Tennessee Valley Authority."

127. In reality, each podcast addressed discrete episodes of political commentary, instances of public corruption, or other publicly-debated issues involving various public figures and at no point did Taylor allege a single unified conspiracy encompassing all of those individuals in the referenced podcasts. By claiming he did, the Channel 5 Media Defendants cast serious doubt on Taylor's credibility and the believability of his claims.

128. Phil Williams falsely claim that Shawn Taylor blamed the 2011 murder of 20-year old Holly Bobo on "Al Gore and banker Jim Ayers," when in fact Shawn Taylor had referenced a party that Bobo had allegedly been to where Gore and/or Ayers were present.

129. Phil Williams falsely implies that Shawn Taylor had conducted a background check on U.S. Senator Marsha Blackburn, even though the podcast that Taylor was referenced in involved her publicly-available campaign contributions through Fifth Third Bank, which Phil Williams intentionally omits. Moreover, this information was, upon information and belief, part of the same information that Taylor had given to Phil Williams and Levi Ismail during a meeting they had in January of 2023.

130. Phil Williams Falsely claims that Shawn Taylor "imagines that his own DA, Ray Whitley, has done favors for drug dealers who he thinks helped him in office." Phil Williams omits the fact that Shawn Taylor was basing his statements on two publicly-available Court of Criminal Appeals cases in which Ray Whitley was, in fact, accused of intentionally suppressing evidence. In *State v. Marshall,* 845 S.W.2d 228 (Tenn. Crim. App. 1992), a case in which a conviction for First Degree Murder was reversed after the district attorney's office failed to disclose evidence that was favorable to the defense. Ronnie Marshall and Robert Spurlock became suspects in the murder of Lonnie Malone. The evidence suggested that were two other suspects, Robert Thomas "Astro" Coats, and

"the Bandys." According to these publicly-available cases, Marshall and Malone were heavily in debt to the Bandys. There were statements that had not been disclosed, to the effect that "one of the Bandys" had picked up the victim and the defendant, and then shot the victim to make an example of him since the defendant owed the Bandys more than he owed Spurlock. See also *State v. Spurlock*, 874 S.W.2d 602 (Tenn. Crim. App. 1993)(accusing Ray Whitley of criminal conduct, perjury, and subornation of perjury).

131.    Shawn Taylor's comments about "the Bandys" were also based on his law enforcement experience, where his investigation had involved individuals with the last name "Bandy" and Taylor had specific knowledge of Travis Bandy trafficking 5-gallon buckets of pressed pills and crystal methamphetamine, who was subsequently arrested in Cobb County, Georgia for trafficking these same illegal drugs.

132.    The media Defendants took isolated, years-old podcast appearances involving Plaintiff Taylor and dishonestly presented them as though they were a single, coherent belief system. By stripping the original context and purpose of Taylor's remarks - and presenting them in a deliberately sensationalized, disjointed narrative - Defendants created the false appearance that Taylor believes in a massive, delusional conspiracy involving dozens of public figures, with "no evidence whatsoever."

133.    The article explicitly asserts that Plaintiff Taylor "believes the completely bogus QAnon conspiracy theory," and that his views are "bizarre," "bogus," "imagined," and based on "no evidence whatsoever." These are not expressions of opinion but presented as factual conclusions by a purported investigative journalist, intended to convey that Taylor is unfit to carry a badge and is mentally incompetent or dangerous.

134.     Williams attributes to Taylor a pledge to "root out corruption" made on a podcast specifically *within Millersville*, falsely implying that Taylor was hired to pursue the topics and subjects of his prior podcasts on City time. Williams falsely attributed this promise to Taylor's general discussion of "Operation Clean Sweep," an initiative announced by Taylor on April 28 2024—long after the podcasts at issue.

135.     Phil William falsely claimed that Shawn Taylor believed that "everybody is corrupt except for him and his podcaster friends."

136.     Williams concealed critical facts that would have destroyed the defamatory narrative: (i) Taylor's podcasts were private, off-duty speech long before his Millersville appointment; (ii) Taylor is a POST-certified officer with an unblemished psychological evaluation; (iii) many of Taylor's allegations echoed published FBI affidavits, court filings, or news reports that Williams chose not to reference; and (iv) Chief Morris independently verified Taylor's credentials before hiring him. These omissions, juxtaposed with sensational accusations, created a false implication of present-day misconduct.

137.     Defendants acted with actual malice or, at a minimum, reckless disregard for the truth. They reviewed Taylor's personnel file (which contained the psychological-exam clearance), possessed full copies of the podcasts (which showed the supporting evidence), and nevertheless broadcast the defamatory assertions while refusing to provide hyperlinks or context that would reveal the truth.

138.     The story ominously asks whether Taylor "has been digging into [Williams] … using government computers or government resources," insinuating that Taylor engaged in criminal misuse of CJIS or similar systems. Defendants possessed no evidence for that insinuation; indeed, every podcast video Williams cited predates Taylor's employment in

Millersville, and no database activity logs suggest any misuse. The accusation is therefore false and made with reckless disregard for the truth.

139.    These falsehoods are further weaponized by the media Defendants' repeated references to Taylor's police authority, with phrases such as "he now has a gun and a badge," used no fewer than three times, implying a threat to public safety and stoking public fear that Taylor poses an imminent danger to the community. The May 20, 2024 Article characterized Taylor as mentally unfit and urged viewers to question how he ever passed a psychological exam.

140.    Most egregiously, the media Defendants knowingly published this article as part of their "Hate Comes to Main Street" series, which covers stories involving neo-Nazis, Ku Klux Klan members, and other violent hate actors. Defendants knew that Taylor had never associated with or expressed support for any hate group. Including him in this series was a deliberate act of defamation by false implication and a reckless disregard for the truth - designed to falsely portray Taylor as a dangerous extremist.

141.    In addition, the article falsely implies that Plaintiff Taylor may have used "government computers or government resources" to investigate Phil Williams' deceased wife, without any basis or source, a malicious and inflammatory insinuation that would outrage the public and compound reputational damage.

142.    Each of these statements and inferences is either demonstrably false, taken grossly out of context, or deliberately crafted to give rise to a false implication that Taylor is mentally ill, delusional, and a danger to the public in his role as Assistant Police Chief. By omitting material context and selectively editing Taylor's statements, Defendants intentionally presented a false narrative to destroy his credibility and career.

143.     The foreseeable result - and likely purpose - of the article was to provoke public

outrage, demand Taylor's termination, and interfere with his employment in Millersville

and elsewhere. This was not legitimate journalism, but a targeted political and personal

attack, carried out with actual malice and reckless disregard for the truth.

144.     Subsequently, the media defendants reposted the each of their "Hate Comes to Main

Street" series involving Shawn Taylor, Bryan Morris, and Millersville with defamatory

labels, adding to each article and reposting it to reach additional audiences, such as the

following:

> **Part One:** Meet Millersville's conspiracy cop. He believes the completely bogus
>
> QAnon conspiracy theory that falsely claimed Democrats had kept child sex slaves
>
> locked up in the basement of a pizza parlor in Washington, D.C.
>
> He imagines sinister plots involving some of the country's most prominent political
>
> figures, including his theory — with no evidence whatsoever — that former Vice
>
> President Al Gore was involved in the disappearance and murder of 20-year-old
>
> Holly Bobo in 2011.
>
> Taylor recently landed in Millersville as assistant police chief, promising to root
>
> out the corruption he sees there."

145.     Defendants Phil Williams and Scripps Media, Inc. ("Channel 5 Media Defendants")

repeatedly republished the defamatory statements of and concerning Plaintiffs Shawn

Taylor and Bryan Morris by (a) editing the original articles in their "Hate Comes to Main

Street" series to add new text, context, and hyperlinks, (b) embedding those revised articles

inside an on-line directory located at https://www.newschannel5.com/news/newschannel-

5-investigates/franklin-politics, and (c) pushing the revised pieces—together with freshly

written commentary and screenshots—to Channel 5's Facebook, X/Twitter, Instagram, and YouTube accounts. Each of these steps was an affirmative act intended to reach readers who had not seen the earlier versions, causing as much widespread harm to Plaintiffs' reputations as possible.

146.     Unlike a passive or a bare hyperlink, Defendants' conduct involved substantial, substantive alterations: they updated headlines, inserted fresh paragraphs tying Plaintiffs to "neo-Nazis," "KKK members," and "white-supremacist hate groups," appended new video segments, and inserted the articles within Channel 5's searchable "Hate Comes to Main Street" repository so that users researching extremist and racist organizations were automatically served content about Taylor and Morris. These deliberate edits, reorganizations, and social-media blasts were calculated to expand dissemination beyond the stories' previous limits, falsely associate Taylor and Morris with being racists, and in fact drove a brand-new audience of viewers interested in hate-group coverage to defamatory material that had never before reached them.

147.     By intentionally republishing the challenged statements in this fashion, Defendants caused fresh and independent reputational harm to each Plaintiff with each republication and with each "update" of the story throughout the series.

148.

***Defendants Cristina Templet, David Gregory, Phil Williams, and Scripps Media, Inc. Conspire to Violate Shawn Taylor's First Amendment Rights.***

149.     Years before he was Millersville's Assistant Chief, while off duty and in his personal capacity, appeared on several podcasts between 2021 – 2023 discussing obvious matters of public concern: public corruption, campaign-finance abuses, and government

misconduct. Those appearances constitute classic "core political speech" fully protected by the First Amendment under *Connick v. Myers*, 461 U.S. 138, 145-46 (1983).

150.    On May 21, 2024, during the "comments" section of Millersville's Meeting, Defendants Commissioner David Gregory and former Commissioner Cristina Templet a/k/a Cristina Rosado brandished Phil Williams' broadcast during a regular Board of Commissioners meeting and served a written "Special Call Meeting Request" demanding a public hearing to:

   a.  Re-examine Taylor's "moral character";

   b.  Compel disclosure of his confidential psychological evaluation, including the examining doctor's identity and report; and

   c.  Cross-examine Taylor about the content of his podcasts and any "background checks" he had allegedly performed.

151.    The Millersville City Charter vests all hiring, firing, and disciplinary authority exclusively in the City Manager—not in individual commissioners. Thus, Gregory and Templet possessed no lawful authority to take any employment action against Taylor, rendering their conduct purely retaliatory and outside any sphere of legislative immunity.

152.    Before publishing their statements, Gregory, Templet, Williams, and NewsChannel 5 had already obtained Taylor's personnel file from prior agencies, which unequivocally showed that he (a) passed every POST-mandated psychological examination and (b) had never been disciplined for mental-fitness issues. Each Defendant therefore knew the insinuations about Taylor's mental health were false—or, at minimum, they acted in reckless disregard of their falsity.

153. Templet and Gregory expressly state that the "recent revelations" in Taylor's privately recorded podcasts triggered their inquisition, which was a pretext. Gregory later confirmed during the meeting that he wanted a special session "to question Assistant Chief Taylor about what he said." These admissions nonetheless satisfy the causation for violating Taylor's First Amendment rights: the threatened adverse action was motivated solely by Taylor's protected speech in years-old podcasts.

154. Demanding a public interrogation into an officer's political beliefs, tethered to a threat of exposing HIPAA-protected psychological records, would deter a person of ordinary firmness from continuing to engage in similar speech. Such threats constitute a cognizable "adverse action" under Sixth Circuit precedent. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724-26 (6th Cir. 2010); *Hill v. Lappin*, 630 F.3d 468, 472-73 (6th Cir. 2010).

155. By drafting, circulating, and publicly reading the Inquisition Letter, Defendants Gregory and Templet acted under color of state law and in concert with NewsChannel 5 to chill Taylor's speech, thereby violating 42 U.S.C. § 1983. Because the Inquisition was *not* a legislative act, Gregory and Templet enjoy no absolute or qualified legislative immunity.

156. Phil Williams' and NewsChannel 5's active coordination with Commissioners Templet and Gregory, including providing the defamatory narrative that prompted the special meeting and then accepting privileged material from them—renders Williams and Scripps Media joint participants in state action, subjecting them to § 1983 liability. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982).

157. Alternatively, all four Defendants formed a civil conspiracy to deprive Taylor of his First-Amendment rights, actionable under 42 U.S.C. § 1985(3). The objective of the

conspiracy was to punish and silence Taylor for exposing public corruption, to force disclosure of his confidential psychological records, and to defame him as "unfit" in the public eye.

## Defamatory Article Published on May 22, 2024

## Phil Williams and NewsChannel 5 Amplify False Claims

158.     On May 22, 2024, just two days after the publication of the May 20, 2024 article, Phil Williams and NewsChannel 5 published a follow-up article titled "Commissioners demand meeting to look at hiring of Millersville's conspiracy cop," filed herewith in the Appendix. The article falsely asserts that a scandal has erupted over Shawn Taylor's employment, when in fact the controversy was fabricated by Phil Williams.   This Article uses innuendo and repetition to portray Shawn Taylor as mentally unfit, paranoid, and associated with dangerous conspiracy theories, white supremacy, and Neo-Nazis as part of the continued "Hate Comes to Main Street" series - all while knowingly concealing facts that directly contradict this defamatory narrative.

159.     The import of the Channel 5 Media Defendants' May 22, 2024 Article is to reinforce and re-broadcast the smear launched in the prior article, which they now frame as an "ongoing scandal," when in fact it was one manufactured by Williams himself through orchestrated coordination with Commissioners Cristina Templet and David Gregory. The headline and article falsely imply that Taylor's hiring was improper, unlawful, or the product of negligent vetting, despite Williams' prior receipt of Taylor's personnel records verifying that he had passed all POST certification requirements, including the psychological examination mandated under T.C.A. § 38-8-106.

160.    Phil Williams again refers to Taylor as a "conspiracy cop," falsely claims he "has no real evidence," and describes him as someone who has "bounced from town to town," thereby impugning his professional competence and integrity. These falsehoods are bolstered by repeated references to his "arrest power," invoking fear that Taylor poses a danger to the public despite the Channel 5 Media Defendants' knowledge that Taylor has passed the requisite psychological and background check.

161.    The article quotes from the letter introduced by Commissioners Templet and Gregory at the May 21, 2024 meeting, which calls for an investigation into Taylor's "moral character" and psychological fitness. Rather than treating these claims with journalistic scrutiny, Williams endorses and elevates them - publishing their letter in full without acknowledging that he himself already reviewed Taylor's file and knew these insinuations to be false.

162.    Williams also falsely states that Taylor had "been fired from Ridgetop" - a mischaracterization of the facts that ignores that both Taylor and Chief Morris were retaliated against for blowing the whistle on an illegal ticket quota and are pursuing a pending lawsuit in which they are plaintiffs. This misstatement further compounds the defamatory implication that Taylor is unstable or professionally deficient and also impugns the professional reputation of Chief Morris and characterizes him as unfit for duty, even though neither was ever fired from the City of Ridgetop.

163.    Williams once again injects himself into the political theater to fabricate a public controversy, reporting as fact that his own ambush interviews are the source of public concern:  "We've got questions to ask the assistant chief Shawn Taylor, especially after what we saw on NewsChannel 5 last night, presented by Mr. Phil Williams."  This quote,

attributed to Commissioner Gregory, is not a neutral statement of fact but rather a scripted echo of Williams' own reporting, used as a feedback loop to lend legitimacy to his defamatory coverage.

164.     Williams continues to press the false implication that Taylor used "government resources" to investigate the reporter's background - a claim he knew was baseless and lacked any evidence, whatsoever.  Williams was specifically aware that his "late wife's last name" was publicly available on the Internet, but he falsely alleged that Taylor must have accessed a "government resource" to obtain the information, thereby injecting himself as a victim into his fabricated controversy.

165.     The defamatory impact of the article is further amplified by Williams' continued framing of Taylor's statements as "bizarre conspiracy theories" without ever identifying the substance of what was actually being discussed by Taylor.  Williams' then used his portrayal of public support from Defendant Templet and Defendant Gregory, whom he was actively colluding with, as evidence of official negligence. The article asks:  "But is that the type of person who should have arrest power in Millersville?"  This rhetorical device is designed not to inform the public but to stigmatize Taylor as mentally unstable and dangerous, despite Williams knowing that Taylor had been cleared for duty by a psychological evaluator.

166.     Defendants' conduct in publishing this article was not accidental or the result of negligence. Phil Williams possessed exculpatory information that would have rebutted every defamatory innuendo made in this article. Instead of reporting truthfully or responsibly, he suppressed those facts and knowingly amplified false and stigmatizing

accusations - all in coordination with political operatives and aligned actors engaged in a retaliatory campaign against the new administration in Millersville.

167.     Like the May 20, 2024**,** this article is part of the "Hate Comes to Main Street" series, falsely associating Taylor with hate groups and political extremism, despite no evidence and full knowledge by Defendants that Taylor has never belonged to, supported, or endorsed any such group or ideology.

168.     The article was reposted and republished by "CNN Newsource" on May 23, 2024 to the website:   [https://keyt.com/cnn-regional/2024/05/23/city-commissioners-demand-special-meeting-to-investigate-hiring-of-conspiracy-cop/](https://keyt.com/cnn-regional/2024/05/23/city-commissioners-demand-special-meeting-to-investigate-hiring-of-conspiracy-cop/).   "Keyt.com" is the official website for News 3-12, a television station serving various areas in California and is a purported CNN Affiliate owned by News-Press & Gazette Company, based on St. Joseph, Missouri.   KEYT-TV also claims to be an "ABC affiliate."

*The TBI Operation Plan Shows Investigation Was Requested on May 22, 2024.*

169.     According to a TBI Operation Plan found at Shawn Taylor's house after the "raid" had concluded, on May 22, 2024, District Attorney Ray Whitley requested that the TBI conduct an investigation into allegations against Shawn Taylor for "improper use of law enforcement intelligence data, falsifying government records, and official misconduct." Discovery will be needed to determine if the investigation was triggered by the allegations from the Phil Williams stories.

170.     The Operation Plan shockingly claimed that Taylor was alleged to have been improperly utilizing government databases, when in fact he was the one that had created the very Task Force that was investigating improper utilization of the ICJ portal and other matters.   Moreover, Taylor's Task Force had been formed with the knowledge and

inclusion of multiple TBI officials and the actual Administrator of the Integrated Criminal Justice Portal. The TBI's Operation Plan states, "It is believed [Taylor] has improperly utilized law enforcement intelligence data to include the State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center."

171.    The allegation that Taylor "improperly utilized" FinCEN data is difficult to understand or believe. Taylor accessed this data through the proper channels by requesting it via the TBI's web portal and justifying its use for legitimate criminal investigations. In Tennessee, the TBI acts as an intermediary to FinCEN, ensuring that only authorized officers with valid reasons are provided FinCEN information. Therefore, it's unclear how Taylor could have misused data that was provided to him through the correct procedures. The suggestion of official misconduct is as questionable as if a bank allowed a customer to withdraw money from their own account, and then turned around and accused the customer of robbing the bank.

172.    By statute, municipal police officers have extremely broad authority to investigate and prevent crimes. Under T.C.A. § 6-21-602, municipal police are authorized to protect residents from *all* criminal acts, and to prevent the commission of crime, and violations of law and of the city ordinances. Thus, it is difficult to understand how a police officer investigating suspected criminal activity can be charged with official misconduct and "exceeding his authority" when he was both doing what the law requires of municipal police, and he possessed documents that the TBI had approved and provided.

*Millersville's Request for a Prosecutor Pro Tem and Investigative Grand Jury is Declined.*

173.     In an effort to ensure that the Millersville investigations remained unbiased, Taylor had also proposed notifying the Tennessee Attorney General to request a prosecutor *pro tem* and convene an investigative grand jury. Taylor had briefed the Attorney General and Reporter on several occasions with regard to the criminal activity he was investigating, and an official request had been sent by the City of Millersville in mid-April, 2024. However, on May 23, 2024, after the negative press, the Attorney General "respectfully declined" to do so, claiming that he was constrained by statute requiring the local district attorney's consent to appoint a prosecutor *pro tem*, which the Attorney General believed was unlikely to occur.

174.     Not coincidentally, a prosecutor *pro tem* and an investigative grand jury were convened as part of a different TBI investigation occurring in Chattanooga based on allegations identical to those against Millersville Commissioner Cristina Templet. According to the TBI press release:

> At the request of District Attorney General Pro Tem D. Michael Dunavant, TBI agents began investigating the residency of Celeste Murphy (DOB [REDACTED]) in April. Dunavant was appointed by the Court to serve as District Attorney General Pro Tem upon the recusal of 11th Judicial District Attorney General Coty Wamp. During the investigation, agents determined Murphy knowingly entered false information on several government documents related to establishing residency in Chattanooga, though swearing to their truth in signing the documents.
>
> On Tuesday, the Hamilton County Grand Jury returned a 17-count indictment, charging Murphy with one count of Illegal Voter Registration, one count of False Entries on Official Registration or Election Documents, three counts of False Entries in Governmental Records, three counts of Forgery, three counts of Perjury, and six counts of Official Misconduct. This morning, Murphy surrendered to agents at the Hamilton County Jail, where authorities booked her and subsequently released her after Murphy posted an aggregate $19,000 bond.

## Defamatory Articles Published on May 28, 2024

## Defamatory Allegations That Shawn Taylor Denied Covenant School Shooting Took Place And Claimed School Shooting Was "Staged"

175.     The Covenant School Shooting occurred on March 27, 2023, at 9:22 am. Shawn Taylor's house was also shot up earlier that same morning between 5:00 am and 5:20 am, and the TBI had been called out to investigate the shooting. Evidence showed that a 9mm weapon had been used. TBI agents had to leave their investigation of the shooting at Shawn Taylor's house to respond to the scene of the Covenant School Shooting. It was later revealed that the shooter, Audrey Hale, used a 9mm carbine as part of her arsenal at the Covenant School. In the story, Shawn Taylor was criticized over comments he made on a podcast in which he stated that the bodycam videos that had been released by MNPD looked like a "Training Op." Contrary to the media report, Taylor never once stated that the Covenant School shooting did not occur. Nor did Taylor deny that students and teachers were killed by Hale or that MNPD had shot Hale.

176.     Over a year later, at 6:41 a.m. on May 28, 2024 May 28, 2024, the Channel 5 Media Defendants published an article titled " 'Something's not right!' Conspiracy cop pushed bogus theories about Covenant shooting, video shows," which was repeatedly updated thereafter. The headline, sub-head, photos, captions, pull-quotes, and article text collectively convey that Assistant Chief Shawn Taylor "pushed bogus theories," and "lied" that the shooting was "staged." These statements are false, were known by Defendants to be false (or published with reckless disregard for their truth), and were calculated to impugn Taylor's professional integrity, honesty, and fitness for duty.

177.    Phil Williams' Covenant School Shooting Story falsely claims that Shawn Taylor denied that the shooting had ever occurred. The article falsely claims that Taylor said the shooting was "staged," and the Channel 5 Media Defendants falsely portrayed Shawn Taylor as "Alex Jones," who became infamous for peddling the false conspiracy theory that Sandy Hook was a "hoax" and for defaming grieving parents as "crisis actors." By equating Taylor with Jones, the article implies that Taylor likewise spread malicious lies about a tragedy, when he never once denied the shooting or equated it with a "hoax."

178.    The Covenant School employee interviewed by Phil Williams, Anna Caudill, had never heard of Taylor or seen the podcast he had appeared on when he had discussed the body cam video of the responding Metro Nashville Police Department Officer that had shot Audrey Hale. As a then-retired police officer, Taylor discussed tactics during the podcast with another former police officer and a former Navy SEAL. Although one of the individuals denied that the shooting happened at all, Taylor never did.

179.    Anna Caudill never heard of Shawn Taylor until Phil Williams staged her outrage by playing the podcast to Mrs. Caudill for the first time. He selectively played portions of the video in order to provoke her outrage and capture her emotions, which underscores that there was no public controversy or matter of public importance involving Taylor's appearance on the podcast until Phil Williams fabricated it. His appearance, over a year before he became the Assistant Chief in Millersville, never involved any denial that the shooting had taken place, but the Channel 5 Media Defendants manipulated the narrative and intentionally associated with Taylor through express and concealed means, including hidden "keywords" associating Taylor with Alex Jones on their "Hate Comes to Main Street" series.

180.    Part of the Channel 5 Media Defendants' plan to falsely portray Shawn Taylor as an "Alex Jones" shooting denier involved their association of the keywords "Alex Jones" along with "Shawn Taylor" and embedding it within their website code, which is visible in the lower portion of the following screenshot:



181.    The May 28 article falsely portrays Plaintiff Shawn Taylor as a delusional, dishonest, and malicious individual who fabricated lies about the victims of the Covenant School shooting. The article intentionally distorts Taylor's commentary on a podcast and accuses him of statements he never made, provoking outrage and public ridicule.

182.     The same day, Defendants published a companion piece, "It's indecent! Friend of Covenant victim on conspiracy cop's fabrications about school shooting," repeating the foregoing libels and likening Taylor to Alex Jones.  By juxtaposing Taylor's statements with a grieving friend's tears and labeling his remarks "fabrications," Defendants fabricated a public controversy, stoked outrage, and exposed Taylor to hatred, contempt, ridicule, and professional ruin.

183.     In reality, the full March 18, 2023 podcast where Taylor commented about the Covenant School Shooting shows that he expressly acknowledged that the Covenant shooting "did happen," while questioning tactical anomalies and the timing of a week-prior training exercise.  Defendants deliberately omitted these clarifying passages, rendering their publications materially false and defamatory.

184.     The full Rumble podcast shows Taylor repeatedly accepts that a shooting occurred, critiquing officer tactics.  Williams cherry-picked sound-bites, stripped away conditional phrasing, and placed Taylor's words next to another podcaster's outright denial to impute that denial to Taylor.  Williams had to play clips for interview subject Anna Caudill—who "did not know who Shawn Taylor was"—thereby admitting he alone shaped the outrage and was fabricating public outrage that did not exist until Phil Williams made it so.

185.     The article falsely claims that Taylor "spread false and dangerous conspiracy theories about last year's Covenant School shooting that left three students and three staff members dead."  In fact, Taylor never denied the murders and analyzed tactics.

186.     The article states that Taylor "falsely claimed that the Metro Nashville police body-cam video was actually staged.  In fact, Taylor offered an opinion that a portion of the

video looked like a "training op," referring to a particular room-entry tactic involving a "stack" and never said anything was "staged."

187.    Defendants published the foregoing libels with actual malice: Williams possessed and reviewed the complete audio-visual record, selectively edited it, and published accusations he subjectively knew were contradicted by the very source material in his possession.

188.    By branding Taylor a "conspiracy cop," "Alex Jones wannabe," and "defense attorney's dream," and asserting his "lies could let criminals go free," Defendants accused him of professional incompetence, dishonesty, and moral turpitude—statements that plainly tend to injure his reputation in his trade as a law-enforcement officer.

189.    The import of this article is to suggest that Taylor not only traffics in "dangerous lies" but directly harms grieving families and undermines public safety.  In fact, the Williams relies heavily on guilt by association, misleading paraphrasing, and deliberate omission of key contextual facts, all while layering in emotionally charged rhetoric and false authority figures to fabricate the appearance of consensus condemnation.

190.    This statement is not merely opinion or rhetorical flourish - it is a direct factual assertion that Taylor lied, with no effort to prove the required elements of falsity or knowledge of falsity. Given that Williams never contacted Taylor to verify the full meaning or intent of the comments, and that Williams continued quoting out-of-context remarks even after Taylor began defending his speech, this statement supports a finding of actual malice.

191.    Further, the article includes this knowingly false and defamatory conclusion: "Metro Police say Taylor's claims are 100% false, that officers had never trained at Covenant."

   a.   This false attribution blurs separate topics discussed by Taylor, who had even prefaced his statements by saying he was "going to be kind of all over the place with this." Taylor spoke first about MNPD and SWAT Tactics, and then mentioned that there was a "training and simulation" at the Covenant School the week before the shooting. He never said there was SWAT training at that school.

   b.   His statement was based in part on comments from Pastor Jim Bachmann, who told CBS Mornings News that the Covenant School had a "safety shooter drill" the week before the mass shooting: "They had just had a safety shooter drill the week before, so that's fortunate." CBS Reporter David Begnaud agreed with Pastor Jim Bachmann by saying "yep."

   c.   Furthermore, on April 4, 2023, Metro Police Chief John Drake stated, "I want to give a special thanks… to the teachers at Covenant School… the teachers had gone through active aggressor active shooter training recently…"

   d.   NewsChannel 5 and multiple of its reporters had also extensively covered the active shooter training taken by the Covenant School teachers prior to the shooting.

   e.   The media Defendants also intentionally omit that Shawn Taylor mentioned various emails about The Covenant School, the shooting, and allegations about sexual assaults of children that were publicly available on a website called "TheSilentBell.Org" and he encouraged viewers to go look at the evidence themselves and decide.

192.     Throughout the article, Phil Williams again uses the recurring rhetorical device of suggesting that Taylor poses a public danger because he "now has a gun and a badge," repeating a theme seen in prior articles. The purpose is to incite fear and public distrust, even though Taylor is fully POST-certified and passed psychological and background screenings, which Williams was aware of and/or had already obtained.

193.     Finally, this article primes the audience for the more theatrical emotional manipulation seen later that same day when Williams plays distorted and misrepresented podcast clips to an unsuspecting friend of a Covenant victim in order to elicit tears, gasps, and outrage, which are then used to frame Taylor as a modern-day Alex Jones.

194.     The May 28, 2024 articles also quote from NewsChannel 5's "Legal Analyst" Nick Leonardo, a Nashville-area attorney, left-wing political commentator, and on-air legal analyst regularly featured by NewsChannel 5 and Phil Williams to advance partisan narratives. At all relevant times, Leonardo had a personal and professional interest in discrediting the current leadership of the Millersville Police Department, including Plaintiffs Shawn Taylor and Bryan Morris.

195.     Prior to his participation in the defamatory May 28, 2024 article, Leonardo served as personal attorney to disgraced former Millersville Police Chief Dustin Carr, who abruptly resigned after releasing nude photographs of himself - including images in which he was grasping his exposed penis while in uniform inside Millersville City Hall. Following this scandal and Carr's resignation, Leonardo sought to extract a financial settlement from the City of Millersville on Carr's behalf, despite Carr's clear violations of law, policy, and decency.

196.     Dustin Carr's misconduct also included corrupt activities involving Solaren Risk Management, a private security company in which Carr had a financial interest. Carr used his position as Police Chief to print unauthorized police commission cards for Solaren contractors, some of whom were unqualified and not POST-certified. These actions endangered the public, violated TBI regulations, and risked municipal liability.

197.     As Carr's attorney, Leonardo was personally invested in discrediting and destabilizing the leadership that ultimately replaced Carr, namely Chief Bryan Morris and Assistant Chief Shawn Taylor. His defamatory statements must be viewed in the context of this vendetta and financial motive.

198.     In the May 28 article, Leonardo is quoted as stating:

    a.  "He [Shawn Taylor] is a defense attorney's dream."

    b.  "[Shawn Taylor] jeopardizes every prosecution that Millersville is involved in."

    c.  "If he touched a case at all, it's … More than potentially damaged ... it's done."

199.     These statements are demonstrably false, legally baseless, and maliciously made. Leonardo, as a practicing attorney and former Metro Council member, knew or should have known that:

    a.  Assistant Police Chiefs do not prosecute criminal cases.

    b.  The presence of a department member with unpopular political opinions has no bearing on the constitutional sufficiency of evidence in a criminal prosecution.

    c.  Courts assess suppression motions and credibility on the basis of facts and law, not political commentary made years earlier on unrelated podcasts.

200.     Leonardo's statement that "every prosecution that Millersville is involved in" is jeopardized is legally impossible and intended to incite fear, destroy Taylor's career, and trigger state intervention into the City's law enforcement - all without any factual basis.

201.     Leonardo's analogy of Taylor to Alex Jones, and his reckless echoing of Williams' narrative that Taylor spreads "bizarre conspiracy theories," was made without personal review of Taylor's actual statements or the full context of the podcast material. On information and belief, Leonardo never reviewed the April 4, 2023 podcast in its entirety, never contacted Taylor, and never consulted the relevant POST compliance records before issuing these public and injurious declarations.

202.     By amplifying false claims, comparing Taylor to a notorious defamer of school shooting victims, and asserting that Millersville's prosecutions were "done," Leonardo exceeded the bounds of commentary or opinion and entered into the realm of actionable defamation, made with actual malice and driven by personal motive, political bias, and retaliatory intent.

203.     Defendant Scripps Media, Inc. expressly held out Leonardo as "NewsChannel 5's Legal Analyst" and he is therefore the agent of Scripps Media, Inc..  Leonardo made the false and defamatory statements within the scope of his authority as agent for Scripps Media, Inc., and the defamatory act was authorized by Scripps Media, Inc. as principle. Scripps Media, Inc. is therefore liable for his defamatory statements.

204.     Scripps Media, Inc. was aware that Nick Leonardo acted in concert with Defendants Phil Williams and NewsChannel 5, who provided the platform and framing for these defamatory statements, reinforcing a shared objective: to destroy the reputation and

professional standing of Shawn Taylor through coordinated, malicious, and demonstrably false public statements.

***Capt. Todd Dorris Testifies at The Preliminary Hearing on May 28, 2024.***

205.　　On the morning of May 28, 2024, Capt. Todd Dorris testified at the preliminary hearing in State of Tennessee v. Henry Dean Jordan.  Jordan was the only suspect arrested during the sting. Assistant DA Jason White did not prepare Capt. Dorris in advance of his testimony, but Dorris brought copies of some pictures of the text messages where he was posing as a minor and Jordan had made the solicitation.

206.　　Assistant DA Jason White directed the examination of Capt. Dorris.  He testified that he was an investigator at the Millersville PD, which had conducted an investigation into internet crimes against children.  Capt. Dorris testified that between May 17 and the early morning hours that followed, he and Detective Candler conducted an online "sting" with the assistance of V4CR, a veterans group specialized in these types of stings, targeting adults soliciting sex with minors via the social-media app MocoSpace. He testified regarding the creation of the decoy profiles—set to the app's mandatory minimum age of 18 but posing as a 12-year-old girl—and communicated with suspects first through the app and then by standard text message once suspects agreed to meet offline.

207.　　Using phone numbers identified through database searches, they engaged Henry Dean Jordan in text exchanges in which he expressly solicited oral sex. Jordan traveled by bicycle to a Millersville Shell station, where he was arrested on the interstate by officers who had been dispatched to intercept him. At arrest, Jordan denied "touching" the decoy but did not dispute the content of the text messages, seven pages of which were admitted as "State's Exhibit 1" at the preliminary hearing.

208. Throughout his testimony, Captain Dorris clarified that he and Det. Candler drafted and sent each message in the communications involving Henry Dean Jordan's *solicitation* of the decoy profile. He further explained that they used AI-generated images—derived from algorithmic alteration of adult photos—to create the decoy profile picture, but was never questioned about that process or the identity of whose picture formed the base for the AI program to alter. All communications and exhibits were handled consistently with standard evidentiary procedures, and the full, unedited hearing recording makes clear that Captain Dorris was describing only his own messages to Jordan, not broader aspects of the multi-phone operation.

***After Kim Kelley Questioned by V4CR, She Uploads Video of Herself Claiming She Texted Suspect, and Locks V4CR Out of Their Social Media Accounts.***

209. Shortly after the Millersville Op concluded, Craig Sawyer was notified that Kim Kelley and Phil Drake had attempted to bribe one of the V4CR members to commit corporate espionage against V4CR. Although the V4CR volunteer declined to commit corporate espionage, Kim Kelley and Phil Drake's attempt to commit the offense and/or solicitation of another to commit the offense constitutes a violation of 18 U.S.C. § 1832, and is therefore a predicate racketeering offense for purposes of 18 U.S.C. § 1961 et seq.

210. After learning about this subterfuge, Mr. Sawyer invited Kim Kelley to participate in a Zoom call with him and some other managers. The call took place at 10:00 am PST on the morning of May 28, 2024 and lasted approximately two hours.

211. During the call, Mr. Sawyer asked Ms. Kelley, "Kim, we want to understand from your perspective, why are you investigating V4CR?" Sawyer stated that they were a non-profit and their records were open. He informed her that her business partner, Phil Drake,

is a criminal and Sawyer questioned why she and Drake were working together to try and disrupt the important work that V4CR was doing under the guise of some "investigation."

212.     During the Zoom call, Kim Kelley was acting in a bizarre manner and was hyper-focused on minute distinctions in order to avoid answering questions.  For example, if she was asked about harmful statements she had made on Thursday, she would immediately accuse the person of lying, saying the statements happened on Wednesday and that the person was therefore a "liar."

213.     During the Zoom Call on the morning of May 28, 2024, Kim Kelley acted in a bizarre manner, and began hyper-focusing on trivial details and disputing definitions of words instead of providing direct answers about her actions related to the corporate espionage that she and Phil Drake were attempting against V4CR.  An example of the type of quibbling would be responding to an accusation that she had made harmful statements on Thursday, to which she would counter with the accusation that the person was lying because the statement was made on a Wednesday, while dodging the call of the question as to *why* she had made the statements.   At other times, she would quibble with the definition of a word when asked a question, responding with evasive non-answers such as, "well, that depends on how you define that."    Her deliberate evasion and emphasis on minutiae prevented a clear understanding of her involvement and actions with Phil Drake, but at that point she knew that her and Drake's "investigation" had been exposed.

214.     Kim Kelley had been handling the social media for V4CR and had access to all of their social media accounts.  Shortly after the Zoom Call, Kim Kelley uploaded a video of herself to V4CR's YouTube channel, claiming that she was the one who had texted the suspect that was arrested during the Millersville sting.  In the video Kim Kelley made of

herself, she suspiciously emphasizes with unnecessary details that she alone had done all the texting and chatting with suspect Henry Dean Jordan, which was false. She also emphasized that law enforcement essentially had nothing to do with the sting, except for arresting the suspect, which was part of her attack on the Millersville Pedophile Sting and her promotion of herself and the subsequent promotion of her businesses at the expense of Plaintiffs.

215. Kim Kelley's disinformation tactics were aimed at derailing the Millersville pedophile sting and manipulating public perception. She falsely emphasized her unilateral role in texting with the suspect, despite multiple witnesses contradicting her claims. Kim Kelley was fully aware that only law enforcement was authorized to handle solicitations with suspects under Tennessee law, and the video she took of herself and uploaded was designed to make a public video containing information that she knew would not only obstruct the Millersville sting, but would also contradict any truthful testimony from Capt. Dorris that he had handled the messages involving Henry Dean Jordan's solicitations.

216. After uploading the video to V4CR's YouTube channel, Kim Kelley locked V4CR out of their social media accounts and changed the 2-factor authorization to a phone number controlled by her, making it impossible for V4CR to either take down the misleading information, access their accounts, or recover them. Because they lacked access to the account, Kim Kelley's video remained on V4CR's YouTube account. Kelley then provided the link to the video of herself to local reporter Phil Williams as "evidence" that she had done all the texting with Henry Dean Jordan, which conveniently contradicted the testimony that Det. Dorris had given earlier that morning.

217. On the evening of May 28, 2024, Craig Sawyer emailed Kim Kelley, stating:

Hi Kim,

After a 2-hour discussion with you, trying to gain understanding of why you have been working with a known criminal and facilitating his bizarre attempt to "investigate" our org, even though our books are open public record, we were unable to get that honesty, or sincerity.

Instead of addressing our observations of your words and actions, you accused us of making accusations and fought us on every minute aspect of your behavior, even when we have video evidence of your behavior. Even with your painful betrayal, we were inclined to try to reach you and get you to see you've been led into a very precarious situation with many red flags on the legal front.

One day, you will see we were telling you the truth and were trying to save you from whatever you're headed into. But at the end of the day, you've chosen your own behavior. That is your prerogative. We each must choose our path. You have chosen yours, which is now obviously hostile to ours. We have an important org to run and a difficult mission to conduct.

Due to your refusal to address our concerns, You are no longer trusted by our team. Your contract services here will no longer be needed, even though we all genuinely celebrated your contributions while you were here.

We do ask that you cooperate with our people as we make some adjustments to our online services for turnover, in good faith.

We will have nothing negative to say about you and genuinely wish you well. In addition, we will continue to aggressively defend our org & mission from defamation by all comers where needed.

Go be well. I pray that you continue to grow, learn, heal and thrive.

Craig "Sawman" Sawyer
Founder, Veterans For Child Rescue

218.    On the morning of Wednesday, May 29, 2024, Kim Kelley responded to Sawyer

and denied the accusations made against her, asserting that she had dedicated two hours

during the Zoom call to addressing the concerns and what she characterized as "false

allegations," even though she never presented any evidence to support her claims. Kelley's

denials were later proven false through her own subsequent interviews and statements from

Phil Drake, who confirmed that Kelley was deliberately sabotaging the Millersville sting

operation and subsequently attacking the Plaintiffs. As Drake admitted in his interview with Heartland Journal Podcast, Kim Kelley went in to "take those bastards out."

219.    On May 30, 2024, Craig Sawyer wrote to Kim Kelley, characterizing her hostile actions to lock V4CR out of their social media accounts and withhold their property as "attempted extortion":

"Hi Kim,

Under normal circumstances, no, there would be no reason we would ever withhold any compensation. However, under a hostile attack from an outside entity attempting to hold our property hostage, or to actively bring harm to our mission for children, we reserve the right to handle the situation as our legal team advises. Since I trust you're not attempting to hold our property hostage in such an attempted extortion scenario, I trust that's not even an issue we need to further discuss.

So, as you turn over our property (social media accounts) in good faith, as agreed, we will all be free to continue the separation process amicably.

**Craig "Sawman" Sawyer**
**Founder, Veterans For Child Rescue"**

220.    Despite the fact that Sawyer never acknowledged the validity of the 30-day clause, Kim Kelley disingenuously replied to him, stating that she was going to still demand final payment 30 days out:

"1. Ok, great. Since there's no hostile attack or attempt to hold your property hostage on my end 😂 I'm going to confirm that you're agreeing to honor the termination process and the final payment will be due the week after June 28.
If any of that is incorrect, please clarify in your next email.

2. My expense invoice was approved and processed by Forrest :D thank you!

3. Following up on this important question, since I have still not received a response:
**Would you like Grow Online to continue our regular work until June 28th, or would you like us to halt further work and go ahead and send the final invoice, and complete a smooth turnover process?**
Please advise so we have a clear, written agreement on our next steps to wrap up this contract.

THANKS

Kim Kelley"

221.     In fact, no expense invoice had been approved by V4CR, and Kim Kelley charged several thousand dollars to a V4CR credit card without permission.    Moreover, V4CR remained locked out of their social media accounts for many months and, upon information and belief, have still not recovered access to several of their accounts or discord server as of the time of filing this lawsuit.

***Defendant Kim Kelley and Phil Drake's Intentional Sabotage of the Millersville Pedophile Sting in Furtherance of Their Racketeering Influenced Corrupt Organization.***

222.     Unbeknownst to V4CR or the City of Millersville, Defendant Kim Kelley had been sent into Millersville as an "undercover" agent provocateur and saboteur at the direction of Defendant Phillip Drake.    These Defendants had the shared goal of disrupting the Millersville undercover sting operation to, in their words, simultaneously "take out" their perceived competitor, V4CR, and the members of the Millersville Police Department working with them.  The Defendants and their co-conspirators, by fabricating evidence and coordinating a smear campaign, attacked and disparaged the Plaintiffs with false and negative statements for the purpose of advancing their own unlawful agendas and promoting their unlawful racketeering enterprise.

223.     Phillip Drake ran in the 2024 United States Presidential Race, first as a Democrat, and then as an independent candidate.  In fact, his purported campaign was and is a front for illegal transmissions of money, money laundering, and racketeering enterprises owned and operated by Drake and Defendant Kelley, with over $200,000 being paid to Defendant Kim Kelley for "online marketing" services, when in fact the money was paid as part of

these Defendants' unlawful scheme to purchase, traffic, and conceal children on a farm owned and operated by the Defendants, in violation of dozens of federal laws.

224.     As set forth herein, Defendant Kim Kelley has been engaged in various racketeering enterprises with Defendant Phillip Drake, including through her companies, Defendants Digital Defenders United, Inc. and Grow Online, LLC, and Drake's purported "non-profit" corporation, Uniting America Incorporated.

225.     Kim Kelley, an admitted former member of a "sex cult," was later interviewed in Episode 236 of the Heartland Journal Podcast on August 5, 2024,[2] and she emphasized that she was "raised by gaslighters and narcissists."[3] Kim Kelley's admission that she was raised by narcissists and "gaslighters" demonstrates her familiarity with their manipulative tactics and further demonstrates that she understands, and has the propensity to utilize, gaslighting and narcissistic strategies—such as distorting facts, sowing confusion, and controlling narratives—to gather and selectively edit evidence for blackmail, to fabricate false evidence, and to orchestrate smear campaigns—which is exactly what she did as part of her and Drake's campaign to "destroy" the MPD and its leadership – Shawn Taylor and Bryan Morris – whom she personally attacked along with Det. Candler and Capt. Dorris.

226.     V4CR attempted to disrupt child trafficking operations by posing as minors in states where that is allowed, and assisting law enforcement with posing as minors in states like

---

[2] See, e.g., https://rumble.com/v59v3gd-heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24.html; https://podcasts.apple.com/us/podcast/heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24/id1650288595?i=1000664415208

[3] "Gaslighting" originates from the 1938 stage play *Gas Light,* later adopted into the 1944 film, in which a husband systematically manipulates his wife's environment, most notably by dimming the gas lamps, to make her question her own perceptions and sanity. As used herein, a "gaslighter" is someone who employs psychological manipulation and deception to make another person doubt their own reality or sanity, while a "narcissist" is an individual who displays extreme self-centeredness, lacks empathy, and exploits others for personal gain.

Tennessee. V4CR's goal was to catch and arrest pedophiles who sought to have sex with persons they believed were minor children. Kim Kelley apparently disagreed with the manner in which V4CR was operating, stating that she "had concerns about the lack of effectiveness on the "combatting" side of their operations," which she later stated in an online post on July 3, 2024. She claimed that she had been terminated after raising concerns about V4CR's affiliation with something she referred to as "the Moonies cult."

227.     According to statements published by Defendants Kelley and Drake online, including in podcasts and videos streamed over the Internet and elsewhere in the channels and streams of interstate commerce, Defendant Kelley and Defendant Drake had been planning to "investigate" and eliminate V4CR for some time and that they had planned to sabotage Millersville for nearly a month in advance.

**Phil Drake and Kim Kelley's "Child-Purchasing" and "Survivor Center" Fraud Scheme.**

228.     Phil Drake and Kim Kelley had a shared "vision" of an enterprise to purchase children being illegally trafficked in the United States and then conceal them from society at an undisclosed farm operating as a purported "survivor center." According to admissions by Drake during his subsequent August 19, 2024 interview on the Heartland Journal Podcast, to obtain these children, some of which are as young as ten (10) months old, he and his "team" will either use force to kidnap children from child traffickers, or he will "bribe government officials" involved in the illegal trafficking scheme, and then transport them to a compound owned and operated by him and Kim Kelley.

229.     Drake claims that he and Kim Kelley have built a "Survivor Center" to house the child trafficking victims he has rescued. His stated reason for having this compound of children is "because you can't trust the government to house the children."

230.     Of course, being on the "buy side" of a child trafficking scheme is just as illegal as being on the "buy side" of a drug trafficking scheme. Regardless of whether an individual wants to purchase a kilo of cocaine "to get it off the streets," they can still be arrested and charged for possession of the drugs as if they intended to use them personally. Similarly, whatever lofty intentions were shared by Drake and Kelley as part of their "child purchasing" scheme or "kidnapping trafficked children from the traffickers" scheme, their conduct is just as illegal as if they had kidnapped these child victims by prying them from their parents' arms.

231.     Phil Drake openly admitted during his interview with Craig Sawyer that the funds he used to fund both his presidential campaign and the purported "Survivor Center" came from the illicit funds he made doing "horrible things" along the U.S. – Mexico border. Drake made the following statements approximately 1 hour and 24 minutes in the online interview with Mr. Sawyer:

*Listen, my motivations have completely changed. Like the nonprofit up to this point where we're doing the Survivor Center and all that stuff. It's been funded completely out of pocket. Now I'm running out of money, but it's been completely out of pocket. The campaign completely out of pocket because. Listen, I did a lot of horrible things to make that money, right? It wasn't good money, even though there's not much of it left. I knew I had to. I knew that I had to do something good with that money or dispose of it. So I'm doing good with that money. And I have a unique set of skills now. I can use those skills for the good instead of for the bad. And that's why we run operations. Me and my team, we just go in and we get the kids. You know, we do a lot of investigating of child sex cults. I know you know a great deal about that, Craig. Ugly.*

232.     Phil Drake has admitted that his 2024 Presidential Campaign was funded in whole or in part with the illicit funds he obtained as part of the Defendants' scheme of mass murder of migrants on the border, and their subsequent trafficking of the children that Drake separated from their parents. Thus, all funds received by Drake, including all funds transferred to or from Drake and Kelley's shell corporation, Uniting Americas, Inc., which

holds funds known to be derived from criminal offenses and holds said funds for purpose of tax evasion, and therefore constitutes an illegal "money transmitting business" in violation of 18 U.S.C. § 1960. The Defendants, individually and in collaboration with Defendant Uniting America, Inc., participate in and solicit participation in a human trafficking payment network used to move funds in furtherance of human trafficking operations in violation of 18 U.S.C. § 1960.

***Defendant Phil Drake Admits Involvement In Interstate and Transnational Racketeering Scheme, Willfully Violating Rights of Americans, and Engaging in Acts of Terrorism.***

233.     On numerous occasions, Phil Drake has publicly boasted not only about openly bribing government officials and expressing his continued willingness to do so, but also engaging in heinous acts of mass murder of migrant families along the U.S. Border with Mexico. Drake has claimed that he was working as a "federal contractor" for both the CIA and Mexican drug cartels, and that he would intercept immigrants travelling to the U.S. Border from Mexico. Drake claims that he, with the assistance of other "federal contractors," separated children from their parents and then engaged in the systematic murder of the parents of over 5,000 child immigrants. Drake has claimed on numerous times that he knows where "all the mass graves" of the murdered victims are located, and that it is somewhere along the U.S. border with Mexico in Texas.

234.     Drake has openly admitted to trafficking children as part of his purported campaign of mass murder and violence. Drake claims that after separating migrant children from their parents and killing their adult parents, he was given "satchels full of money" from the drug cartels and ordered to transport these illegal payments across the border and state lines to officials in Washington D.C. as part of the Defendants' unlawful racketeering enterprise.

Drake claims that he had been involved in this enterprise "under the past four U.S. Presidents," indicating that his pattern of racketeering has gone back at least two decades.

235.     Phil Drake's admissions of separating children from their parents at the U.S. – Mexico Border, participating in the murder of those parents, and then smuggling satchels of money back into the United States to bribe officials—constitutes a clear "murder-for-hire" scheme that is unlawful under 18 U.S.C. § 1958, which prohibits using interstate or foreign commerce facilities for the intentional commission of murder in exchange for anything of pecuniary value. Drakes admissions also serve as a "predicate act" under the Racketeer Influenced and Corrupt Organizations Act, rendering anyone involved in the scheme jointly and severally liable for it. Specifically, 18 U.S.C. § 1958 identifies the use of interstate commerce (through travel, mail, or other means) with the intent to commit murder-for-hire as a federal offense; under civil RICO, such conduct demonstrates a pattern of racketeering activity that gives rise to liability for those who knowingly participate in, conspire to commit, or benefit from the scheme.

236.     Defendant Drake's admissions of mass murder at the U.S.-Mexico border also constitute "international terrorism" in violation of 18 U.S.C. § 2331(1). First, his activities involved violent acts and serious threats to human life, which would be criminal under state or federal law if committed within the territorial jurisdiction of the United States. Second, these acts were inherently designed to intimidate or coerce a civilian population or government, satisfying 18 U.S.C. § 2331(1)(B). Finally, Drake's actions transcended national boundaries by allegedly occurring in Mexico and continuing into the United States, fulfilling the requirements of 18 U.S.C. § 2331(1)(C). Accordingly, Drake is guilty

of international terrorism, and these offenses constitute separate predicate acts for purposes of the Plaintiffs' Civil RICO claims brought under 18 U.S.C. §§ 1961–1968.

237. Drake's admissions also implicate 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering activity. Specifically, Section 1959 penalizes individuals who commit or conspire to commit murder, kidnapping, and other violent offenses either for something of pecuniary value from a racketeering enterprise or to maintain or increase their position in such an enterprise. Here, Drake admits to committing mass murder on the U.S.–Mexico border, and then kidnapped the children and smuggled funds into the United States to bribe public officials—conduct that is the epitome of violent crimes done in furtherance of a racketeering scheme. Consequently, Drake's actions violate 18 U.S.C. § 1959 and constitute yet another multitude of predicate acts for purposes of Plaintiffs' Civil RICO claims under 18 U.S.C. §§ 1961–1968.

238. Accepting Phil Drake's admissions as true, his direct involvement in the systematic murder of 5,000 to 10,000 civilians would also constitute crimes against humanity under international law and would rank him among such notorious persons as Serbian war criminal Ratko Mladić, who was criminally responsible for the July 1995 Srebrenica massacre in which over 7,000 Bosnians were systematically murdered.

239. Phil Drake has told witnesses that he has videos on his cell phone showing him and his "team" stacking dead bodies into mass graves somewhere along the U.S. – Mexico border. Discovery is needed to verify these claims.

240. In the August 19, 2024 Episode 240 of the Heartland Journal Podcast, Drake claimed that he and his Affiliated Organizations are responsible for the "rescue" of 1,384 children in the eight months from January 2024 and his interview in August of 2024. Drake

stated that he does not film his "rescues," because the child traffickers that he steals these children from view his actions as "stealing their product," which Drake claims justifies hiding these children from society on the purported farm owned and operated by him and Defendant Kelley.

241.    Under 18 U.S.C. § 1201, kidnapping is broadly defined as the unlawful abduction or confinement of a person, regardless of the perpetrator's claimed motive. In Defendant Drake and Kim Kelley's "business model," forcibly taking children from their parents or traffickers—without lawful authority—and holding them at a concealed location purportedly to "rescue" them still constitutes "abduction" and "holding" for an unlawful purpose. The statute does not require proof of a demand for ransom or reward; the phrase "or otherwise" covers <u>any</u> unlawful holding of a victim against their will or without proper legal justification. Consequently, even if Drake and Kelley subjectively view their actions as noble or protective, the act of removing children from their rightful custodians and hiding them away at a "Survivor Center"—absent a valid legal order—constitutes kidnapping under federal law and also constitute at least 1,384 additional predicate acts occurring in 2024 for purposes of Plaintiffs' Civil RICO claims under 18 U.S.C. §§ 1961–1968.

242.    Defendants Drake and Kim Kelley have knowingly used their Affiliated Organizations as unlicensed money transmitting businesses in violation of 18 U.S.C. § 1960 by funneling illicit proceeds from their murder/kidnapping/trafficking/fraud scheme into Drake's presidential campaign and then, in turn, transferring those funds to themselves under the guise of the expenditures being "campaign expenses." Further, they have misused their 501(c)(3) entities—Uniting America Inc. and Digital Defenders United—to

facilitate these transactions without obtaining the required state licensing or federal registration as a money transmitting business under 31 U.S.C. § 5330. By operating without the appropriate license(s) and using instrumentalities of interstate commerce to move illicit funds, Defendants have violated 18 U.S.C. § 1960.

243.     In addition, Defendants Drake and Kelley have engaged in the unlawful laundering of monetary instruments in violation of 18 U.S.C. § 1956, as they knew the funds derived from their murder/kidnapping/trafficking operation were proceeds of unlawful activity, yet they conducted financial transactions with the intent to promote further illegal conduct and to evade reporting requirements. Specifically, by moving money from the presidential campaign and through nonprofit accounts to pay themselves, Defendants concealed or disguised the nature, source, ownership, and control of these criminal proceeds. This conduct constitutes money laundering in violation of 18 U.S.C. § 1956(a)(1) and (a)(2), as the transactions involved interstate commerce, were designed in part to avoid taxation and required disclosures, and clearly promoted continued unlawful activity.

244.     Defendants Kelley also exploited their 501(c)(3) nonprofits—Uniting America Inc. and Digital Defenders United—as conduits for funneling illicit funds while claiming the protection of charitable status. This misrepresentation to federal and state authorities further underscores their intent to conceal the origins and beneficiaries of the money. As a result, these nonprofits acted as fronts for illegal financial transactions, intensifying Defendants' violations of both 18 U.S.C. § 1960 and 18 U.S.C. § 1956, and contributing to a broader pattern of racketeering activity under 18 U.S.C. §§ 1961–1968.

*Defendants Phil Drake and Kim Kelley's "Survivor Center" Is An Instrument of Fraud Racketeering.*

245.     Defendant Drake and Defendant Kelley, Co-founders of Uniting America Inc., created and utilized Uniting America Inc. to not only promote and facilitate their unlawful racketeering enterprise, but have also used the instrumentalities of interstate commerce to fraudulently obtain donations and funds to build a "Survivor Center" that does not actually exist.  At bottom, Drake and Kelley are scam artists who travel across interstate lines to perpetrate their many frauds.

246.     Although the Defendants took down their websites "UnitingAmericaInc.org" and "GrowOnline.Com" in December and August of 2024, respectively, the Defendants had utilized those websites to advance their racketeering activities and fraudulently obtain donations.

247.     To advance their racketeering activities, Defendants Drake and Kelley claimed to own 80,000 acres of property "in the Carolinas," where they had built their Survivor Center and were actively harboring "child trafficking survivors."   The following screenshot is from the Facebook page of Uniting America Inc.:



# Our Vision in Action

80,000 acres in the serene Carolinas, transformed into a beacon of recovery. Here, every survivor finds safety, therapeutic care, a connection with nature, and opportunities to grow.

248.     The Defendants published the following information about their business plan and the purported "Survivor Center" on their website "UnitingAmericaInc.Org":

# 1. Human/Child Trafficking:

We actively spearhead counter-trafficking and rescue operations across the USA to combat child trafficking and exploitation. Collaborating with specialized agencies, we identify and dismantle trafficking networks, safely recover victims, and connect them with essential rehabilitation and support services. Our comprehensive approach targets both the prevention of such heinous crimes and the holistic recovery of survivors.

**Learn More**

## Join the Movement For Positive Action!

By contributing your time, resources, or donations, you directly impact the lives of those in need and contribute to the positive transformation of our society. Every small action contributes to lasting change.

Join the #UnitingAmerica Movement and become an agent of change. Together, we will take action, uplift our communities, and create a brighter future for all.

**A Sanctuary of Hope: Uniting America's Center for Child Trafficking Survivors**

Imagine surviving the unimaginable, facing each day with the heavy burden of unfathomable mental and physical trauma.

Children trapped in the harrowing realm of trafficking require more than sympathy. Beyond rescue, they need a sanctuary where they can rediscover hope, heal from their trauma, and envision a future where they are free and empowered.

**Donate & Make A Difference**

249.    The scope of the Defendants' fraudulent scheme varies.  On Facebook, they claimed to own 80,000 acres "in the serene Carolinas," but on their website, they claimed to own "85 acres in the peaceful Carolinas":



**Our Vision: A Self-Sustainable Haven**

At Uniting America, we're rising to address this challenge. Over 85 acres in the peaceful Carolinas will soon be transformed into a beacon of hope and healing.

Our Survivor Center and Safe Home Community promises:
**- Safety & Security:** High-security measures, from on-site security teams to advanced tech, ensuring every child is truly safe.

> **- Healing & Therapy:** Spaces dedicated to trauma-informed care, led by specialists in various therapy and rehabilitation modalities.
> **- Reconnection with Nature:** Our community will thrive sustainably, complete with its farm, animals, and gardens, offering therapeutic engagements with nature, and solar panels ensuring green energy.
> **- Education & Growth:** Holistic growth opportunities, from education to skill-building, preparing them for brighter tomorrows.

250.     According to videos on the Defendants' Facebook page, they have travelled to various places throughout the United States to promote their illicit business and seek donations from those they can scam into believing that the "Survivor Center" has been built.  Through creative editing of videos and recordings, the Defendants have taken clips of videos from various places and edited them together to create the illusion that they own and operate a resort-like "Survivor Center" complete with what they refer to as a "regenerative farm," where purported child trafficking survivors live and work as part of some collective commune.   Drake and Kelley have uploaded videos of themselves with various children, claiming that these children were currently being housed at their "Survivor Center."  It is not clear if these children are, in fact, trafficked children or if they are just more "props" that the Defendants have used to create the illusion that they are operating a legitimate business.

251.     In videos the Defendants have posted to their Facebook page "Uniting America Inc," Kim Kelley announces herself as the "co-founder" of Uniting America Inc. and claims that the Defendants own "100 acres" that houses their Survivor Center and their "regenerative farm" and they claim in these videos "right now, we have a regenerative farm

and we have cabins that can house 15 to 17 children each." The Defendants show videos of children working on this "regenerative farm" and other videos of children playing with dogs, which the Defendants represent are trafficked children who have been rescued and are currently living at this compound.

252.     Defendants Drake and Kelley, and those acting in concert with them have admitted to harboring and conspiring to harbor children at their so-called "Survivor Center," which they claim is surrounded by armed guards. Drake has claimed that these children are then isolated and concealed from the public and lawful authorities until they will reach adulthood. Drake has stated his intent that these children remain under his control at the "Survivor Center," working on the "regenerative farm" that is attached or part of the same property. The Defendants' actions constitute the knowing recruitment, harboring, or obtaining of persons for labor or services under conditions that effectively prevent them from exercising their rights or seeking help from law enforcement—thus violating 18 U.S.C. § 1590. By removing any possibility of discovery by authorities, voluntary departure, or lawful guardianship, Drake and Kelley's plan violates the statutory prohibitions against peonage, slavery, involuntary servitude, or forced labor and constitute independent predicate acts of racketeering activity under 18 U.S.C. §§ 1961–1968.

253.     Moreover, Defendant Drake and Kelley's scheme to house these children in a compound surrounded by armed guards and compel them to work at the "Survivor Center" inherently envisions him benefiting—financially or otherwise—from their unpaid or forced labor. Under 18 U.S.C. § 1593A, any individual who knowingly profits from a venture involving trafficking or forced labor, knowing or acting in reckless disregard of the venture's illegal nature, is subject to the same penalties as a direct participant. Here,

Defendant Drake's continued public statements reveal an intent for him and the other Defendants and Defendant Organizations to profit from coerced labor, thereby demonstrating that he benefited (and plans to benefit) from his ongoing, criminal trafficking scheme.

254.    At bottom, Defendants Drake and Kelley are also simply utilizing their fraudulent enterprises to scam people into donations and receipt of money based on their misrepresentations.  For example, Drake uploaded a video on YouTube claiming it showed him building one of the "cabins" for trafficked children at the Defendants' Survivor Center:



255.    Although it is not clear where the staged videos of the two "tiny homes" being delivered were taken, Google Earth images show that both of these structures are now in

the back yard of Phillip Drake's dilapidated residence in South Carolina, as shown at the end of the dirt driveway in the right side of the following photo:



256.    Defendants Drake and Kim Kelley also utilized their fraudulent racketeering enterprises to scam individuals into donating money for purported "disaster relief efforts." Drake and Kelley used the federally-declared Maui fire disaster in 2023 to divert donations to his and Defendant Kelley's illicit enterprises.   In furtherance of this scheme, Defendants Drake and Kelley uploaded videos to YouTube falsely claiming that they were sending in a "team" to assist with the disaster relief, which was false.

257.    The following is a screenshot of the Defendants' YouTube video:



258.     The Defendants also linked back to their website for Uniting America, Inc., thus

using the instrumentalities of interstate, in order to obtain fraudulently induced donations

provided to them for purposes of assisting with the disaster in Maui:

## UNITING AMERICA: STEPPING UP TO FILL IN THE GAPS

In these unprecedented times, we're committed to locating the lost, supporting the survivors, defending residents' rights, and initiating community rebuilds.

### Our Recon Team

Despite the risks, our dedicated team is heading to Maui in an effort to render aid, mitigate further losses, and champion the spirit of Aloha.

### Your Role in Their Resilience

Your generosity can be the beacon of hope Maui desperately needs.

We guarantee:

💯 **Direct Impact**: Every penny of your donation directly fuels the Maui Disaster Relief effort.

🎥 **Transparent Updates** We promise raw, unfiltered updates from the heart of the action, revealing the truths some might wish to conceal.

Join hands with us. Together, let's empower Maui to rise from the ashes.

**Donate Now**

259.     The Defendants disaster relief fraud not only violates 18 U.S.C. § 1040, it also constitutes yet another predicate act for purposes of Civil RICO, 18 U.S.C. § 1961 et seq. Drake and Kelley have violated 18 U.S.C. § 1040 by knowingly making materially false and fraudulent statements concerning the solicitation and use of donations purportedly designated for "Maui disaster relief" efforts. Specifically, under § 1040(a)(2), they falsified representations by assuring donors that their contributions would be allocated to emergency relief initiatives related to the Maui disaster, which qualifies as a benefit authorized under a major disaster declaration pursuant to the Robert T. Stafford Disaster Relief and

Emergency Assistance Act (42 U.S.C. § 5170). Their deceptive actions involve interstate commerce, as the donations were solicited and transmitted across state lines, thereby meeting the circumstances described in § 1040(b)(1). By concealing the true intent and misuse of the donated funds, Drake and Kelley engaged in fraud connected to major disaster benefits, warranting prosecution and penalties as stipulated under. 18 U.S.C. § 1040.

260.    Defendants Drake and Kim Kelley, along with their respective business entities and co-conspirators, have willfully combined and conspired to commit multiple federal offenses, including—but not limited to—money laundering, illegal money transmitting, kidnapping, forced labor, and tax evasion. By funneling illicit proceeds through purported nonprofit entities, concealing children at Drake's so-called "Survivor Center," and moving funds in and out of Drake's presidential campaign, Defendants engaged in a series of overt acts designed to further their collective criminal objectives. In so doing, they intended not only to defraud the United States government but also to obstruct law enforcement operations in Millersville, all in violation of 18 U.S.C. § 371.

261.    As part of their conspiracy, Defendants Drake and Kelley intentionally interfered with the undercover pedophile sting conducted by the Millersville Police Department, disparaging Plaintiffs and their participation in the operation as part of their promotion of their own unlawful racketeering ventures, Uniting America Inc. and Digital Defenders United. This interference included disseminating false and misleading information, orchestrating public attacks on Plaintiffs and law enforcement personnel, and coordinating a media narrative aimed at discrediting the sting's legitimacy and the Plaintiffs actions during the sting. By undermining a legitimate law enforcement operation, Defendants

sought to advance their racketeering enterprise by promoting it as superior to the methods used during the V4CR/Millersville pedophile sting.

262.     The above-described conduct also constitutes predicate acts under the Racketeer Influenced and Corrupt Organizations Act. Defendants' repeated violations of federal statutes—ranging from money laundering (18 U.S.C. § 1956) to unlicensed money transmitting (18 U.S.C. § 1960) to the conspiracy offenses described in 18 U.S.C. § 371—demonstrate a pattern of racketeering activity. By coordinating efforts to interfere with an active pedophile sting and simultaneously diverting criminal proceeds into their personal coffers and nonprofit organizations, Defendants acted as a cohesive "enterprise," seeking both financial gain and insulation from law enforcement. Their unlawful conspiracy, carried out through multiple related criminal acts, thus falls squarely within Civil RICO's purview, and each Defendant is jointly and severally liable for the damages caused by this pattern of racketeering activity.

263.     During his August interview on the Heartland Journal Podcast, Drake claimed that he had travelled across state lines into Tennessee "the other day" to assist "a young lady who has been abused quite a bit," claiming that "law enforcement" would not do anything about it.  Whatever illicit act Drake accomplished during this August trip to Tennessee, it constitutes another predicate act of extending the Defendants' racketeering enterprises into Middle Tennessee.

264.     Drake claims, and Plaintiffs therefore aver, that Drake provided the "secret recordings" taken by his agent, employee, business partner, and co-conspirator Kim Kelley during the undercover pedophile sting in Millersville to two media outlets that he mentioned in his Heartland Journal Podcast interview.  Drake has admitted that he was the

first person to contact Phil Williams at Channel 5, whom Drake claimed was eager and willing to publish the stories about Chief Taylor, Chief Morris, Capt. Dorris and Det. Candler.

265.     Drake, a multiple felon, has prior convictions and has pled guilty to many crimes of dishonesty.  According to public records, Drake has over three dozen criminal filings against him from South Carolina and Texas, including multiple infamous crimes of dishonesty:

   a.  Two charges in South Carolina for Cruelty to Animals dated August 27, 2013.

   b.  Convictions in South Carolina for felony fraud/theft charges for "Breach of Trust with Fraudulent Intent for over $2,000" on November 2, 2012;

   c.  A guilty plea to the felony charge in South Carolina for the fraud/theft crime of "Larceny/Failure to Return Rented Objects, Fraud, Misappropriation," on February 24, 2012;

   d.  A guilty plea to a 2011 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses under $2,000" ;

   e.  A guilty plea to a 2012 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses under $2,000" ;

   f.  A guilty plea to a 2012 felony charge in South Carolina for the fraud/theft crime of "Obtaining Signatures or Property Under False Pretenses Valued $10,000";

   g.  A guilty plea to a 2012 felony charge in South Carolina for theft crime of "Exploitation/Exploitation of a Vulnerable Adult," on February 24, 2012;

   h.  A pending felony charges from 2010 in South Carolina for Theft of Livestock valued at $5,000 or more

i.  Indictments from 2009 for Breach of Trust with Fraudulent Intent, valued at $5,000 or more.

j.  Five guilty verdicts in 2006 for writing fraudulent checks valued at $500 or less;

266.    In November of 2024, Defendant Drake was arrested by U.S. Marshalls and is currently being held in the Hidalgo County jail in Texas, so he can stand trial for a half dozen felony charges of Theft of Cattle/Horses/Livestock and Theft of Property valued between $30,000 and $150,000.   Hidalgo Texas and Hidalgo County in the Rio Grande Valley sit directly on the U.S. – Mexico border, which is a geographic hotspot widely known to be a corridor frequently used in furtherance of cross-border smuggling and human trafficking.  Thus, Drake's allegations of kidnapping, trafficking and murder along the U.S. Border should be investigated by federal agents, as he had the means, motive and opportunity to have engaged in the heinous acts he has claimed to committing along the U.S.-Mexico border.

***Phil Drake Publicly Claims To Have Created the "Q Anon" Conspiracy As Part of His Work as Contractor for CIA, FBI, and OIG.***

267.    It is the peak of irony that Phil Williams has baselessly branded Shawn Taylor a "QAnon conspiracy theorist," yet he relied on statements and evidence from Kim Kelley and her co-conspirator Phil Drake as his star witness and source of information in his smear campaign in Millersville against Shawn Taylor, Bryan Morris, Capt. Dorris, and Det. Candler.  Phil Drake openly claimed in online videos available to the Channel 5 Media Defendants to be the *actual* creator of QAnon, supposedly as part of his top-secret work as a "federal contractor" working for the FBI, CIA, OIG, and various other unidentified "three-letter agencies." By using an unreliable witness and her self-professed QAnon–

founding accomplice Phil Drake to smear the Plaintiffs for doing their job, Phil Williams has actually advanced the very "Q conspiracy" narrative he purports to condemn. Williams has also supported and promoted the racketeering

268.     On January 2, 2024, Phil Drake uploaded a YouTube interview he did with Craig Sawyer, another favorite target of Phil Williams, during which time Drake made additional, shocking claims. According to Drake, contractors were needed to be a "third party" that could accomplish illegal tasks that the agencies themselves could not carry out. He claims that his job was to assist the "FBI, OIG, or CIA" by breaking into homes, documenting evidence, and then being treated as an "undercover informant," in order to somehow provide these agencies the stolen information so they could then obtain a search warrant to seize the evidence.

269.     During the podcast with Craig Sawyer, Drake claims that his "entire career doing this was [sic] revolved around violating the rights of the American people," and that he was "not going to sugarcoat it." Drake claims that he received "orders" from the CIA. "You make the people in the community trust you," claimed Drake, "and then you manipulate situations so you can follow out your orders."

270.     Drake claims to have received direct orders from "the administration," to create "QAnon." He claims that he started working on "QAnon" in mid-2016. To accomplish the creation of "Q" - Drake claims that he and unidentified members of his team of "contractors" were provided an English translation of Adolf Hitler's "Mein Kampf" as part of the creation of "QAnon." According to Drake, his "QAnon" development was accomplished to target members of "the Christian faith."



271.     Drake claims that he and his team used "Cambridge Analytics" to create QAnon. He reiterated that his mission was to "target Christians" and "target their faith" to make sure that there was a "living savior" in office.

272.     As set forth herein, these facts about Drake were ignored by Phil Williams and the Channel 5 Media Defendants, who weaponized this criminal and his co-conspirator Ki Kelley against veteran police officers in Millersville in order to create a false narrative that Plaintiffs were engaged in criminal activity, when in fact they were trying to eliminate in.

**Defamatory Article Published on June 3, 2024**

**False Attribution of Motive and Fabrication of Timeline to Smear Shawn Taylor as**

**Retaliatory and Delusional**

273.     On June 3, 2024, Phil Williams and NewsChannel 5 published an article titled "Millersville's Conspiracy Cop Says He Has His Two Critics 'Under Investigation'", included herewith in the Appendix, which falsely claims that Plaintiff Shawn Taylor initiated criminal investigations into City Commissioners David Gregory and Cristina

Templet in retaliation for their public criticism of him - a narrative that is factually false, maliciously intended, and legally indefensible.

274.     Taylor is quoted in the article as saying "Two of the commissioners, who are under investigation for criminal acts, what they have done is that they have called for a special meeting."   The Media Defendants intentionally omitted critical details from the article, including that Defendant Cristina Templet was, in fact, under investigation for her various acts of residency fraud by DA Ray Whitley.   In addition, the City of Millersville had disclosed in a prior meeting that Defendant David Gregory had unlawfully possessed one of the illegally-made Police Commission Cards printed for him by the pre-2024 Millersville administration, even though Gregory had never undergone the requisite training to be entitled to a police commission, an issue that has plagued Millersville for years until Chief Morris ended it in 2024.

275.     The import of the article is to create the impression that Taylor is abusing his position as Assistant Police Chief to intimidate elected officials, driven by delusions and personal vendettas. In reality, the investigation into Gregory and Templet was already active months prior to their public statements about Taylor, and Taylor's podcast comments simply acknowledged the preexisting investigation.

276.     In addition to this false causal implication, Williams again recycles his own defamatory label by writing:  "Shawn Taylor, who has become known as Millersville's conspiracy cop,"   This phrase falsely suggests that the moniker originated from public consensus or independent concern when, in fact, it was invented and propagated solely by Williams and NewsChannel 5. This is a deliberate attempt to launder the origin of his

defamatory branding by implying he is merely "reporting" on a narrative that he himself concocted.

277.     The article then deceptively conflates events unrelated in time and substance by stating:  "The latest interview - with a podcast associated with the far-right John Birch Society - comes a month after the arrest of former Millersville Mayor Tim Lassiter."

278.     This line falsely implies that Taylor's April 28, 2024 arrest of Lassiter was part of a child sex trafficking investigation - a claim that Williams knew was factually impossible, since the arrest occurred prior to a child trafficking operation conducted between May 17 and May 20, 2024. Despite this, the article uses innuendo to suggest that Taylor is weaving unrelated criminal events into grand conspiracies.

279.     Williams then selectively quotes a podcast in which Taylor discusses the systemic nature of corruption in public contracting and real estate development. Rather than reporting the full context, Williams cuts away from clarifying remarks and accuses Taylor of "leaving the impression - without evidence - that his investigation" is somehow linked to "child sex trafficking."

280.     The article also misrepresents Taylor's response to a question about Lassiter: "Instead of immediately clarifying that the former mayor's arrest had nothing to do with child sex trafficking, Taylor went on and on."

281.     This is a misleading editorialization, especially since Taylor ultimately says on the record:  "I'm not saying that the former mayor is involved in sex trafficking, by any means."

282.     Rather than acknowledge that disclaimer outright, Williams and Commissioner David Gregory first suggest it proves the opposite:  "He said the words. That indicates, probably an indication, that he wants people to believe that."

283.     This speculative commentary, anchored in a false timeline and misrepresentation of Taylor's actual words, is used to support Gregory's baseless public demand for Taylor's resignation at the June 3, 2024 work session.

284.     As confirmed by the meeting transcript, Gregory acknowledged that Taylor had not named the commissioners, and Taylor's podcast comments referenced an already pending criminal investigation - not a new or retaliatory one. Thus, both Gregory's statement and Williams' article falsely frame the investigation as retaliatory and initiated in bad faith.

285.     The article also seeks to further stigmatize Taylor by guilt-by-association, linking him to QAnon podcasters, referencing Mars colonization conspiracies, and quoting Williams' own critics as if they were Taylor's allies. These editorial decisions have no journalistic value and are included solely to dehumanize Taylor and portray him as unhinged.

286.     Once again, the article concludes by quoting Commissioner Gregory making the ludicrous claim:  "They [the public] are afraid now of the police department... because of Shawn Taylor."  This is a knowingly false and defamatory assertion - no evidence is provided of any formal complaint, incident, or public statement of fear directed at Taylor. This fearmongering is intended solely to destroy Taylor's reputation, justify his termination, and incite third-party intervention into city governance.

287.     Williams and NewsChannel 5 published this article with actual malice, knowing the timeline was reversed, that the Lassiter arrest was unrelated to child sex trafficking, and that Taylor never retaliated against anyone for criticism. They further failed to disclose the City Charter provision that prevents commissioners from influencing police hiring decisions, and that comments made by them regarding Taylor's employment are not

protected by legislative immunity - making their defamatory accusations both unlawful and actionable.

288.     On or about June 10, 2024, Defendant Levi Ismail posted a video on Youtube, whereby he repeated and republished the false allegation that Shawn Taylor claimed the Covenant Shooting was "staged."  Defendant Ismail republished the false and defamatory allegations on Instagram and TikTok, sometimes using the handle "NashvilleNews" to spread the defamatory accusation.

**Commissioner David Gregory's Defamatory Statements - June 3, 2024 Work Session**

289.     During the Commissioner Comments segment of the June 3, 2024 Work Session, David Gregory delivered another personal tirade against Shawn Taylor.  He was not debating or voting on legislation, and therefore absolute legislative immunity does not apply to his defamatory statements.  Gregory holds no authority over police hiring or discipline, and his remarks were purely personal and unprivileged.   The following is a rough transcript of Gregory's defamatory comments:

**T. Long:** [01:43:03.000 --> 01:43:08.000]   Commissioner comments, Commissioner Gregory?
**D. Gregory:** Yes, I got a little bit to say here.

[01:43:08.000 --> 01:43:17.000]   Shawn Taylor said on the podcast that there are two commissioners, which are the most vocal critics.

[01:43:17.000 --> 01:43:25.000]   He has us under investigation for criminal acts. So who are the two commissioners and what are the criminal acts?

**[…]**

**D. Gregory:** [01:43:35.000 --> 01:43:42.000]   He raised the question. I don't think it is. But that's a question I have. I wonder what's going on also.
[01:43:42.000 --> 01:43:55.000]   I think Shawn Taylor needs to apologize to the covenant victim shooting that was brought out. That's not funny.
[01:43:55.000 --> 01:44:04.000]   And for the victims that were hurt, the three children, three adults that were trying to protect the children that lost their lives.

[01:44:04.000 --> 01:44:17.000]   And he brought and made a sarcastic remarks about it. And he needs to apologize to the victim's family that covenant shooting and also Metro Police and what he said about them.

[01:44:17.000 --> 01:44:26.000]   And what he said about our former mayor doing an investigation on him is child trafficking.

[01:44:26.000 --> 01:44:32.000]   Folks, this has got to stop. It don't matter. I heard it's on there.

[01:44:32.000 --> 01:44:44.000]   And I'm wondering why it was on a podcast that he said Phil Williams was a pedophile.

[01:44:44.000 --> 01:44:49.000]   Now he's an employee of this city. This happened during the point he was here.

[01:44:49.000 --> 01:44:54.000]   He made an accusation against two commissioners. They're going to go ahead and do criminal action against them.

[01:44:54.000 --> 01:45:01.000]   The comments about Covington (sic) was about a year, a year or so back on the shooting, but yeah, I've seen it and Nashville seen it.

[01:45:01.000 --> 01:45:11.000]   And those people were affected. Those families are re-hurt again. They're trying to heal. I don't need a Taylor, Shawn Taylor in this city.

[01:45:11.000 --> 01:45:20.000]   I'm asking for his resignation. I want him out of here. He's killing our city. He's dragging our city through the mud.

[01:45:20.000 --> 01:45:27.000]   Our name is getting through the mud and I'm doing that publicly and on that camera right there.

[01:45:27.000 --> 01:45:39.000]   The Shawn Taylor is a disgrace to our police department. Nothing against the guys back there and the women, but against our police department and being an employee of this city.

[01:45:39.000 --> 01:45:43.000]   You hired him. You need to fire him.

**T. Long:** [01:45:43.000 --> 01:45:50.000]   David, you're pretty good at politics.

**D. Gregory:** I want people to apologize.

**C. Templet:** [01:45:50.000 --> 01:45:51.000]   You're out of order.

**D. Gregory:** [01:45:51.000 --> 01:45:52.000]   That's my comment.

290.     Gregory made numerous false allegations and false implications during his personal rant, which was all made in furtherance of his coordinated efforts with Phil Williams and NewsChannel 5.

291.     Gregory continued spreading the false accusation that Shawn Taylor had denied that the Covenant School Shooting had taken place, claiming that he "needs to apologize to the Covenant victim … he made sarcastic remarks about it."  In fact, Taylor never made any sarcastic remarks about the Covenant School Shooting.  Gregory also spread the false

allegation that Taylor had claimed that former mayor Tim Lassiter was engaged in child trafficking, which was patently false.

292.     Gregory continued his tirade by imputing that Taylor was unfit for public office and guilty of moral turpitude, stating that, based on the false accusation he had levied against Taylor, that Taylor was a "disgrace to our police department" and that the City Manager needed to "fire him."

293.     Gregory had no evidence for his claims and the full podcast was publicly available, showing Taylor never made the statements attributed to him. Gregory therefore spoke with actual malice—knowledge of falsity or reckless disregard for the truth—motivated by personal animus and a desire to force Taylor's resignation.

**Defamatory Article Published on June 4, 2024**

**Fabrication of Public Outrage and Defamation by Omissions, Distortions, and Misleading Juxtapositions**

294.     On June 4, 2024, Defendants Phil Williams and NewsChannel 5 published an article titled "Millersville Commissioners Stand With Assistant Police Chief - and His Covenant School Conspiracies," included in the Appendix, in continuation of their defamatory "Hate Comes to Main Street" series. This article falsely portrays that Plaintiff Bryan Morris and the City's elected officials endorsed "bizarre conspiracy theories" and "fabrications" surrounding the Covenant School shooting - a narrative created solely by Defendants themselves through intentional misrepresentation of Plaintiff Shawn Taylor's commentary.

295.     The import of the June 4, 2024 Article is to create the false impression that Taylor's remarks about deficiencies in public bodycam footage were equivalent to denying the

reality of the Covenant shooting or slandering its victims. This is categorically false: Taylor never denied the Covenant shooting took place, never impugned the victims' suffering, and never accused any Covenant official of child trafficking in the manner suggested by Defendants.

296.     Furthermore, Williams repeatedly asserts that Taylor "falsely claimed" that video footage "was staged" - despite Taylor's actual words reflecting observations about the limited and edited footage available to the public at the time, noting the absence of standard signs of a live active shooter situation (locked doors, children fleeing) and inconsistencies that merited scrutiny.

297.     Rather than report this fairly, Williams weaponized the emotional trauma of the Covenant tragedy by ambushing Millersville officials with leading questions intended to manufacture the appearance of official embarrassment or disapproval. Williams quotes Commissioner David Gregory demanding that Taylor "apologize," despite the fact that Gregory himself had admitted at the June 3, 2024 work session that Taylor had not named him and that Taylor's referenced investigations were preexisting.

298.     Critically, Phil Williams engages in a deceptive framing technique:

   a.   He describes Millersville as "controlled by a three-member majority backed by the far-right group Sumner County Constitutional Republicans."  This was, in fact, false, as neither Tommy Long, Milton Dorris, or Alisa Huling were members of SCCR.  Plaintiffs Bryan Morris and Shawn Taylor were also perceived by the Defendants of being members of the SCCR, which was not true.

   b.   He claims these commissioners "stood behind Taylor" despite many admitting that they had not even reviewed the podcasts or coverage themselves.

c.  He presents refusal to publicly attack Taylor as an endorsement of "bizarre conspiracy theories," weaponizing the officials' procedural neutrality into defamatory implication.

299.     When Williams interviews Mayor Tommy Long and Interim City Manager Bryan Morris, he again attempts to manipulate their neutral or procedural answers into guilt: Mayor Long said he had not personally watched the videos, which Williams twists and presents as a lack of concern for victims.

300.     Bryan Morris declined to engage with Williams based on Williams' past harassment and mischaracterization - which Williams again manipulates to falsely suggest a callous indifference toward Covenant victims.

301.     Williams continues to falsely assert: "Taylor had falsely accused the beloved hero of being involved in child sex trafficking."  This is demonstrably false. Taylor's commentary raised concerns about broader trafficking issues based on allegations from a website he cited called "www.TheSilentBell.org." He never even got to finish his thought in the show.  His point was that a lot of schools are having issues with school administrators failing to report sexual assault, which was alleged in great detail in various posts on TheSilentBell.org.  Williams conflates Taylor's general commentary about systemic child trafficking with personal defamation of a specific individual - a reckless and malicious mischaracterization designed to elicit public outrage.

302.     Williams closes the article with an editorial flourish:  "Taylor, who has become known as Millersville's conspiracy cop..."  Once again, Williams falsely implies that this stigmatizing label reflects independent public consensus, when in fact it is solely the invention of Williams himself, retroactively justified through defamatory repetition.

303.     As a matter of law, the publication of June 4, 2024 Article constitutes defamation

per se because it falsely imputes:

   a.   Conduct incompatible with Taylor's duties as a law enforcement officer;

   b.   Criminal or unethical behavior;

   c.   Mental instability;

   d.   Dishonesty regarding a mass tragedy.

304.     Defendants Phil Williams and NewsChannel 5 published June 4, 2024 Article with

actual malice, knowledge of falsity, and reckless disregard for the truth. Their aim was not

to report news but to perpetuate a politically and personally motivated smear campaign

aimed at destroying Shawn Taylor's professional career, discrediting the Millersville City

administration, and protecting the political interests of Williams' personal allies, including

corrupt former officials and their enablers.

### Defamatory Article Published on June 6, 2024

### Phil Williams Attacks His Victim for Speaking Out and Doubles Down on Lies

305.     On June 6, 2024, Phil Williams and NewsChannel 5 published an article titled "Phil

Williams on Millersville's Conspiracy Cop: 'Shawn Taylor Thinks I Am the Real

Problem'", included in the Appendix, as a continuation of their campaign to punish and

destroy Plaintiff Shawn Taylor for expressing political viewpoints and raising questions

protected under the First Amendment.

306.     The import of this article is overtly retaliatory: it purports to respond to Shawn

Taylor's statements that Williams is the instigator of the smear campaign against him, but

instead of addressing those claims or quoting Taylor in context, Williams unleashes a

deeply personal and sarcastic tirade laced with falsehoods, omissions, and malicious insinuations.

307.    The article falsely asserts that Taylor had a "grotesque accusation that former Vice President Al Gore was involved in the murder of, Holly Bobo,"

308.    This is a provable falsehood. In the podcast at issue, Taylor never claimed that Gore murdered Bobo. His exact words were:

   a.  " So they put this other guy in [at the TBI] who had botched a missing girls case by the name of Holly Bobo.  They came up missing and it's funny because the Holly Bobo case ties into that Jim Ayers guy and Al Gore directly as well because she was going to party the week before,"

309.    This reference to a party that Bobo attended being tied to Gore is not a murder accusation and specifically references an event occurring "the week before."  This claim from Williams is part of his concerted effort to defame Taylor as incompetent and mentally unstable by grouping various disparate topics from different podcast episodes and taking isolated statements to make Taylor's claims appear impossible and implausible, which is amplified by Williams' repeated false claims that Taylor had never presented any evidence in the podcasts he spoke on.

310.    Similarly, Williams falsely states:  "His outrageous claims that Nashville's horrific Covenant School shooting was staged,"

311.    Again, this is false. Taylor never said the shooting itself was staged. His criticism concerned:

   a.  The editing that had obviously been done to the public bodycam footage;

b. The absence of children or locked doors in that footage which is consistent with a weekend Active Shooter training session that The Covenant School had acknowledged had occurred;

c. Evidence discussed on the publicly available website TheSilentBell.org, which Williams never mentions, despite it being directly cited by Taylor in the podcast.

312. Taylor's actual quote regarding the Covenant victim was:

a. "And this woman just happened to be a part of that. And she was being looked at in this – in that in that realm of of trafficking of children. She helped in the cover up of kids that had come to her. And she was obligated by law to notify the authorities and did not – there's emails that state that. And it's to the point that you can go to a website that's called "TheSilentBell.org", TheSilentBell.org. And you can start digging for yourself. There are numerous cases that involve sexual assaults of young adults – kids – in things like that at some of these private schools, including The Covenant, Grace Chapel, and places of that nature."

b. In the same podcast, Shawn Taylor refers to the Grant Solomon death case: "We have another case that goes into a boy who was murdered. Or, well, they try to say he's not murdered. They say it was an accidental death. But the state attorney general said this is a homicide.[4] It needs to be investigated. And that ties to this woman what was shot at the covenant school last week. Okay. So this has a whole lot more to it than what the general public knows. And I highly suggest that everybody goes to this website, TheSilentBell.org. There is all sorts of information regarding the child trafficking. There's emails that have been made public."

---

[4] This was stated by Jonathan Skrmetti on August 8, 2022 during the TN Attorney General Hearing posted by "The Silent Bell" on Youtube at the following link: https://www.youtube.com/watch?v=5L-b7h3PoJ4

313.     This quote - though controversial - was based on a cited public source and not fabricated. Williams deliberately omits this critical context and falsely asserts Taylor had "no evidence."

314.     Moreover, this article is structured as a first-person polemic where Phil Williams takes the unusual step of personally defending his reporting and mocking Taylor - rather than reporting as a journalist. This includes sarcastic flourishes such as quoting Taylor Swift lyrics and repeatedly referring to Taylor as a delusional liar.

315.     Phil Williams misrepresents Taylor's remarks about public criticism and retaliation, twisting Taylor's concerns about career sabotage into an admission of guilt:  "There's no way I could go anywhere else, after what Phil has done."  This was a candid statement of real-world reputational harm caused by Williams' campaign - and instead of addressing it, Williams uses it to ridicule and dismiss Taylor's legitimate First Amendment retaliation claim.

316.     The article quotes a Presbyterian minister, Rev. Ian Hard, who was not present at the podcast, and had never spoken to Taylor, but nonetheless accuses Taylor of "slanderous comments," falsely stating:  "He claimed footage of the response was staged,"

317.     The Channel 5 Media Defendants knew that statement is false and solicited it and published it knowingly. Taylor never said the footage was staged; he stated that the footage released was inconsistent, limited, and lacked several elements typical of such responses. Williams' republishing of this accusation, without correction, subjects him to liability under defamation law.

318.     Williams further amplifies the defamatory idea that Taylor is endangering children, writing: "How can future jurors be asked to trust the reports and testimonies of a law enforcement officer who so flagrantly abuses the truth?"

319.     This is explicit defamation of professional capacity, calling into question Taylor's fitness to testify or serve as a police officer, based on a knowingly false portrayal of his prior public commentary. That Taylor is a POST-certified sworn police officer - acknowledged by Williams in this article - further underscores the damage caused by these falsehoods.

320.     This article also omits a material fact: Taylor's podcast was recorded over 18 months before he became Assistant Police Chief. Williams falsely portrays the statements as if they were made while Taylor was in office, thereby creating the illusion that the City employed someone who was actively spreading misinformation while on duty.

321.     Williams repeats his defamatory refrain:  "He has become known as Millersville's conspiracy cop,"

322.     This is an invention of Phil Williams himself, designed to stigmatize and isolate Taylor, and its repetition - despite knowledge that the term is defamatory and not used by the public - satisfies actual malice under New York Times v. Sullivan.

323.     Throughout the article, Williams conflates his own campaign of defamation with public concern and falsely suggests that Taylor's podcast commentary is somehow disqualifying for law enforcement - without identifying a single legal basis or professional complaint filed against Taylor.

    a.   As in prior articles, Williams never once mentions:

    b.   Taylor's First Amendment rights;

c. The time gap between the podcast and Taylor's employment;

d. That POST certification includes psychological screening;

e. That none of Taylor's statements were made on behalf of the City or while on duty.

**Defamatory Article Published on June 7, 2024**

**False Reporting, Character Smearing, and Ridicule of Whistleblower Protections**

324.     On June 7, 2024, Phil Williams and NewsChannel 5 published an article titled "Millersville Special Meeting Postponed, Conspiracy Cop Now a 'Whistleblower'", a copy of which is included in the Appendix, in continued retaliation against Plaintiff Shawn Taylor. The article falsely mocks Taylor's legitimate whistleblower status, continues to misrepresent prior podcast statements, and deliberately conceals material facts, including cited sources and public safety concerns.

325.     The article's import is to portray Taylor as mentally unstable, professionally unqualified, and now - through ridicule - as a deceptive opportunist attempting to hide behind whistleblower laws. Williams continues to refer to Taylor exclusively as the "conspiracy cop," a moniker Williams fabricated and which he attempts to launder into legitimacy through repeated usage.

326.     The article falsely claims:  "Shawn Taylor is now claiming he is a whistleblower," and "Conspiracy-minded cop now says he's a 'whistleblower'."  These phrases are plainly defamatory in context. Taylor had already raised concerns about public corruption and had previously cooperated with investigatory attorneys - including prior work on cases involving misuse of city funds, abuse of power, and cover-ups involving other municipalities. Taylor retained whistleblower counsel due to legitimate concerns of

retaliation for his protected speech and investigatory efforts, not as a tactic to "delay" a hearing.

327.      Phil Williams repeats the already-debunked claim: "He imagines sinister plots... including his theory - with no evidence whatsoever - that former Vice President Al Gore was involved in the disappearance and murder of 20-year-old Holly Bobo..."

328.      This is a fabrication. Taylor's exact quote was: "the Holly Bobo case ties into that Jim Ayers guy and Al Gore directly as well because she was going to a party the week before." This statement references a social event, not a crime, and makes no assertion that Gore was involved in any criminal act. Williams' repetition of this knowingly false accusation - long after being presented with the actual transcript - supports a finding of actual malice.

329.      Williams further repeats: "Taylor falsely claimed that video released by police was actually staged." This is again false. Taylor questioned the editing and completeness of the bodycam footage, noting the absence of visible children, locked doors, or the actual shooting. These are firsthand observational critiques, not claims of fabrication. Taylor also referenced SilentBell.org and cited emails suggesting failures by a school official to report past child abuse claims - none of which are mentioned in the article, despite being directly cited by Taylor.

330.      Williams again ignores that Taylor is a POST-certified police officer, who passed all psychological and background requirements. Instead, Williams uses defamatory implication to suggest that Taylor is dangerous and unfit to carry a badge - a theme repeated across multiple articles.

331.    Williams targets Taylor's retained legal counsel, Todd Callender, smearing him for prior COVID-19 vaccine commentary and attempting to discredit Taylor's whistleblower status by association. The article cherry-picks out-of-context claims made by Callender in unrelated interviews, without evaluating whether Taylor's claims meet the actual legal definition of whistleblower under federal or Tennessee law.

332.    Williams then restates: "Two city commissioners want a special meeting to figure out how Shawn Taylor landed his job,"

333.    This line falsely presumes that the special-called meeting is legitimate, when in fact it was based on pretextual retaliation, violated the City Charter, and involved proposed public questioning about political podcast commentary made over 18 months before Taylor was hired.

334.    The article again republishes the defamatory and false claim: "Taylor's bizarre theories regarding the Covenant School shooting." Williams falsely attributes to Taylor statements he never made (e.g., that the shooting was "staged"), and never discloses that Taylor's statements were based on named sources, public evidence, and a cited database of school abuse allegations at private institutions.

335.    Williams closes the article by repeating smears previously published, suggesting that Millersville is being "rocked" by a scandal involving Taylor - when in fact the controversy was manufactured by Williams himself, using selective editing, mischaracterization of quotes, and coordination with hostile commissioners.

**Defamatory Article Published on June 21, 2024**

**Phil Williams Repeats Fabrications, Attributes False Claims, and Attempts to Erode**

**Public Trust in Law Enforcement**

336.     On June 21, 2024, Defendant Phil Williams published a false and defamatory article titled, "Police chief downplays conspiracy cop's Covenant shooting claims. Watch, then decide for yourself." The article accuses Plaintiff Bryan Morris of engaging in "on-going denials of the facts" that followed "NewsChannel 5's recent discovery of Shawn Taylor's appearance last year" on a podcast with two individuals that Channel 5 characterizes as "well-known QAnon conspiracy theorists."

337.     Despite actual knowledge that Shawn Taylor never denied that the Covenant School Shooting took place, Phil Williams and NewsChannel 5 continued to press this false narrative. Chief Morris is quoted in an exchange with David Gregory, where he asks if Gregory had watched the podcast in its entirety, to which Gregory says that he had. Chief Morris then correctly stated that Shawn Taylor had not denied that the Covenant Shooting never happened. Channel 5 and Phil Williams intentionally mischaracterizes Chief Morris's truthful statement – that Shawn Taylor had never denied that the Covenant Shooting happened – into the false and defamatory statement that Morris had "downplayed" the "conspiracy cop's Covenant shooting claims" and had engaged in "ongoing denials of the facts."

338.     The article falsely claims that Chief Bryan Morris had "mocked" the official story of Nashville's Covenant School shooting. Morris did not "mock" the official story, he contradicted the fake narrative spread by Phil Williams and Channel 5 that Taylor had expressly "denied" the Covenant School Shooting ever took place and that Taylor was therefore another "Alex Jones." Bryan Morris merely truthfully pointed out that Taylor had never denied that the Covenant shooting occurred.

339.     A caption in the article by Phil Williams states, "Millersville Police Chief Bryan Morris continues to downplay his assistant chief's own words, mocking the official story of Nashville's Covenant School Shooting."  In fact, no part of Bryan Morris's statements could reasonably be construed as "mocking" the Covenant School Shooting.

340.     The article falsely claims that Chief Morris suggested that Taylor's words were "no big deal," in an effort to generate more public outrage with false claims, defame Morris, and hold him up to opprobrium and public ridicule.

341.     Additional false claims from Channel 5 and Phil Williams were that Shawn Taylor stated that the Covenant Shooting was "staged."

342.     The article omits that many of Shawn Taylor's comments in the video podcast referenced evidence and emails from a website called "TheSilentBell.Org" that specifically discussed and disclosed evidence about cover-ups occurring within the Covenant School and others, and then falsely claims that Taylor "has no evidence" of the claims he was attributing to this source in order to defame his character.

343.     Williams again calls Taylor's comments "lies" and "bizarre," and inserts his own editorial voice to undermine any trust in Taylor as a law enforcement officer, writing:

   a.   "Experts say Taylor's conspiracy theories raise questions about his fitness to carry a gun and a badge."

344.     This unnamed appeal to "experts" is legally and ethically defective - especially since Taylor is POST-certified, passed a psychological exam, and had been cleared by the same law enforcement standards used across the State of Tennessee.  In fact, the only expert qualified in the field of psychology to opine on Asst. Chief Taylor's mental fitness for duty was the one who conducted his background check and opined that Taylor was, in fact, fit

for duty.  Thus, Williams' and Channel 5's statements were published with knowledge of falsity or reckless disregard for the truth.

345.    Williams again republishes false and defamatory statements made by Commissioner David Gregory during the June 18, 2024 Commission meeting, including that Taylor:

    a.  Was "fired" from Millersville in 2016 for mental instability;

    b.  Was not a canine handler;

    c.  Had "delusions" and committed "criminal acts" like secret recordings.

346.    Each of these statements is demonstrably false because:

    a.  Shawn Taylor was a recognized K9 handler at Millersville, and this fact was documented and celebrated on the City's own Police Department Facebook page at the time;

    b.  The allegations of instability and criminal behavior are completely unsubstantiated;

    c.  The accusations were made with knowledge of falsity or reckless disregard for the truth, rendering both Gregory and Williams liable for defamation.

347.    Further, Williams acknowledges that Police Chief Bryan Morris refuted Gregory's claims at the June 18 meeting. Morris stated clearly:  "That's not what [Taylor] said at all. Not even close."

348.    This on-the-record contradiction undermines every defamatory claim made in the article - but Williams only includes it in passing, minimizing its importance while giving full and extended space to Gregory's false accusations.

349.    Williams also continues the rhetorical lie:  "Taylor, who has become known as Millersville's conspiracy cop,"

350.     Again, this label was invented by Phil Williams, not by the public. Repeating it under the guise of "public reputation" is a false attribution designed to evade responsibility for originating the defamatory moniker.

351.     Finally, the article, like all others, reposts hyperlinks to earlier defamatory articles, creating a new false public narrative and spreads it to new audiences. Williams uses anchored hyperlinks, lengthy and biased descriptions, and repeated headlines to recirculate the Channel 5 Media Defendants' defamatory publications, compounding the reputational harm and prolonging public outrage based on knowingly false and selectively presented information.

### July 15 2024 Article

**"Secret recordings from inside child-predator sting shows police ignoring laws."**

352.     On July 15, 2024, Phil Williams published a teaser on Twitter claiming that "disturbing recordings from inside child predator sting shows police, MAGA operatives ignoring laws." In the video, Williams simultaneously attacked military veterans and the Christian faith, referring to volunteers as "MAGA operatives" and "prayer warriors."

353.     The article labels Assistant Chief Shawn Taylor's May 2024 child-predator sting as "troubled" and led by "conspiracy-minded cops," falsely conveying that Taylor's lawful efforts to protect children were driven by irrational QAnon conspiracies rather than legitimate criminal investigations. In truth, Taylor assembled a vetted team of sworn officers and civilian volunteers pursuant to standard protocols and sought judicial authorization for every aspect of the operation.

354.     By highlighting isolated out-of-context remarks—such as Taylor's reference to "pre-signed search warrants"—the story implies he planned and executed illegal searches.

Yet Taylor's comments reflected preliminary planning discussions and were merely discussed and never implemented. The only warrant prepared in the case was sworn before a judge based on actual probable cause. The article's failure to disclose this renders its portrayal misleading and defamatory.

355. The piece alleges that the Millersville Op was "unhinged" and "very, very, very dangerous," imputing recklessness and misconduct to Taylor, Morris, and their team. These conclusions are based on selective audio clips and fail to account for the full recordings—approved and supervised by multiple prosecuting agencies—which demonstrate that Taylor consistently sought legal guidance and complied with POST standards.

356. By asserting that volunteers "posed online as minors" contrary to prosecutorial instructions, the article insinuates that Taylor knowingly broke the law. In fact, Taylor conferred with the District Attorney's Office and TBI analysts to ensure at least one sworn, POST-certified officer was always the operational "chatter," rendering the sting protocols fully lawful. Omitting these critical clarifications defames Taylor's professional integrity.

357. The article portrays Chief Bryan Morris—by association—as head of a department "ignoring laws," despite the fact that Morris and Taylor fully followed the laws. This sensationalist framing wrongfully tarnishes Morris's reputation as a disciplined law-enforcement leader.

358. The story makes numerous false claims that "laws were ignored" by Millersville police. The piece brands Millersville's Assistant Chief Shawn Taylor a law-breaking "conspiracy-minded" extremist and depicts the MPD as a "rogue agency," thereby

impunging the character and reputation of its leadership and its Chief, Bryan Morris. Among other falsehoods, the article declares that:

a. "Taylor did not involve other law-enforcement agencies … because of his unfounded conspiracy theories" when in fact the Pedophile Sting was a live training opportunity for members of the MPD.

b. Taylor and the MPD "crossed the line of what's legal," when everything was actually done according to the Robertson County DA's instructions.

c. Taylor intended to use "pre-signed search warrants, which would likely be illegal, according to experts," an allegation that accuses him of planning an outright crime, when in fact pre-signed search warrants have been used in Tennessee cases for decades.

d. NewsChannel 5's legal analyst Nick Leonardo, quoted by Williams, concludes MPD "never had control," thereby asserting that Taylor and Morris's leadership was reckless and unlawful and also imputing various illegal acts of prior administrations on Morris and Taylor. Leonardo also failed to disclose that he had personally represented disgraced former Police Chief Dustin Carr, who resigned suddenly years prior after he sent photos of himself in uniform holding his penis at City Hall and who had engaged in widespread illegal issuance of police commission cards for his own profit.

359. The import of these statements was to portray Taylor and Morris as incompetent, dishonest, and willing to violate constitutional rights—thus impugning their character and professional reputations.

**July 22, 2024 – "Did Millersville detective commit perjury about child-predator investigation?  Here's the evidence."**

360.     On July 19, 2024, Phil Williams posted another teaser on Twitter, stating "Did a Millersville, TN police officer commit PERJURY with his testimony about a child-predator sting?  The explosive new story – with evidence – airs Monday on @NC5 at 6!"

361.     On July 22, 2024, the Channel 5 Media Defendants released a story claiming that Detective Dorris had committed perjury.   As if on que, on July 23, 2024, the TBI informed Williams that they were opening an investigation based of the purported perjury, which Williams gleefully reported.

362.     All of the "evidence" posted in the Channel 5 came from short clips of the alleged secret recordings taken by Kim Kelley, which Defendant Phil Drake claims to have provided to Phil Williams.   Either Kim Kelley or the Channel 5 Media Defendants selectively edited those recordings to fabricate the allegation that Det. Doris committed "perjury" about the pedophile sting, which the Channel 5 Media Defendants have attributed to being caused by MPD leadership, Chief Taylor and Chief Morris.

363.     The article sensationalizes former Kim Kelley's unsubstantiated claim that Detective Todd Dorris "lied under oath," implying systemic fraud in the entire sting operation overseen by Assistant Chief Taylor.  No court has found Dorris's testimony false; Kelley's heavily edited snippets—supplemented by Phil Williams' own voice-overs covering up at least half of what Det. Dorris was saying—do not demonstrate perjury, and the article omits that Dorris's sworn statements align with the official protocols approved by Taylor and the DA's office, which were briefed to Kim Kelley and all other volunteers.  Upon information and belief, Kim Kelley provided the recording of the briefing to the

Channel 5 Media Defendants, which conclusively proves that Taylor gave clear and accurate statements regarding what the DA requested.

364.    By relying exclusively on Kelley's account and editing the evidence, the Channel 5 Media Defendants' story falsely suggests broad corroboration of perjury, when in fact no other participant—neither Taylor, Detective Candler, nor any other person present at the Millersville sting—has backed Kelley's version of events.   This one-sided and biased "reporting" was intended to defame Taylor by casting doubt on his supervisory role and implying he directed deceptive practices.  By extension, the reputational harm intentionally caused by the Channel 5 Media Defendants also applies to Chief Morris.

365.    The piece intimates that Taylor and Chief Morris knowingly oversaw an operation dependent on private volunteers conducting key investigative functions, thereby mischaracterizing a carefully structured partnership in which civilian "chatters" operated only under sworn-officer supervision and were never supposed to handle any solicitation from a suspect.   Such allegations defames both officers by imputing unauthorized delegation of law-enforcement duties to persons that were not authorized to do so, leading to false impressions there was a conspiracy to commit perjury and a fraud upon the court.

366.    By framing Kelley's allegations as "explosive" evidence of official misconduct, the article creates an unfair inference that the entire child-predator sting—and by extension Taylor's leadership—was fraudulent.  The only reason the evidence was "explosive" was because Kim Kelley, Phillip Drake, or the Channel 5 Media Defendants fabricated it.   In reality, the operation resulted in actionable intelligence and an arrest consistent with Tennessee law; portraying it as tainted by perjury is defamatory not only to Capt. Dorris,

125
Case 3:25-cv-00576    Document 1    Filed 05/22/25    Page 125 of 188 PageID #: 125

but also to Taylor's and Morris's reputations as law enforcement officers upholding public safety and complying with the law.

367.     Throughout, Phil Williams's false narrative amplifies Kelley's claims without acknowledging her admitted conflict of interest or her affiliation with extremist groups, thereby misleading viewers about the sting's legality and Taylor's professionalism. This omission defames Taylor and Chief Morris by presenting Kelley's unverified assertions as conclusive proof of wrongdoing.

368.     Of the 8 minutes and 20 seconds of the video broadcast associated with the Channel 5 Article titled, "Did Millersville detective commit perjury about child-predator investigation? Here's the evidence," there was only one minute and twenty seconds of video that actually showed Kim Kelley's "secret recordings" of the Millersville undercover sting, none of which actually showed Kim Kelley texting or messaging suspect Henry Dean Jordan.  The article and broadcast quote Kelley at length, and it therefore appears that the gravamen of the purported "evidence" of perjury is, once again, Kim Kelley's own words backed up with nothing more than her own fabricated evidence, selective editing, and visual disinformation.

369.     Three of the seconds-long video clips were sweeping panorama shots taken by Kelley of various people inside Shawn Taylor's barn, where the initial briefing took place on or about May 16, 2024.  These shots obviously do not support Kelley's claims, but instead only serve to identify the persons who were present at the sting.

370.     There was one seven second video clip of Kim Kelley asking Todd Dorris, "I need to know what you'll need, so I can work up to that."  Dorris responds to Kim Kelley with, "You know, as much as you can," but the audio of his full response is intentionally cut off

by the Defendants to create their "explosive" false allegations about Capt. Dorris and his superior officers, Taylor and Morris. What can be heard is that Dorris states, "You know, as much as you can, *but the DA said that*…" – and at that point, Phil Williams' voiceover drowns out the rest of what Det. Dorris was saying, which was that "the DA said that" law enforcement had to do the typing for all of the actual solicitations. Det. Dorris repeated this same instruction numerous times during the Millersville sting, which Defendants Kelley, Drake and the Channel 5 Media Defendants knew but failed to disclose in the edited clips they published online, on air, and throughout interstate commerce.

371.    Although Kim Kelley claims this video is proof of her "doing all the work" in order to contradict Det. Dorris's testimony, everybody present knew that she was actually referring to what he needed her to do to "work up to the solicitation," which was part of the assistance the V4CR volunteers were allowed to provide, including filtering through suspects and determining whether subjects had no interest in communicating with the decoy underage profile after they revealed that their age was 12 to 13 years old.

372.    Another four second clip of the "secret recordings" shows Kim Kelley's hand on a grey phone, ostensibly to suggest she was typing something in a message. A subsequent eight second clip shows a recording of what appears to be the same grey phone, but the bottom of that phone appears to lack the text from a removable sticker that was left on the back of the Ops Phones by Det. Michael Candler as follows:



373.    Two angles of the bottom of the grey phone used by Kelley in her "secret recording" do not appear to have the above text, which should still be visible through at least part of the bottom of the phone:





No white letters are visible in the space toward the bottom of this phone

374.    The video showed another eight second clip with a grey phone in Kim Kelley's hand, where she is heard on recording claiming that a suspect got away because a vehicle "had no siren."



375.    Remarkably, the phone shown in the video appears a lighter shade of grey and does not appear to have any of the Ops Phones numbers written on the back, which should be located in the open space near where the "2" and the "1" are written on Ops Phone #2 and #1, as seen in the image below:



376. Ops Phone #3 was used for the Henry Dean Jordan solicitation, so the phone should have a "3" in the location where the "1" and "2" are located on the above phones.

377. In sum, none of the video clips provided by Kelley and Drake to the Channel 5 Media Defendants actual show Kim Kelley texting the suspect Henry Dean Jordan, and the few clips that were provided appear to just be Kim Kelley texting with different phones, not Ops Phones.

378. In another isolated clip provided by Kelley to Channel 5, she played a clip of Asst. Chief Taylor stating that the detectives needed to be in the room with the chatters at all times, without playing the rest of the recording and without clarifying that this rule was independent of the rule regarding law enforcement officers handling the solicitation with suspects. These are two separate rules, and Kim Kelley and Phil Williams combined partial playback manipulation of the recording of a different rule to fabricate evidence "the Rules had changed" and Shawn Taylor had changed them. In fact, the rules at the Millersville Op never changed, and none of the publicly available videos taken by Kim Kelley prove

otherwise, except through the selective editing and partial playback manipulation by Kelley and the Channel 5 Media Defendants.  One rule was that the detectives had to always be present with the chatters.  The next rule was that the detectives had to handle the solicitation because that is what Tennessee law required.  Rule #1 and Rule #2 make sense because a detective needed to be present so that if a solicitation was about to happen, the phone could be handed to them immediately.   Another rule was that volunteer chatters could only handle preliminary communications with suspects to "work up" through preliminary chit chat to see if the conversation was going to steer toward a solicitation that needed to be handled by the detectives.

379.     According to Phillip Drake in an August, 19 2024 interview on episode 240 of the Heartland Journal Podcast, he and Kim Kelley had conspired to sabotage the Millersville/V4CR sting and had agreed in advance that she would travel to Millersville with the express goal "to take those bastards down," referring to the officers involved in the Millersville Pedophile Sting.  Defendant Kelley and Defendant Drake intended to sabotage the Millersville pedophile sting and then exploit the subsequent media coverage generated from the fallout to accomplish this goal.

380.     In one of the "secret recordings" made by Kim Kelley and sent to Phil Williams, Kim Kelley speaks with Asst. Chief Taylor, who correctly informs her that under Tennessee law, the detectives had to handle the solicitations and that the volunteers needed to tell the detectives what to type.  Taylor then asks Kim Kelley, "When it comes to setting up the account, what's got to be done to set up the account?"  After an awkward pause, Kim Kelley offered the following shill or non-sequitur, "That's what I want to understand are the parameters.  The parameters.  That's what – I'm being counseled against this, not

only against this being effective.  But I'm being counseled against doing this."   In the recording, a male voice is heard laughing.   Upon information and belief, the laughter was from Phil Drake, who admitted in a subsequent podcast that he was listening to the phone call and that it was somehow funny that Taylor was asking Kelley for her advice on how to set up a profile on the phone, which Kelley was unable to answer.

381.     Defendant Kim Kelley stated in the recording that she was "being counseled against doing" the Op and was counseled against the "effectiveness" of a pedophile sting, which she would later state was, in her opinion, not the same as investigating "child trafficking." Philosophical differences aside, the full recording shows only that Shawn Taylor informed Kim Kelley truthfully about the requirements of an undercover law enforcement officer handling the solicitation aspect of the conversation.  Taylor's rules were consistent with Tennessee law and never changed.

382.     Despite giving the impression that she had been on many V4CR Ops, Kim Kelley had participated in two with V4CR over the prior year.   Drake admitted during his Heartland Journal Podcast interview that he had seen Defendant Kelley online and had recruited and groomed her to work for him.   Drake admitted during the Heartland Journal Podcast that he had targeted Kelley because she was already working with V4CR and had inside access to their operations, which would make it easier for him to commit corporate espionage against them.

383.     In sum, there were plenty of reasons to doubt the veracity of Kim Kelley's claims about MPD and Plaintiffs, including by reviewing her selectively presented "evidence." Yet, this case does not involve a failure to investigate, as the Channel 5 Media Defendants knew the evidence proved that Capt. Dorris did not perjure himself, yet they manipulated

recordings to falsely make it appear that he did and to further impugn Shawn Taylor as part of their coordinated smear campaign with Defendants Templet and Gregory.

**July 23 2024 – "TBI opens investigation of Millersville child-predator sting amid questions of possible perjury."**

384.      Williams next reported that the Tennessee Bureau of Investigation ("TBI") had opened a criminal probe "following questions raised by NewsChannel 5" about the sting, stressing yet again that the operation was "brought into Millersville by the department's conspiracy-minded assistant police chief Shawn Taylor." Having intentionally edited the "secret recordings" and published them to fabricate evidence that Capt. Dorris had committed perjury, the Channel 5 Media Defendants intended and accomplished their defamation and their goal of coaxing the TBI into investigating the child predator sting, which they had been begging for during the commentary at the end of their televised broadcasts.

**July 29 2024 – "TBI expands investigation … looking into misuse of government data."**

385.      This article announces that MPD officials "may have used sensitive law-enforcement data to investigate their political enemies," noting that "Shawn Taylor has talked about investigating political figures … without evidence." In fact, the videos and podcasts that the Channel 5 Media Defendants describe involve Shawn Taylor presenting evidence, yet they claim he had no evidence in order to create the false impression that he was delusional and mentally unfit for office.

386.    Phil Williams accuses Shawn Taylor of accessing "sensitive data linked to some powerful people" which "includes the banking records for U.S. Senator Marsha Blackburn's campaign."  Williams again failed to mention that Shawn Taylor's statements in the podcast were related to Marsha Blackburn's publicly-available campaign bank records and were made during a podcast that he participated in long before he was Millersville's assistant chief and would have had access to FinCen, and that these purported Marsha Blackburn bank records therefore could not have been accessed by him via a FinCEN query.  Moreover, the article fails to mention that FinCEN is not an open database that Shawn Taylor could access like an Internet search engine – it is directly controlled by the TBI, which submits and processes all queries of subjects requested by law enforcement officers in the State of Tennessee.

387.    The piece further asserts Chief Bryan Morris condoned or participated in the unlawful acts, characterizing them as abuses of authority. The clear sting is that Taylor and Morris weaponized federal databases for personal vendettas—conduct that, if true, is a federal crime and professional malfeasance.  These allegations are false and defamatory, which the Channel 5 Media Defendants knowingly published or published with reckless disregard for the truth or falsity of the allegation.

**August 5 2024 – "The stories that Millersville conspiracy cop tells about himself, his employment history, his threats."**

388.    Williams' August 5 smear piece systematically paints Assistant Chief Taylor as a fraud and a menace, asserting that agencies have "no record" of his claimed employment, accusing him of lying on job applications, and reporting that investigators once "concluded

he was guilty of harassment, stalking and criminal trespassing."  In fact, the allegations asserted by Williams were unsubstantiated allegations from a complainant, not a finding by investigators.  The alleged 10-day suspension referenced in the article was actually because Taylor had attempted to help the individual in question, which was not within the scope of his duties.  In carrying out the 10-day suspension, Taylor's supervisor shook his hand and said he wished he had dozen more officers like Taylor.

389.     This article, like several others from the Channel 5 Media Defendants, repeats the claim that "Taylor has refused to answer any of our questions about his wild conspiracy theories."   Phil Williams' questions are actually insults masquerading as questions, such as the question he repeated in numerous videos, "Don't you think that's crazy talk?"

390.     In fact, Williams himself once relied on Taylor as a confidential source or at least met with Taylor and fellow reporter Levi Ismail, whereby Taylor provided USB drives with volumes of information on public corruption—only to subsequently turn on Taylor once he assumed a leadership role in Millersville. By branding Taylor's actions as a "refusal" to answer questions, Williams defames Taylor's integrity, implying cowardice and contempt for transparency where none exists.   Dismissing Taylor's evasions is not journalism; it is propaganda designed to have the "last word" and convince viewers to take Williams's word over Taylor's.

391.     In sum, the article's defamatory import is that Taylor is a serial liar, morally unfit, and psychologically unstable, thereby destroying his good name and credibility.

**August 12 2024 – "TBI limits Millersville's access to sensitive law-enforcement data, chief says in podcast interview."**

392.	In this publication, Williams and the Channel 5 Media Defendants shift fire to Chief Bryan Morris, dubbing him a "conspiracy chief" and ridiculing him as someone whose claims require belief in "time travel" regarding a claim that Channel 5 has posted Shawn Taylor's address before Taylor's house was shot up – the same morning of the Covenant School Shooting. This was in fact true, as Taylor's address had been posted in the comments section of an article and Channel 5 delayed taking down for a considerable amount of time. The article says the chief "appeared to express support for the bogus 'Pizzagate' hoax" which was false, and asserts that "Millersville doesn't just have a conspiracy cop, they've also apparently got a conspiracy chief." These statements falsely portray Chief Morris as delusional, dishonest, and professionally incompetent—directly impugning his integrity and fitness to serve.

**August 26, 2024 – "QANON COMES TO MAIN STREET: Millersville cops team up with so-called pedophile hunter who blames 'satanic cult masquerading as Jews'"**

393.	This article also repeatedly brands Assistant Chief Shawn Taylor as a "conspiracy theorist" aligned with QAnon and falsely attributes to him false beliefs. These mischaracterizations falsely portray Taylor as an extremist and anti-Semite, damaging his reputation and professional standing. In truth, Taylor has never espoused any antisemitic or QAnon ideology and has no control over who supports him online.

394.	The article falsely claims that Millersville officers, including Taylor and Morris are "conspiracy theorists" that "carry guns and badges, using their police powers to explore notions" completely divorced from reality. In fact, Taylor, Morris and the MPD engaged in nothing but actual police investigations during their entire tenure in Millersville, and

Phil Williams and the Channel 5 Media Defendants have no evidence to support their false claim.

395.     By quoting Taylor's description of "kids that are actively being smuggled, being chained to walls, that are being raped," followed immediately by the assertion that "conspiracy theorists can produce no photos or videos as evidence," the article implies that Taylor knowingly spreads dangerous lies for attention.   The article omits that Taylor was discussing information from a witness that had described that scene to Taylor during one of his investigations.  This insinuation defames Taylor by suggesting he fabricates criminal activity without regard for truth. In fact, Taylor's statements were based on unverified tips he shared with investigative authorities, and at no time did he claim firsthand evidence—facts the article omits.

396.     The story depicts Taylor's May 2024 child predator sting—conducted under his direction and in coordination with the Robertson County DA's Office—as a "botched child-predator sting" resulting in "perjury," when in fact it was Phil Williams and Kim Kelley who intentionally botched the sting and fabricated evidence of perjury for their own agenda.

397.     The piece emphasizes Taylor's recruitment of "like-minded MAGA activists" for the sting, suggesting his official duties were driven by partisan politics rather than public safety.  In fact, V4CR is one of the few groups who work in this area, and they were the only one willing to come to Millersville.   This implication wrongfully defames Taylor by imputing improper partisan motives to his law-enforcement actions. In reality, the volunteer participants were vetted civilian helpers, and Taylor's sole motivation was child protection and training his officers to professionalize the MPD.

398.     By titling the investigation "QANON COMES TO MAIN STREET" and stating that "Millersville cops team up with so-called pedophile hunter," the article casts the entire Millersville Police Department—including Chief Bryan Morris—in an extremist light. This sensationalist framing defames Chief Morris by implying departmental endorsement of QAnon conspiracies and extremist tactics. In fact, Chief Morris has publicly disavowed all conspiracy theories and maintained strict adherence to professional standards, making the article's broad brush an unwarranted attack on his leadership.

*August 2024 - Steve Abramowicz And The Heartland Journal Join Defendants Kim Kelley And Phil Drake's Racketeering Enterprise*

399.     Beginning no later than August 2024 and continuing to the present, Defendants Phillip Drake, Kim Kelly, Uniting America Inc., Digital Defenders United, expanded to include an association-in-fact enterprise with Heartland Journal LLC, and its editor-in-chief Steve Abramowicz, whose common purpose was to raise money under false pretenses, promote the unlawful racketeering influenced enterprises of Kelley and Drake, and to launder credibility for Drake's and Kelly's outlaw operations by portraying them as heroic, law-enforcement partners rescuing thousands of trafficked children. 18 U.S.C. § 1961(4).

400.     Kim Kelley was interviewed in Episode 236 of the Heartland Journal Podcast on August 5, 2024,[5] and provided the following statement to host Steve Abramowicz, who

---

[5] See, e.g., https://rumble.com/v59v3gd-heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24.html; https://podcasts.apple.com/us/podcast/heartland-journal-podcast-ep236-kim-kelley-interview-8-5-24/id1650288595?i=1000664415208

read the disclaimer at the beginning of the podcast as a promotion of Kim Kelley and Phil Drake:

*All recordings of V4CR in the Millersville's Police Department conducted by Kim Kelly were authorized by Uniting America Incorporated, Phil Drake. Uniting America Incorporated led the entire investigation with Kim Kelly serving solely as an employee of Uniting America Incorporated.*

401.     Kim Kelley 's above disclaimer, published in Episode 236 of the Heartland Journal Podcast about her working for Phil Drake and Uniting America Incorporated as part of an "investigation," contradicts her own statements in the podcast. For example, one of her pretexts or justifications for making recordings was that she had a "gut instinct that they were trying to either frame me or just do some shady things that I had been observing and calling attention to." Thus, according to Kim Kelley, she needed to have evidence just in case "they," at some future point, tried to "frame her" for some unknown act. Kim Kelley does not identify the exact origin of her paranoia or explain who "they" are and what she was going to be "framed" for. At another point during her interview, she claims that she released her recordings because she saw that "people" were "trying to gaslight and deceive her" and had put her at "significant risk," but she offers no more details other than to say that when she got to Millersville, the phones had not been set up. Kelley's statements about the MPD and Taylor/Morris trying to "frame her" or "set her up" are entirely false and defamatory, as the impugn that two veteran police officers had criminal intentions to harm Kim Kelley during the Millersville pedophile sting, which she knew was ludicrous and completely false.

402.     Kelley represented that Digital Defenders United was a fully operation 501(c)(3) combating child trafficking, yet IRS Form 990 searches and state charity filings show no registered 501(c)(3) status for Digital Defenders United or Uniting America, Inc.

403.     Abramowicz provided donation links on-air and urged listeners to *"follow along, maybe donate to your charity."* Kelly repeated the Enterprise's standard script, falsely asserting that she was working under signed contracts with federal agencies, and that Digital Defenders United was a registered public charity.

404.     Abramowicz exercised managerial control over the Enterprise by (a) selecting the guests; (b) determining the airing schedule and providing vocal prompts for content to steer viewers and listeners to Defendant Kelley and Drake's donations pages; (c) editing and rebroadcasting the solicitations on additional platforms; and (d) sharing in ad-revenue and affiliate income generated by the fraudulent traffic. His active role surpasses that of a passive publisher into the realm of operation and/or management of the Enterprise.

405.     The Enterprise used interstate wire, radio, and television communications—specifically the Heartland Journal podcasts streamed through Rumble, Apple Podcasts, YouTube and other national content-delivery networks—to execute its scheme. Each episode was recorded in Tennessee and across state lines and instantaneously transmitted to listeners and viewers in multiple states, satisfying the jurisdictional element of 18 U.S.C. §§ 1341 & 1343.

406.     Abramowicz and Heartland Journal LLC were not passive media bystanders. They selected the guests, scripted questions, repeatedly solicited donations on-air on their own accord to promote Defendant Phil Drake and Kelley's racketeering influenced organizations, including displaying Drake's and Kelly's web addresses, vouching for their supposed child-rescue statistics, attacking the credibility and professionalism of Chiefs Taylor and Morris, and intentionally rebroadcasting those solicitations across additional

platforms. By curating, directing, and monetizing the content they participated in the operation or management of the Enterprise and are therefore liable.

407. The Heartland Journal then tagged Phil Williams "@NC5PhilWilliams" on Twitter and other social media platforms to generate even more traffic to their website:



408. Defendants' repeated use of interstate wires to further their donation scheme constitutes at least four predicate acts of wire fraud under 18 U.S.C. § 1343, forming a pattern of racketeering activity that is both closed-ended (multiple related acts over a one-year period) and open-ended (the show continues weekly, donation links remain live).

409. On August 19, 2024, Defendants Abramowicz and Heartland Journal, LLC used interstate wires to stream "Episode 240—Phillip Drake for President" to a nationwide audience. During the broadcast Abramowicz affirmatively represented that *"Uniting America is a frontline movement … no salaries, admin costs or hidden expenses"* and immediately exhorted listeners to make tax-deductible donations through Drake's website. These statements were materially false because Uniting America was not recognized as a § 501(c)(3) charity and routinely diverted donor funds to Drake's personal expenses.

410. In the same transmission Drake falsely claimed his group had *"1,384 successful child rescues in just eight months"*. Abramowicz endorsed that statistic, thereby lending his platform's credibility to the misrepresentation. When Phil Drake said "We work with

agencies, but I can't speak about it," Abramowicz's reply was to assist: "Okay. That's. I don't want you to get in trouble. Don't say anything you can't say." No law-enforcement agency has any record of those "rescues," and Defendants have never produced documentation. Phil Drake's statement and Abramowicz's endorsement was intended to bolster Drake's credibility and did induce listeners to donate via wire transmissions and across state lines.

411.     In August of 2024, the Heartland Journal Podcast, owned by Defendant Heartland Journal LLC and hosted by Defendant Steve Abramowicz, broadcast at least two episodes that falsely portrayed Chief Bryan Morris and Assistant Chief Shawn Taylor as (a) incompetent, (b) corrupt, and (c) willing to "black-mail pervs" and shield child-traffickers. The broadcasts were streamed on Rumble, YouTube, Apple Podcasts and other interstate platforms, instantly reaching listeners in multiple states. Each broadcast contained defamatory statements of and concerning the Plaintiffs that were either knowingly fabricated or made with reckless disregard for their falsity.

412.     Abramowicz admitted on-air he had done "no investigation" into Taylor's alleged "conspiracies", yet repeated them as fact.

413.     Defendant Abramowicz made, inter alia, the following defamatory statements of and concerning Chief Taylor and Chief Morris:

    a.   "Could [Millersville PD] be using the data for exploitation and blackmail for the pervs…?" This false accusation imputes felony extortion and obstruction of justice to Morris and Taylor, even though MPD has never used arrest data for blackmail and no such allegation exists anywhere in any record.

b. Agreeing with Phillip Drake that Millersville is a "mess that traffickers could hide in" if they "know how to spew the false far right wing conspiracy theories." This states as fact that the City under Morris/Taylor is a safe haven for human-trafficking—a provably false assertion damaging to their professional reputations.

c. "[Shawn] Taylor is the 'conspiracy cop'… involved with Covenant-shooting mis- and dis-information." Abramawicz accuses Taylor of professional misconduct and spreading disinformation about a mass-shooting, when no such finding or evidence exists. Moreover, Abramowicz is liable for republishing the false and defamatory accusations from NewsChannel 5.

d. "God forbid they're [Morris and Taylor] involved in this organization and don't want actual effective policing… I can only speculate that's happening." Abramowicz implies that Plaintiffs deliberately undermined child-exploitation investigations without any factual basis.

e. Abramowicz also conflates prior administrations' problems with the Plaintiffs tenure, creating the false impression that Morris and Taylor engaged in illegal hiring, even though the scandals were from prior administrations.

414. Defendants Heartland Journal and Steve Abramowicz made these accusations with knowledge of falsity or deliberate disregard for the truth.

415. Each podcast episode was posted, clipped, and rebroadcast on Heartland Journal's website and social-media feeds, generating thousands of views. Abramowicz personally managed the posting and selected inflammatory headlines to maximize clicks, ensuring widespread dissemination.

416.     Kim Kelley has a remarkable talent for weaving a web of vague terminology and evasive rhetoric, making it difficult to discern her true intentions or accusations. She frequently relies on pronouns like "they" and "them," deliberately obscuring who she is referring to and what specific issues she is addressing. This penchant for ambiguity allows her to construct straw men, deploy red herrings, and engage in circular logic, effectively derailing meaningful conversations and evading responsibility for anything she does. Much like her boyfriend Phil Drake, the self-proclaimed creator of the QAnon conspiracy, Kelley thrives on misdirection and confusion and their collaborative efforts resemble a modern-day QAnon playbook.

417.     For instance, Kim Kelley fixates on attacking V4CR by alleging vague "ties" to "The Moonies Cult," which has absolutely nothing to do with Millersville or the MPD.

418.     Additionally, Kelley's grandiose claims that she provided V4CR with "many opportunities to do what's right" and that they "made their decisions" are nothing more than circular statements designed to evade accountability. Her love for vague assertions and misleading statements is no surprise, given her close association with Drake, whose own conspiratorial antics mirror the cryptic and unfocused tactics Kelley employs.

419.     Regardless of her shifting and ambiguous statements, it is clear that Kim Kelley openly promoted Uniting America Inc. and solicited donations from viewers as part of her and Phil Drake's smear campaign.  For example, she provided the following statement on behalf of Uniting America Inc. to be used in the description of Episode 236:

"Joining us is Kim Kelley spokesperson for Uniting America Inc. a frontline movement actively assisting the homeless, advocating for social justice, and combating child trafficking in the USA. But we can't do it alone. We need your help to address these critical issues, make lasting impact, and make a world of difference in our communities. Kim requested she be given an opportunity to share her side of the story as it relates to our Millersville episode with Police Chief Bryan Morris so we did so and here it is. To find out more go tohttps://unitingamericainc.org/"

420.     In the Heartland Journal Podcast, Kim Kelley states that there were four "chatters," but she fails to disclose that there were six phones.   She also claims to have been the one who identified suspect Henry Dean Jordan, claiming that the detective was with her and she showed him the phone.  She stated that the "chatters" were the ones "posing as minors," but fails to include the full truth, which is that chatters were only allowed to filter through communications to ascertain whether the subjects were still interested in talking to the underage profile or not.  She failed to state that none of the Volunteers were authorized to handle the solicitations from the suspects.

421.     Drake stated in his interview that he was a "federal contractor" for 15 years, and that he did "horrendous things" to civilians as part of his work along the U.S. – Mexico border and as part of his purported "counter-corruption" job duties for one of several three letter agencies, including the FBI, OIG, and the CIA.  Although Drake claims that he only uses the CIA for when he needs to kidnap (in his terms "rescue") children that are trafficked internationally. Violence is a routine part of Drake's racketeering enterprises.    As Drake candidly stated to host Steve Abramowicz during Drake's interview on the Heartland Journal Podcast, when any individuals get in his way or his organization's way, "we take them out, too, as you well know."

***Events Leading to Issuance of Search Warrants and the "TBI Raid" on September 4, 2024.***

422.     In June of 2024, Det. Candler had submitted a Public Records Act request for numerous individuals including several individuals who were Commissioners at the time. The purpose of the request was to obtain public records that Candler already knew existed, but that had been produced as part of a complaint in a different administrative proceeding.

Thus, Candler was merely trying to authenticate documents he already had in his possession. Some of the records included emails and requests for other documents from the Sumner County Election Commission.

423.     On June 12, 2024, Det. Candler attended a training conducted by the FBI about open-source intelligence. During breaks in the training, Candler discussed the issues that were occurring in Millersville, and the FBI agents stated they believed there was clear evidence of public corruption and that they would send an analyst down to discuss the case with him.

424.     On June 18, 2024, Det. Candler emailed the FBI to connect with an agent in Nashville, and ultimately set up a meeting with them on June 25, 2024.

*Det. Candler Attempts to Obtain a Judicial Subpoena for Public Records.*

425.     Concerned that his Public Records requests might be arbitrarily denied or that he might be provided incomplete information, on June 18, 2024, Det. Candler dropped off an application for a judicial subpoena to Judge Joe Thompson's judicial assistant. She emailed him back stating that she needed additional information. Det. Candler responded, and sent the completed Judicial Subpoena via email.

426.     This "Attempted Subpoena" was reported by Judge Thompson to the TBI and used as a pretext to obtain a search warrant against the City of Millersville and Assistant Chief Shawn Taylor's home. It is not illegal to attempt to obtain a subpoena, which is why the judicial process exists. If the subpoena is improper, it is denied. This "attempt" to obtain the subpoena was apparently reported by Thompson to the TBI as part of some criminal act and became part of the probable cause used to obtain the search warrants for the City of Millersville and the home of Shawn Taylor. Shockingly, the search warrant was then

signed by Judge Thompson, despite Thompson being neither a neutral nor detached magistrate required under the Fourth Amendment to the United States Constitution. Upon information and belief, at least one other Judge refused to sign the search warrant for lack of probable cause, which is why Thompson ultimately signed it.

427.     On June 20, 2024, Detective Candler returned to Sumner County Circuit Court, and met Judge Joe Thompson again. Instead of meeting Judge Thompson in chambers, the Sheriffs' deputy directed Candler to the courtroom, stating that Judge Thompson was waiting on him in the courtroom.

428.     Upon entering the courtroom, Judge Thompson initiated the official recording of the session by pressing the record button, signaling the start of the proceedings. He addressed Detective Candler directly, stating for him to come up, and that his subpoena needed a "clear and concise nexus." Candler responded by specifying his request for emails and other public records. Judge Thompson reviewed the subpoena, highlighting specific sections and making annotations directly on the document.

429.     As the discussion progressed, Judge Thompson identified the individuals listed in the subpoena, stating, "I know these people. They are on the Sumner County Election Commission. And these three are lawyers." He claimed that the records would be protected by "attorney-client privilege," asserting, "You know these are lawyers. This is protected by attorney-client privilege." Detective Candler clarified, "No sir, I'm not requesting that information; these are public records."

430.     The courtroom tension heightened when Judge Thompson inquired about Candler's sources, asking, "Who is your confidential source? Who is the complainant?" Candler referenced a Bureau of Ethics Complaint filed by a Millersville resident against a

Commissioner. In response to further probing from the Court, Candler stated that Shawn Taylor had provided him with some information for him to either use or discard. Of course, Shawn Taylor's role as Asst. Chief of Police was to assist the detectives with any technical research and computerized intelligence gathering for anything that might be relevant or related to the cases being investigated by the City's detectives, but Taylor was otherwise uninvolved and let the detectives conduct their investigations how they saw fit.

431. Judge Thompson expressed concern over the direction of the investigation, stating, "Your bosses are putting you in a predicament. You shouldn't be investigating this. It should be handled by a third party" In response, Candler stated that he had reached out to a third-party—the FBI. However, Judge Thompson stated that the FBI "did not have jurisdiction."

432. Judge Thompson dismissed the legitimacy of the subpoena. The judge reiterated his claims that Candler had been put in a predicament by his superiors and concluded the session by denying the subpoena. Notably, instead of returning the subpoena, Judge Thompson retained it, made additional annotations, and informed Candler, "You're not allowed to talk about this."

433. Subsequent actions raised serious concerns about Judge Thompson's impartiality. Detective Candler wrote a statement to document what occurred on the same day, but was later seized by the TBI on September 4, 2024, along with all three copies of the statement and the laptop upon which it was typed. Additionally, the City of Millersville's request for the hearing's recording has been denied, pending further proceedings. Analysis of the TBI's Operation Plan "notes," inadvertently left behind after search warrants signed by Judge

Thompson were executed, revealed references to "attempted subpoenas" as part of alleged "official misconduct"—claims that appear unfounded.

434.     On June 25, 2024, Det. Candler and Det. Dorris met with FBI special agents, bringing binders with evidence of their criminal investigations.  They discussed the cases, but did not hear back from the FBI before the TBI "raid" took place.  The TBI seized all of the folders that Detectives Candler and Dorris had taken to the FBI.

435.     On August 20, 2024, Assistant DA Jason White called Det. Dorris and stated that they were not going to prosecute the case against Henry Dean Jordan for solicitation of a minor "at this time."  Gen. White told Det. Dorris to "keep the evidence on Henry Dean Jordan in the event we decide to prosecute again."

436.     On August 23, 2024, Asst. Chief Taylor asked Capt. Dorris to email Sumner County DA Ray Whitley to see if he would be willing to come to Millersville and review the evidence that the detectives had been accumulating in the larger "white-collar type of case" they had been working, and he even offered to buy Whitley and Assistant DA Thomas Dean lunch for taking their time:

"General Whitley,

I need your help.  I was wondering if you would be able to come to the Millersville PD to look at a case I am working.  It is a white-collar type of case that leads into the possibility of official misconduct, money laundering and fraud, so I put ADA Dean on the email as well.  I have multiple binders, things drawn out on a white board and items posted on the wall.  I believe I have enough for prosecution or at least to present to the Grand Jury, but I am not 100% sure.

With your knowledge and experience in these matters being greater than mine, plus it would be your office prosecuting, I was hoping you could take some time and come see if I am in the ballpark.

It shouldn't take too long, and if we do it around lunch time, we would feed you for taking the time.  I know you have a very busy schedule.

Captain Todd Dorris
Millersville Police Department

437.     On August 23, 2024, Assistant DA Thomas Dean responded to Capt. Dorris as follows:

"Capt. Dorris,

Thanks for reaching out.  Sorry to be responding late - it's been a busy day.  We will get back with you.

Have a good weekend.

Thomas Dean

***The TBI Conducts Suspicious Show of Force in Millersville to Forcibly Seize Evidence The MPD Had Voluntarily Offered.***

438.     Sumner County District Attorney Ray Whitley, who has the statutory authority in Tennessee to initiate and supervise TBI investigations in their county, was explicitly invited by the Millersville Police Department to review the evidence they had been accumulating, which included an offer to buy the DA lunch to facilitate this collaboration. Instead of accepting the offer and cooperating transparently, the DA opted to have the TBI conduct a highly publicized raid twelve days later, forcibly taking the very files the MPD had prepared and intended to voluntarily provide. This orchestrated show of force was a coordinated publicity stunt, evidenced by the Channel 5 camera crew's presence in the immediate wake of the TBI's arrival. The sealed search warrants imply that Channel 5 had prior contact with the TBI, as they were not publicly available on any Circuit Court Docket.

439.     The raids took place at 10:00 AM on September 4, 2024, with the TBI executing two search warrants at Millersville City Hall and one at Assistant Chief Taylor's residence.

440.     Two warrants were issued in Sumner County, and one says "Sumner County" but was apparently signed by a Robertson County Judge.  The search warrant on Asst. Chief Shawn Taylor's house says "Robertson County" but was signed by Sumner County Judge Joe Thompson.  The Official Misconduct search warrant was also signed by Judge Joe Thompson, and targeted Asst. Chief Shawn Taylor.

441.     The Aggravated Perjury and Official Oppression search warrant targeted Det. Todd Dorris with regard to the pedophile sting.  The signature of the judge is difficult to read, but appears to belong to William R. "Bill" Goodman from the 19th judicial district in Robertson County. The allegations of perjury and the search warrant were based entirely on the false allegations from Kim Kelley and Phil Drake who claimed that Capt. Todd Dorris had committed perjury.

442.     The search warrants were obtained and signed on September 3, 2024, with the search warrant for Shawn Taylor's home and Millersville City Hall being signed by Judge Joe Thompson, despite the fact that he had acted as a witness or investigator when he provided evidence of the "attempted subpoenas" and the recording of Det. Michael Candler to the TBI, who have admitted that they possess the recording and considered it as part of their investigation.

443.     Video at City Hall taken by witnesses present on the morning of September 4, 2024 shows that the TBI brought their press spokesperson on the raid at City Hall, and she is seen leading Channel 5 in the parking lot to take video of files being taken out of vehicles. Several witnesses saw the Channel 5 News vehicle enter the City Hall property very shortly after the TBI pulled up and blocked both of the Millersville staff parking lots, thus constituting a "custodial" stop by making it impossible for any officers or employees to

leave.   Given the fact that the Search Warrants were filed "under seal" and could not be obtained publicly, it was obvious that somebody within the TBI or the Sumner County Circuit Court had tipped off Channel 5 and warned them the search warrants had been signed the day before and the "TBI raid" would be taking place the following morning.  In light of the fact that the Millersville PD had been working to get the TBI involved in a Task Force and to also provide evidence directly to Gen. Ray Whitley, who essentially controls when the TBI is involved in investigations in Sumner County, the "raid" objectively appeared to be both a publicity stunt and an intimidation tactic.

444.      The following is a photograph of Channel 5 camera man Brian Staples, seen wearing a blue shirt, with the TBI's Senior Public Information Officer, Susan Niland, seen in the right of the following photo appears to be taking pictures or video of Channel 5 peering into vehicles and filming evidence as it is being collected from vehicles that are actively being searched:



445.    Video from Channel 5's broadcast shows that they were allowed to actually look inside the trunks of vehicles for closeups of the items that were being seized, while they were being seized.  None of the other news agencies that showed up an hour later were given such preferential treatment.



446.    The TBI's decision to involve a media liaison and facilitate the presence of Channel

5 News during the execution of the search warrants is highly irregular.  Traditionally, law

enforcement agencies conduct such operations discreetly to preserve the integrity of

investigations and protect the rights of individuals involved.  Executing search warrants

discreetly is essential to uphold the constitutional rights of individuals, maintain the

integrity of criminal investigations, and preserve the fairness of the judicial process.

Turning a search into a public spectacle can lead to significant legal consequences,

including the suppression of evidence, civil liability, disciplinary actions against law

enforcement, and jeopardizing the prosecution's case.

447.    According to a copy of the TBI's Operation Plan that had been left behind at Shawn

Taylor's home:

"On May 22, 2024, Gen. Ray Whitley requested the TBI conduct an investigation into
allegations against Shawn Taylor for improper use of law enforcement intelligence data,
falsifying government records, and official misconduct.  Taylor is the current Assistant
Chief of the Millerville [sic] Police Department (MPD).  Taylor has been known to request
case numbers in order to initiate criminal investigations without claims or incident reports

being previously filed. It is believed he has improperly utilized law enforcement intelligence data to include the State of Tennessee Integrated Criminal Justice Portal, Financial Crimes Enforcement Network, and the National Crime Information Center. Several interviews have been conducted and information gathered about the initiation of such investigations and the possible motives involved.

The mission will be to execute a search warrant on Taylor's residence in an effort to locate documents and digital evidence to support the allegations of official misconduct. This mission will include a physical search of [Taylor's residence located at REDACTED].

A search warrant for the Millersville Police Department will be executed simultaneously to the search warrant execution for Taylor's residence."

448.     Thus, it appears that Taylor's residence was the primary target. The TBI was aware that Taylor had a sophisticated computer system that contained confidential client files from when he worked as a law enforcement consultant and OSINT researcher for private law firms. Thus, whatever the TBI seized from Taylor's computer, it is all protected under attorney-client privilege.

449.     The TBI was specifically aware of this computer because Taylor had previously filed a complaint against a TBI agent who was investigating the shooting of Taylor's house in the early morning hours of March 27, 2023, the same day as the Covenant School Shooting. The complaint alleged that the Agent had gone into the secured barn next to Taylor's house where the computer system in question was located, even though Taylor had told the TBI that nobody was to go in there unattended because of the highly confidential files located in the area. Shawn Taylor's house had been shot multiple times with a firearm chambered in 9mm while he and his family were asleep. In fact, the TBI had to stop investigating the shooting of Taylor's house to go to the Covenant School after Audrey Hale opened fire on students and teachers. One of Hale's weapons was also a 9mm. The same TBI agent who was the subject of Taylor's complaint participated in the execution of the search warrants at Millersville City Hall on September 4, 2024.

450.     The documents left behind by the TBI include handwritten notes bearing the title,

"Briefing 9/3/2024" reveal the following information:

"NA-82A-312 – Official Misconduct – Rielly
NA-26A-17 – Perjury – McGowan

Bryan Morris – Chief
Shawn Taylor – Asst. Chief
Todd Dorris – Capt/Detective
Michael Candler – Detective

FINCIN Reports – City Commissioners
Portal, Criminal History's, Attempted Subpoenas

Dorris – Agg. Perjury – Prelim – Child Predator Sting
Veterans for Child Rescue" – Group who helped on sting – several days
Henry Jordan – one arrest

Millersville PD
Shawn Taylor – Residence
[ADDRESS REDACTED]
TCA – 39-17-402 – Official Misconduct
[…]"

451.     Although the TBI claims it was searching for evidence related to queries that Taylor

ran through "State of Tennessee Integrated Criminal Justice Portal, Financial Crimes

Enforcement Network, and the National Crime Information Center," this information can

be easily located by the TBI without the need for a search warrant.  For example, the TBI

knew that Taylor had already obtained information from the Integrated Criminal Justice

Portal because they were copied on the email from the Administrator of the ICJ Portal who

had included them in the Task Force Taylor was creating.  A simple "offline audit" of

Taylor's username would show everything he ever ran.    Moreover, there's no question

that the TBI knew exactly what Taylor had received from FinCEN, since they were the

ones who provided the information to Taylor.  In fact, the TBI has the authority and

capability to conduct offline audits of access to the National Crime Information Center.

452.     According to Tennessee regulations, specifically Tenn. Comp. R. & Regs. 1395-1-1-.03, the TBI maintains the Control Terminal Agency (CTA) for the state, which is approved by the FBI/NCIC for control of the Tennessee Information Enforcement System (TIES) network. This network allows full access to make entries into NCIC and TCIC files, indicating that the TBI is the main contact for such access.

453.     Thus, there was no reason at all for the TBI search Taylor's residence or City Hall for the documents they could find via an offline audit.

454.     The remaining search warrant for Det. Dorris's alleged "perjury" was based entirely on the false allegations and fabricated evidence from Defendants Kim Kelley and Phil Drake.


**September 4, 2024 – "TBI agents raid Millersville Police Department, home of town's 'conspiracy cop'"**

455.     This article once again labels Shawn Taylor as the department's "conspiracy-minded assistant police chief" and asserts that he "has appeared in videos in which he displays an impressive collection of electronic equipment that he has utilized to pursue his sometimes bizarre conspiracy theories."

456.     The article repeats the allegations that the TBI is probing "possible use of sensitive law enforcement data to dig up dirt on potential political enemies." In truth, Taylor and Chief Morris are not politicians and do not have "political enemies."  They not only adhered strictly to all data-access protocols, they have never misused department information for political or personal purposes. The insinuation that they engaged in

politically motivated data-mining is false and defamatory because it imputes criminal misconduct and moral turpitude without any evidence.

457.     The piece once again notes that "neither Shawn Taylor nor Chief Bryan Morris has spoken to NewsChannel 5 since this investigation began," implying willful evasion of the press as opposed to evading Phil Williams' personal attacks and fake news.

458.     By repeatedly referring to Taylor as the "conspiracy cop"—a pejorative invented by the reporter—the article continues to rebrand him with a stigmatizing nickname that conveys bias and derision rather than neutral reporting.  This epithet, used without evidentiary support, is defamatory because it plants in the reader's mind an unjustified belief that Taylor's conduct and beliefs are extreme, unhinged, and outside the bounds of acceptable law enforcement practice, when in fact none of his official acts as a police officer evidence anything other than sound police work.

**September 5, 2024 – "QAnon-affiliated figures rally to defense of Millersville 'conspiracy cop' Shawn Taylor after TBI raids"**

459.     The article repeatedly refers to Shawn Taylor as the department's "controversial assistant police chief" and "conspiracy-minded assistant police chief," branding him with a nickname that suggests irrational extremism and unfitness for duty.  These labels falsely cast Taylor's legitimate law-enforcement concerns as lunacy, damaging his professional reputation by imputing mental instability and bias without factual support.

460.     The story quotes a podcaster's claim that "Shawn Taylor … just had his home invaded — with no warrant," implying that Taylor lied about not being presented with a warrant at his house.  In fact, Taylor had requested a copy of the warrant outside his residence, which the TBI refused until moments before they left.  The warrant that Taylor

was handed, however, was not the warrant for his house, but another copy of the warrant for the City of Millersville. Although both were similar and signed by Judge Thompson, there are critical legal distinctions involved in each.

461.     The article asserts that investigators informed Channel 5 that they were seeking "files that Taylor and Millersville PD may have compiled, using sensitive law enforcement data, as Taylor pursued his bizarre conspiracy theories, potentially even investigating his political enemies," information sharing that further suggests collusion between the TBI and News Channel 5.

**September 16, 2024 – "When QAnon Comes to Main Street: Investigating the Millersville Police Department and its 'conspiracy cop'"**

462.     The article's opening claim that "conspiracy theorists carry guns and badges, using their police powers to explore notions that are sometimes completely divorced from reality" falsely portrays Assistant Chief Shawn Taylor and Chief Bryan Morris as irrational extremists unfit for law enforcement. In truth, both officers have conducted themselves in accordance with department protocols and have never endorsed or acted upon any extremist ideology.

463.     By reporting that the Tennessee Bureau of Investigation "has limited the department's access to sensitive U.S. Department of Treasury data … amid concerns about the possible misuse of that information," the story implies Taylor and Morris misappropriated confidential financial records for improper purposes, thereby violating numerous statutes and engaging in illegal activity. No evidence supports any misconduct in their handling of sensitive data, and the restriction was a routine precautionary measure, not a disciplinary sanction.

464.     The piece describes one prong of the TBI investigation as focusing on a "botched child-predator sting and possible perjury by the lead detective," thereby insinuating Taylor's sting operation was legally defective and that perjury occurred under his direction. In reality, the sting complied with Tennessee law, no officer has been charged with perjury despite the Channel 5 Media Defendants' best efforts to fabricate this allegation, and no court has found any procedural failure in the operation.

465.     Quoting Taylor's own video assertion of a "transnational" corruption conspiracy—purporting a "multifaceted attack from a foreign adversary"—the article frames these speculative statements as evidence of his delusional mindset rather than opinion, casting him as dangerously unhinged. This innuendo defames Taylor by presenting his opinions as proven facts and maligning his credibility without basis.

466.     The report that Chief Bryan Morris "has the support" of Taylor and three city commissioners in a community "dominated by far-right ideologies" falsely equates Morris's professional endorsement of his subordinate's work with agreement in extremist beliefs. Morris has publicly disavowed all conspiracy theories and has never condoned any extremist rhetoric, making the implication defamatory.  This is also a reference to the beliefs and statements held by Cristina Templet and David Gregory and their allies that Shawn Taylor and Bryan Morris are members of the Sumner County Constitutional Republicans ("SCCR"), which espouses a different political affiliation and/or ideology than Cristina Templet and David Gregory.  Templet openly disparaged the SCCR as "Nazis" without any basis to do so other than to harm others, which nonetheless proves her malice toward the SCCR and Morris and Taylor.

467.     Throughout the story, NewsChannel 5 persistently uses the pejorative label "conspiracy cop" as if it were a factual description rather than a disparaging epithet. This repeated branding defames Taylor by casting him as a fringe extremist, undermining his standing as a law-enforcement professional without any factual justification

**September 19, 2024 – "Conspiracy theorists threaten retaliation against judge, district attorney, TBI agents"**

468.     The article's headline and lead assert that "QAnon-aligned voices of the far right are threatening retaliation against a judge, a district attorney and Tennessee Bureau of Investigation agents … for their roles … and the residence of conspiracy-minded Assistant Police Chief Shawn Taylor," thereby implying that Taylor orchestrated or endorsed violent threats. In reality, Taylor never made, encouraged, or condoned any such threats; the alleged rhetoric originates from unrelated third-party podcasters and extremist figures, and the story offers no evidence of Taylor's involvement in or approval of violent retaliation.

469.     A close reading of the misleading article actually shows that no threat of any Judge or District Attorney actually occurred.

470.     The article quotes podcaster Scott McKay stating, "Over here, it's 'see something, beat the sh*t out of them' on Patriot Streetfighter … that's how we do it here," insinuating Taylor's association with violent rhetoric and tactics. Taylor has never endorsed violence; this language reflects McKay's own sensational editorial style, not any statements or conduct by Taylor himself.

471.     By asserting that "McKay has long been a go-to source for Shawn Taylor and his conspiracy theorist allies," the story falsely imputes the advocacy of violence to Taylor..

472.     The piece falsely implies that Taylor conspired to target Judge Thompson, DA Whitley, and TBI agents.

473.     Throughout the story, the article portrays Taylor as reckless and dangerous by broadcasting extremist "opinions" and unsubstantiated threats as if they were his own work. In fact, Taylor's public statements concerned only factual questions about the lawful execution of search warrants and department practices; he never promoted or disseminated any violent or extremist content

474.     Notably, the Article does not identify even a single, actual threat that was made to anyone.

**October 7, 2024 – "Election denier says his group gained access to U.S. banking data"**

475.     The article once again labels Shawn Taylor as a "conspiracy-minded assistant police chief" and repeats that characterization without factual support, falsely suggesting he is driven by irrational beliefs rather than legitimate law-enforcement concerns.

476.     It reports the uncorroborated claim that Mark Finchem's group "gained access to a highly confidential federal database … working through" Taylor, thereby accusing Taylor illegally exploited his law-enforcement credentials to obtain private banking records. Taylor not only never provided such information, no evidence exists that Taylor ever disclosed any FinCEN data to an individual not entitled to it, making this insinuation false and defamatory. Phil Williams and the Channel 5 Media Defendants nonetheless intentionally mischaracterized Finchem's statement to fabricate this claim.

477.     By emphasizing that "public disclosure of FinCen data is a federal crime," the story conveys the false impression that Taylor (or Chief Morris) committed criminal

wrongdoing, even though neither officer has been charged with—or investigated for—any unlawful disclosure.

## October 22, 2024 – "Two key GOP lawmakers threaten 'political fallout' if TBI continues investigation of Millersville police"

478.     The article reports that "Rep. Bud Hulsey…sent a four-page letter to TBI Director David Rausch" urging him to end the Millersville probe, and then notes that NewsChannel 5 "obtained" that letter through a public records request "following some recent claims by Taylor that he had the support of state lawmakers". In fact, the TBI had tipped-off Channel 5 about Hulsey's letter, triggering Williams' public records request, the purpose of which was to suppress and retaliate against perceived allies of Shawn Taylor and Bryan Morris.

479.     Rep. Hulsey's letter was not a threat. It was sent as a legislator and former law-enforcement officer to Director Rausch raising legitimate concerns about the public perception surrounding the Bureau's execution of search warrants against the Millersville Police Department and its Assistant Chief, which appeared objectively "inappropriate and retaliatory" and risked chilling cooperation with the TBI by small–town agencies. Far from a "threat," Hulsey's communication was measured and intended to preserve the integrity of criminal investigations and public confidence in state law enforcement.

480.     The letter accurately recounts that certain TBI actions followed publication of a politically-charged news reports from the Channel 5 Media Defendants—timed within two days of the broadcast—which suggested the Bureau was responding to media pressure rather than bona fide law-enforcement needs. Hulsey correctly observed that "timing suggests that the investigation is not based on legitimate law-enforcement concerns," a fact

supported by documentary evidence from the TBI Operation Plan left at Assistant Chief Taylor's residence.

481.    Hulsey's letter further explains that Assistant Chief Taylor's sting operation and law enforcement database access were conducted with full legal authority and in coordination with multiple state agencies, including the TBI, as part of a prospective task force. This refutes Phil Williams's assertion that Taylor misused sensitive data; instead, Hulsey confirms that Taylor's work was both lawful and cooperative, undermining Williams's defamatory implication of criminal misconduct.

482.    Contrary to Williams's portrayal of the letter as a "threat" of "political fallout," Hulsey never claimed personal responsibility for any future fallout nor suggested enforcement action against the Bureau, which he has no authority over at any rate, as the TBI is an independent agency. He merely warned about the perception that politically motivated investigations would harm TBI's credibility and deter collaboration by local departments, a concern that Hulsey was hearing from his constituents.

## December 9, 2024 – "Conspiracy cop Shawn Taylor resigns from Millersville Police Department amid criminal probe"

483.    The article brands Assistant Chief Taylor as "the conspiracy-minded cop now at the center of a criminal investigation" and repeatedly uses the defamatory nickname "conspiracy cop," conveying a false impression that Taylor's official conduct is driven by irrational, extremist beliefs and mental instability.

484.    By highlighting that Taylor "has become the focus of a criminal probe by the Tennessee Bureau of Investigation following questions first raised by NewsChannel 5 Investigates," the article suggests Taylor left because of the allegations of criminal conduct,

when in fact he retired and moved out of his house after the TBI had desecrated it during their "raid." Moreover, the Channel 5 Media Defendants had once again broadcast Taylor's home address to the four corners of the Internet, which risked violence against Taylor and his family from Williams' fanatical supporters who had already threatened actual violence against Millersville officials.

485.    The story asserts that "TBI agents raided the Millersville Police Department and Taylor's home back in September" in connection with "misuse of sensitive law enforcement data" and "perjury in a child predator sting," implying that Taylor committed or was responsible for both criminal acts. The article omits key facts and misconstrues how law enforcement databases are handled in Tennessee, suggesting that Taylor was accessing databases on his own, when in fact all law enforcement officers have to submit their requests for FinCEN data directly to the TBI, which then produces the results, if any, to the requesting officer.

486.    The article criticizes Taylor for having "consistently refused to respond to NewsChannel 5's reporting," implying evasiveness and consciousness of guilt, as opposed to a desire to be left alone in his private life and work life.

487.    Phil Williams and the Media Defendants had already consistently and systematically deleted any comments from any story from any of Plaintiffs' supporters and blocked them all from any future comments in order to generate fake news and make it appear that the public supported their articles unanimously.

488.    By juxtaposing Taylor's purported "resignation" (in fact a voluntary retirement "in good standing," as Chief Morris confirmed) with sensational references to "criminal probe," the article creates a defamatory narrative that Taylor abandoned his post to escape

culpability.  In reality, his departure was totally unconnected to any finding or accusation of wrongdoing.

**January 31, 2025 – "Millersville police chief resigns, blaming 'untenable' situation. His department still faces TBI probe."**

489.     The article falsely implies that Morris was lying about his claim that he would be retained as interim city manager.  In fact, Morris had been informed that he would remain in that position until a permanent city manager was hired, which did not happen.  Morris also stated, correctly, that it appeared that the next broken promise was that he and the staff he hired would be terminated, a fact which is steadily becoming true as the Millersville employees hired by Morris or Tina Tobin are steadily being terminated or forced out, one by one.

490.     The article omits that the "newly elected board" consists of three individuals (Dustin Darnall, Jesse Powell, and Lincoln Atwood) who were so aligned with Defendant Cristina Templet that they were referred to locally by the nickname "The Templet Three."

491.     The article casts blame on Morris, who "was also the one who hired conspiracy theorist Shawn Taylor as assistant police chief, leading eventually to a TBI investigation of Taylor's actions."  By framing Taylor's lawful investigative initiatives as "conspiracy theory," the article defames both Taylor and Morris by imputing a lack of professional judgment on Morris and mental instability on Taylor, without factual basis.

## CAUSES OF ACTION

### COUNT I: FIRST AMENDMENT RETALIATION – 42 U.S.C. § 1983

### (Plaintiffs Shawn Taylor and Bryan Morris against All Defendants)

492.     Plaintiff Shawn Taylor, as a private citizen, engaged in constitutionally protected speech, including private and public statements concerning political matters, government corruption, and public accountability—subjects that are core matters of public concern protected under the First Amendment.

493.     Commissioners Cristina Templet and David Gregory strongly opposed Plaintiff Taylor's viewpoints and political associations, and sought to terminate or discredit him based on their disagreement with his protected political speech.

494.     When Plaintiff Bryan Morris, then Chief of Police and the direct supervisor of Plaintiff Taylor, refused to terminate or discipline Taylor on the basis of his protected speech, Defendants Templet and Gregory began a campaign of retaliation against both Taylor and Morris.

495.     This campaign included repeated public comments falsely implying that Taylor was mentally unfit, affiliated with racist hate groups, and a threat to public safety, all of which were knowingly false and calculated to destroy his credibility and chill his speech.

496.     Commissioners Templet and Gregory coordinated with Defendant Phil Williams, a reporter with NewsChannel 5 and employee of Scripps Media, Inc., to amplify these falsehoods through a calculated public smear campaign under the guise of investigative journalism.

497.     In Spring and Summer of 2024, Defendants Templet, Gregory, Williams, and the Channel 5 Media Defendants published and promoted a series of televised and online

stories falsely linking Taylor and Morris to white supremacists, hate groups, and extremist movements, despite having no evidence whatsoever that Taylor held such affiliations.

498.     Defendant Williams knowingly misrepresented the origins of his reporting, falsely claiming that he had "uncovered" these links through an independent investigation, when in truth, the source of the information was Defendants Templet and Gregory, who themselves were acting in retaliation.

499.     These defamatory reports and public comments were not isolated; they formed part of a sustained campaign of reputational assassination, designed to pressure Chief Morris to remove Taylor or else suffer consequences himself.

500.     When Morris refused to comply with the unconstitutional demands to terminate Taylor, the same Defendants turned their retaliatory efforts toward Morris, publicly criticizing his leadership, questioning his integrity, and falsely implying that he was complicit in Taylor's purported misconduct.

501.     Over the ensuing months, Chief Taylor and Chief Morris endured a hostile and retaliatory work environment caused by unprecedented, daily attacks from the Channel 5 Media Defendants, who were working in concert with Commissioners Templet and Gregory, including efforts to undermine their authority, subject them to baseless scrutiny, and isolate them within City leadership—all coordinated by Templet, Gregory, and aided by Williams's and the Channel 5 Media Defendants' various platforms.

502.     Although neither Plaintiff Taylor nor Plaintiff Morris was ultimately terminated, the retaliatory conduct was so pervasive, public, and coordinated that it would chill a person of ordinary firmness from continuing to engage in protected First Amendment speech, which for Morris included his refusal to terminate Shawn Taylor for his protected

conduct, as well as the retaliation Morris faced for defending his employee from false accusations.

503.    The conduct included reputational harm, public humiliation, false associations with extremist ideologies, and workplace harassment, including harassment at nearly every meeting and work session at Millersville City Hall —all of which are recognized by the Sixth Circuit as adverse action under First Amendment jurisprudence.

504.    The actions of the Defendants were motivated, at least in part, by Plaintiffs' exercise of their First Amendment rights—Taylor's political speech, and Morris's refusal to violate Taylor's constitutional rights.

505.    In addition, the Defendants were motivated, at least in part, by the perception that Plaintiffs were members of the Sumner County Constitutional Republicans ("SCCR"). Although neither Taylor nor Morris had any issues with the SCCR, they were never members, even though Defendants Templet, Gregory, and the Media Defendants perceived Morris and Taylor as members and retaliated against them because of it.

506.    These actions were not *de minimis*. They were deliberate, repeated, and targeted, and they occurred in the context of Plaintiffs' public service, where reputational integrity is essential to professional success.

507.    Defendants Templet, Gregory, Williams, the Channel 5 Media Defendants and the remaining media Defendants thus violated clearly established First Amendment rights of both Plaintiffs, and are liable under 42 U.S.C. § 1983 for the injuries caused thereby.

## COUNT II: CIVIL CONSPIRACY TO VIOLATE FIRST AMENDMENT RIGHTS

## (42 U.S.C. § 1983)

### (Plaintiffs Shawn Taylor and Bryan Morris Against All Defendants)

508.    Plaintiffs Shawn Taylor and Bryan Morris re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

509.    At all relevant times, Plaintiffs engaged in conduct protected by the First Amendment to the United States Constitution. Plaintiff Taylor, in his capacity as a private citizen and public employee, engaged in political speech on matters of public concern. Plaintiff Morris, as Chief of Police, refused to carry out an order to violate the First Amendment rights of Taylor by refusing to terminate him for engaging in protected speech.

510.    Defendants Cristina Templet and David Gregory, acting under color of state law, entered into a mutual agreement and understanding with the Channel 5 Media Defendants, to unlawfully retaliate against Plaintiffs for their exercise of constitutionally protected rights and engaging in constitutionally protected activity.

511.    The purpose of the agreement was to discredit, defame, isolate, and ultimately force the resignation or termination of Plaintiff Taylor based on his protected political views and associations, and to punish and retaliate against Plaintiff Morris for refusing to carry out their unconstitutional directive.

512.    The Defendants engaged in a coordinated, months-long campaign that included repeated, daily or twice daily articles and broadcasts, sharing of confidential personnel information obtained from personnel files, defamatory media reports based on false and misleading premises, and an ongoing, coordinated public efforts to smear and malign the reputations of both Taylor and Morris.

513.    In furtherance of this conspiracy, the Defendants jointly undertook overt acts, including:

    a.  Publishing, promoting, and participating in a multi-part media series falsely associating Plaintiff Taylor with hate groups and extremism;

    b.  Repeatedly pressuring the City of Millersville's leadership to discipline or terminate Plaintiff Taylor;

    c.  Attempting to utilize Shawn Taylor's confidential psychological report to hold a public inquisition of Taylor and question him and the doctor who performed the test, despite lacking any authority to do so or the competence to even questiong the accuracy of the report;

    d.  Retaliating against Plaintiff Morris through public comments made on multiple broadcasts, official pressure, and reputational attacks for his refusal to engage in unconstitutional retaliation against Shawn Taylor;

    e.  Misrepresenting the source and credibility of allegations to the public, falsely claiming that an "investigation" uncovered misconduct, when in fact the information originated with Defendants Templet and Gregory;

    f.  Engaging in continued coordination across official meetings, media appearances, and off-the-record communications to harm both Plaintiffs.

514.    The actions of Defendants were undertaken with the intent to deprive Plaintiffs of their clearly established constitutional rights, including the right to engage in protected speech and the right to be free from retaliation for refusing to violate others' constitutional rights.

515.    As a direct and proximate result of this unlawful conspiracy, Plaintiffs suffered harm, including reputational damage, emotional distress, public humiliation, damage to their professional standing, and the creation of a hostile work environment that would chill a person of ordinary firmness from exercising constitutional rights or defending the rights of others.

516.    The Defendants' conspiracy violated Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, enforceable through 42 U.S.C. § 1983.

517.    The conduct of all Defendants was intentional, malicious, and done with reckless disregard for Plaintiffs' constitutional rights, warranting an award of compensatory and punitive damages, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

518.

## COUNT III – VIOLATIONS OF RACKETEERING INFLUENCED CORRUPT ORGANIZATION ACT (18 U.S.C. §§ 1961–1968)

### (Plaintiffs Bryan Morris and Shawn Taylor Against All Defendants)

519.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

520.    Defendants Kim Kelley and Phil Drake, along with their affiliated and co-owned business entities (including but not limited to Uniting America Inc., Grow Online, LLC, and Digital Defenders United), as well as various unnamed Doe Defendants (1–25), have formed an association-in-fact constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

521.    This enterprise exists separate and apart from the predicate acts in which it engages and operates under a common purpose of raising illicit funds and public attention for Defendants' so-called "child rescue" activities, which included the alleged buying, kidnapping, or stealing of children from traffickers by force, as well as harboring them at a "Survivor Center" surrounded by armed guards and concealing them from society until they reached adulthood, and plans to coerce them into labor at the "Survivor Center." Defendants also use this enterprise to solicit and launder donations through their 501(c)(3) organizations and Defendant Drake's political campaign, diverting money to themselves and evading regulatory oversight and proper taxation.

522.    The Defendants are engaged in interstate commerce, and the Defendants' enterprise activities affect interstate commerce because:

    a.  Defendants used online platforms, interstate travel, and out-of-state bank accounts to solicit donations and fees, and to move money across interstate lines;

    b.  Defendants traveled or caused travel to Millersville, Tennessee, from other jurisdictions for the purpose of sabotaging a police sting and disparaging Tennessee-based law enforcement officers to promote their illicit businesses; and

    c.  Defendants engaged in promotion of their business, including solicitation and demands of funds for illegal "child buying," child trafficking, and forced-labor operations that necessarily involve crossing state or national borders.

523.    Over the relevant period, Defendants have committed multiple predicate acts as defined under 18 U.S.C. § 1961(1), forming a continuous pattern of racketeering activity that poses a threat of continued criminal conduct. These predicate acts include, but are not limited to:

a. The Defendants' violations of 18 U.S.C. § 1590 by Trafficking for Forced Labor or Involuntary Servitude, via the Defendants' scheme to "rescue" or buy children, conceal them at a "Survivor Center," and use them for labor at the compound, which constitutes trafficking under federal law;

b. The Defendants' violations of 18 U.S.C. § 1593A by Benefitting Financially from Peonage or Slavery, including knowingly profiting from their kidnapping, concealment and forced labor scheme, including soliciting donations from the public under false pretenses;

c. The Defendants' violations of 18 U.S.C. § 1960 for operating an Unlicensed Money Transmitting Business, including moving funds derived from illegal activities (including murder, kidnapping, forced labor, bribery of public officials) through the Defendants' nonprofit accounts, business accounts, and Defendant Drake's presidential campaign accounts without the requisite state or federal money-transmitting license;

d. The Defendants' violations of 18 U.S.C. § 1956 (Money Laundering), including the Defendants knowingly conducting financial transactions with proceeds from specified unlawful activities—such as kidnapping, trafficking, murder-for-hire, or forced labor—intending to promote further illegal conduct and to evade tax laws and financial reporting laws;

e. The Defendant Drake's violations of 18 U.S.C. § 1958, Murder-for-Hire, due to Drake's public admissions to engaging in the systematic murder of the parents of migrant children and other "heinous acts" along the U.S.–Mexico border and

transporting money to bribe officials, as part of a murder-for-hire scheme involving interstate facilities and foreign travel;

f.   The Defendants' violations of 18 U.S.C. § 1201, for Kidnapping children from their parents or traffickers by use of force or deception, harboring them without lawful authority, concealing them from the public and authorities, and transporting them across state lines;

g.   The Defendants' Misappropriation of Trade Secrets under 18 U.S.C. § 1832 for wrongfully disclosing and using the protected identity or "likeness" of Plaintiff Detective Candler—an undercover officer—to advance their illicit enterprise, knowing that Candler's identity was kept secret for law enforcement operations;

h.   The Defendants' Defamation, False Light, and Related State-Law Torts as Predicate Acts that are an integral part of RICO through wire fraud, including the Defendants' employment of misrepresentations, false statements, and public smear campaigns to obtain money or property in the form of donations or other funds to obtain a professional advantage.

524.   In furtherance of their enterprise, Defendants conspired to sabotage the Millersville Police Department's undercover pedophile sting in May 2024 and thereafter by traveling to Millersville, infiltrating and influencing volunteers and officers, fabricating evidence, and launching a widespread media campaign to defame Shawn Taylor and Bryan Morris in order to promote their own illicit, racketeering organizations.

525.   The Defendants intentionally published false claims about Plaintiffs, including that they planned on intentionally circumventing Tennessee law regarding the unlawful solicitation of a minor, as well as intentionally deceiving prosecutors and the court, and

numerous other false allegations alleged herein. By disparaging Plaintiffs and the conduct of the sting, Defendants enhanced and intended to enhance their own public profiles, draw attention to their own illegal 501(c)(3) "child rescue" schemes, and thereafter solicited additional donations and monies that were then laundered or funneled into their personal accounts, business accounts, and Drake's presidential campaign.

526.     Throughout all RICO-related counts, Plaintiffs claim actual and compensatory damages for lost employment, out-of-pocket costs, diminished professional opportunities, trade secret misappropriation, and reputational harm, as well as treble damages under 18 U.S.C. § 1964(c), attorneys' fees, and other relief deemed just.

527.     Plaintiffs have suffered concrete financial loss and injury to their business or property interests as a direct and proximate result of Defendants' racketeering conduct.

528.     Plaintiffs' damages include, but are not limited to:

   a.  Loss of Employment/Professional Opportunities.

   b.  Reputational Harm and Out-of-Pocket Expenses. Both Plaintiffs have lost money, wages, including legal expenses, and have endured diminished goodwill, and damages their professional standing in law enforcement.

529.     The Plaintiffs have incurred losses to their property and tangible business interests recoverable under the RICO Act.

530.     Defendants' ongoing criminal scheme—centered on discrediting a legitimate law enforcement operation to exploit media coverage as free advertising and to promote their businesses and solicit donations for financial gain—proximately caused Plaintiffs' injuries.

531.     As a direct and proximate result of the Defendants' unlawful racketeering enterprises, Plaintiffs are entitled to an award of compensatory damages for the harm to

their business, property, and reputations, as well as treble damages under 18 U.S.C. § 1964(c). Plaintiffs are also entitled to the costs of this suit, an award of reasonable attorneys' fees, and all other relief authorized by RICO and deemed just and proper by this Court.

## COUNT IV – CONSPIRACY IN VIOLATION OF RICO ACT (18 U.S.C. § 1962(d))

### (Plaintiffs Shawn Taylor and Bryan Morris Against All Defendants)

532.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

533.    Defendants Kim Kelley, Phillip Drake, their Affiliated Organizations, and all Media Defendants, as well as Defendant Does 1-25 have agreed to participate in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity. They also agreed to carry out the unlawful scheme with the specific intent to harm Plaintiffs' business and property interests as part of advancing their illegal fundraising, money-laundering, child-harboring, and forced-labor operations.

534.    Each Defendant knew of and voluntarily joined in the conspiracy's objectives— namely, sabotaging the Millersville pedophile sting, defaming Plaintiffs, and channeling the resulting notoriety and donations into Defendants' own coffers. Defendants acted in concert with each other and with unidentified Doe Defendants (1–25), each of whom knowingly engaged in at least two or more predicate acts, as alleged in Count IX and incorporated by reference.

535.    As a direct and proximate result of the Civil RICO conspiracy, Plaintiffs suffered injury to their business and property, including lost wages, loss of prospective employment,

damage to professional goodwill, misappropriation of trade secrets, and other pecuniary losses described more fully above.

536.     Plaintiffs respectfully reserve the right to amend their pleadings to add such federal causes of action as may be warranted based on ongoing discovery and developments in this case.

## COUNT V: DEFAMATION – TENNESSEE LAW

### (Plaintiffs Shawn Taylor and Bryan Morris Against All Defendants)

537.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

538.     Defendants—including Kim Kelley, Phillip Joseph Drake, Phil Williams, Scripps Media, Inc., NewsChannel 5, and each of the other media entities and individuals who authored, published, republished, or otherwise disseminated the defamatory content— acted in concert to issue and republish false statements of fact concerning Plaintiffs.

539.     Defendants' publications included, among the other untrue and defamatory assertions alleged in the preceding paragraphs:

   a.   That Plaintiffs engaged in "bizarre conspiracy theories," were "QAnon-aligned," and improperly exploited law-enforcement databases for partisan purposes;

   b.   That Plaintiffs engaged in illegal activity;

   c.   That Plaintiffs oversaw a "botched" child-predator sting and facilitated perjury in its execution;

   d.   That Plaintiffs misused or "raided" sensitive law-enforcement and federal banking data for political enemies;

e. That Plaintiffs threatened or condoned violence against judges, prosecutors, and TBI agents;

f. That Plaintiffs evaded and "refused to answer" journalistic inquiries to conceal their misconduct; and

g. That Plaintiffs resigned or retired to escape criminal culpability.

540. Each of the foregoing statements was false, defamatory, and was published or republished by Defendants to persons other than Plaintiffs, including, but not limited to, viewers, readers, and subscribers of national and local broadcasts, digital web-sites, podcasts, and social-media channels.

541. Defendants knew or, in the exercise of reasonable journalistic care, should have known that the statements were false, misleading, and unsupported by any credible evidence. By recklessly disregarding the truth or with actual malice, Defendants published these statements with the intent to harm Plaintiffs' reputations and divert public scrutiny from the real issues of government transparency and due-process.

542. Defendants' wrongful conduct directly injured Plaintiffs by:

a. Tarnishing their reputations in the law-enforcement community and the public at large;

b. Causing Plaintiffs to suffer emotional distress, humiliation, and anxiety;

c. Compelling Plaintiffs to expend significant time, money, and legal resources to correct the record; and

d. Threatening Plaintiffs' future employment and career advancement within public service.

543.     As a proximate result of Defendants' defamation, Plaintiffs have suffered general and special damages in an amount to be proved at trial, including but not limited to loss of reputation, emotional distress, and attorneys' fees.

## COUNT VI: FALSE LIGHT – TENNESSEE LAW

### (Plaintiffs Shawn Taylor and Bryan Morris Against All Defendants)

544.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

545.     At all relevant times, Plaintiffs Shawn Taylor and Bryan Morris were respected law-enforcement professionals who enjoyed unblemished reputations for integrity, competence, and fidelity to the rule of law.

546.     Defendants—including Kim Kelley, Phillip Joseph Drake, Phil Williams, Scripps Media, Inc., NewsChannel 5, and each of the other media entities and individuals who authored, published, republished, or otherwise disseminated the challenged content—gave publicity to numerous false and misleading statements and innuendoes concerning Plaintiffs. Such statements were broadcast, published, and republished to the public at large and to so many persons that they were substantially certain to become public knowledge.

547.     The matter publicized by Defendants placed Plaintiffs in a **false light** that would be highly offensive to a reasonable person. Defendants repeatedly portrayed Plaintiffs as:

   a. Extremist zealots who propagated "bizarre conspiracy theories" and aligned themselves with QAnon;

   b. Criminal actors who misused sensitive law-enforcement and federal data for partisan ends;

   c. Perjurers whose child-predator sting was "botched" and legally defective;

      d.   Instigators of threats or violence against judges, prosecutors, and TBI agents; and

      e.   Evasive public figures who "refused to answer questions."

548.     Each of these characterizations is false and presents Plaintiffs in a sensational, defamatory light contrary to the truth.

549.     Defendants made these false statements and innuendoes with knowledge of their falsity or with reckless disregard for whether they were true or false, and with deliberate indifference to the highly offensive false light in which Plaintiffs would be placed. Defendants intentionally ignored or suppressed readily available evidence disproving their sensational claims and instead chose to advance a narrative of extremism and criminality for the sake of ratings and page views.

550.     Because Plaintiffs are public officials and the matters involve issues of public concern, Defendants acted with **actual malice**, publishing these false and misleading depictions with knowledge of their falsity or with reckless disregard for the truth.

551.     As a direct and proximate result of Defendants' wrongful invasion of Plaintiffs' privacy by false light publicity, Plaintiffs have suffered and continue to suffer:

      a.   Severe emotional distress, including embarrassment, humiliation, anxiety, and mental anguish;

      b.   Injury to their inner peace and personal dignity; and

      c.   Impairment of their personal relationships and standing in the law-enforcement community and the public at large.

552.     Plaintiffs are entitled to recover from Defendants their actual and compensatory damages, including those for emotional distress and injury to their inner person, in an

amount to be proven at trial; punitive damages to punish and deter Defendants' willful and malicious conduct; pre- and post-judgment interest; and their costs and attorneys' fees.

## COUNT VII: DEFAMATION BY IMPLICATION OR INNUENDO – TENNESSEE LAW

### (Plaintiffs Shawn Taylor and Bryan Morris Against All Defendants)

553.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

554.    Plaintiffs Shawn Taylor and Bryan Morris are public figures and respected law-enforcement officers whose reputations for integrity and professionalism are vital to their careers and public trust.

555.    To the extent that Defendants published any truthful facts the Defendants juxtaposed those facts and omitted material context in a manner that implied Plaintiffs were guilty of, *inter alia*, criminal misconduct, perjury, misuse of confidential data, and extremist affiliations.

556.    To the extent that any individual statements were literally true, the overall implication conveyed by Defendants was false and unprivileged: namely, that Plaintiffs had orchestrated bogus conspiracy stings, engaged in criminal misconduct, suborned or facilitated perjury under oath, improperly accessed or "raided" law-enforcement and federal databases, and resigned to evade prosecution. A reasonable viewer or reader, given the way these truths were edited and sequenced, would infer that Plaintiffs were lawbreakers rather than law-abiding officers.

557.    Defendants acted with actual malice, publishing and republishing these misleading juxtapositions and omissions despite knowing—or in reckless disregard of—the fact that

no charges had been filed, no court had found perjury, and proper legal protocols governed every step of Plaintiffs' investigations.

558.     As a direct and proximate result of Defendants' defamatory implications, Plaintiffs have suffered:

    a.  Injury to their reputations in the law-enforcement community and the public at large:

    b.  Emotional distress, humiliation, and mental anguish;

    c.  Loss of standing, goodwill, and future career opportunities within public safety; and

    d.  Quantifiable economic losses, including attorneys' fees, costs to clear their names, and reduced income prospects.

**COUNT VIII: CONSPIRACY – TENNESSEE LAW**

**(Plaintiffs Shawn Taylor and Bryan Morris Against All Defendants)**

559.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

560.     The Defendants formed a common design or agreement among themselves, including with Does 1-25, to commit unlawful acts, or to commit lawful acts by unlawful means, including but not limited to, defamation, false light, and disparagement of Plaintiffs;

561.     The Defendants engaged in multiple overt acts in furtherance of their unlawful conspiracy, including coordinating a smear campaign, releasing secret recordings, and publishing and posting false accusations, which acts included engaging in overt acts with Does 1-25 and which acts directly caused injury to Plaintiffs.

562. As a direct and proximate result of the Defendants' unlawful conspiracy, including the named Defendants conspiring with Does 1-25, Plaintiffs have been damaged in their reputations, prospective business and employment relationships, and have suffered economic loss, emotional harm, and the destruction of Candler's trade-secret identity.

## DAMAGES

563. Plaintiffs bring this suit for all damages recoverable under Tennessee and federal law.

564. Plaintiffs seek an award of punitive damages against the Defendants, jointly and severally, for the Defendants intentional, reckless, malicious and fraudulent conduct in an amount sufficient to punish the Defendants wrongful conduct and to deter the Defendants and others from similar misconduct in the future.

565. Plaintiffs have experienced and will continue to experience damages to their persons, business interests, and property interest, including, but not limited to the following:

   a. Lost wages,

   b. Out-of-pocket expenses,

   c. Damage to the professional reputations,

   d. Loss of career opportunities and future career opportunities

   e. Loss of case productivity effecting performance evaluations, promotions, and continued employment in specialized roles;

   f. Exclusion from professional circles;

   g. Inability to work in specialized roles;

   h. Loss of standing in the law enforcement community;

i.   Loss of professional standing and the economic value of professional standing;

j.   Loss of earnings potential in current and future employment;

k.   Loss of cases and investigative files, which is a unique form of intellectual and professional property in the field of law enforcement;

l.   Increased likelihood of early retirement or termination due to the false allegations and subsequent fallout, directly impacting the benefits accruing through continued employment, including benefits, accrued leave, and retirement contributions;

m.   Loss of professional equipment and resources, including access to investigative tools necessary for fulfilling their roles, further diminishing their property interests in their assigned work;

n.   Devaluation of professional credentials, which carry value in employment or consulting opportunities, due to the false allegations of the Defendants

o.   Damages for mental anguish and emotional distress;

p.   Damages for loss of goodwill and public trust;

q.   Damages for professional isolation leading to financial and career setbacks; and

r.   Increased legal and financial burdens, including legal costs for representation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray:

1.   That process issue, requiring the Defendants to answer in the time prescribed by law;

2.   That Plaintiffs be awarded a judgment and all damages, including actual and compensatory damages, for invasion of privacy, as well as any further relief the Court deems equitable and just;

3. That Plaintiffs be awarded a judgment and all damages recoverable under Tennessee law for the Defendants' defamation of Plaintiffs, including but not limited to actual damages for injury to reputation, mental anguish, and other relief the Court deems proper;

4. That Plaintiffs be awarded a judgment and all damages recoverable under Tennessee law for the Defendants' defamation by implication or innuendo, including actual, compensatory, and other appropriate damages plus any additional relief the Court finds just and proper;

5. That Plaintiffs be awarded all damages recoverable under Tennessee law for Defendants' invasion of privacy by false light, including actual and compensatory damages for mental anguish, humiliation, and injury to their person, together with pre- and post-judgment interest.

6. That Plaintiffs be awarded all damages proximately caused by Defendants' civil conspiracy, including compensatory and consequential damages for interference with business relationships, reputational harm, and emotional distress, together with pre- and post-judgment interest.

7. That this Court enter judgment against Defendants, holding them jointly and severally liable for their roles in conspiring to conduct the RICO enterprise through a pattern of racketeering activity;

8. Treble damages, attorneys' fees, costs, and all other relief authorized by virtue of the Defendants' violations of the Racketeering Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961–1968;

9. That Plaintiffs be awarded a judgment from and against the Defendants for actual and compensatory damages in an amount in accordance with the proof.

10. That this Court enter an award of punitive damages against the Defendants in an amount sufficient to deter others from like conduct in the future, in an amount of ten million dollars for each Plaintiff, or a greater amount if proven at trial;

11. That this Court enter judgment against Defendants, jointly and severally, for damages (including treble damages), attorneys' fees, costs, and any such other relief as the Court deems fair and equitable;

12. That Plaintiffs be awarded pre- and post-judgment interest on all sums awarded;

13. That Plaintiffs be awarded their court costs and discretionary costs in this matter; and

14. For such other, general relief to which the Plaintiffs are entitled.

**Plaintiff demands a trial by jury for all issues so triable.**

Respectfully submitted,

_/s/ Bryant Kroll_
Bryant Kroll (#33394)
The Law Office of Bryant Kroll
P.O. Box 219,
Pegram, TN 37143
Bryant@BryantKroll.com
Office: (615) 994-1837

*Attorney for Plaintiffs*